1

2

3

4                          UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    BEIJING MEISHE NETWORK                    Case No. 23-cv-06012-SI
     TECHNOLOGY CO., LTD.,
8
            Plaintiff,
9                                              ORDER GRANTING IN PART AND
        v.                                     DENYING IN PART DEFENDANTS'
10                                             MOTION TO DISMISS PLAINTIFF'S
                                               FOURTH AMENDED COMPLAINT
     TIKTOK INC., et al.,
11                                             Re: Dkt. No. 436
            Defendants.
12

13          Before the Court is defendants' motion to dismiss plaintiff's fourth amended complaint.  Dkt.

14   No. 436.  Plaintiff opposes.  Dkt. No. 443.  The Court heard oral argument on this motion on July

15   12, 2024.  For the reasons set forth below, the Court GRANTS defendants' motion as to the Lanham

16   Act claim without leave to amend and DENIES defendants' motion as to the copyright infringement

17   and trade dress misappropriation claims.

18

19                                      **BACKGROUND**[1]

20          On April 23, 2024, this Court granted defendants' motion to dismiss plaintiff's third

21   amended complaint ("TAC") with leave to amend.  Dkt. No. 429.  Plaintiff Beijing Meishe Network

22   Technology Co., Ltd. ("Meishe") filed its fourth amended complaint on May 14, 2024.  Dkt. No.

23   433 ("FOAC").  This complaint alleges four causes of action against defendants TikTok Inc.,

24   TikTok Pte. Ltd., ByteDance Ltd., and ByteDance Inc. (collectively, "defendants"):  copyright

25   infringement,  violation  of  17  U.S.C.  §  1202  (the  Digital  Millenium  Copyright  Act),

26

27          [1] For purposes of this motion to dismiss, the Court treats as true the factual allegations as
     stated in plaintiff's complaint and draws all reasonable inferences in plaintiff's favor.  *See Usher v.*
28   *City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

United States District Court
Northern District of California

1  misappropriation of trade secrets, and Lanham Act false advertising. *Id.* ¶ 1. The FOAC includes

2  many new allegations.

3      Meishe is a private company established in 2014 under the laws of the People's Republic of

4  China with a principal place of business in Beijing. *Id.* ¶ 19. It is a "smart video and audio total

5  solution service provider whose research and development team has been focusing on the

6  development of the video and audio field for more than twenty years." *Id.* ¶ 14. It is the owner of

7  the "Meishe app, a computer program that enables users to complete professional-level video and

8  audio editing processing on the mobile side through simple operations, making high quality video

9  and audio clips." *Id.* ¶ 73. Meishe "developed the Meishe app and further developed the Meishe

10 SDK [software development kit] and other software that provide users with video and audio editing

11 functions." *Id.* ¶ 74.

12     TikTok Inc. is a California corporation with a "regular and established place of business in

13 Austin, Texas." *Id.* ¶ 20. TikTok Pte. Ltd. is a Singapore corporation with its principal place of

14 business in Singapore. *Id.* ¶ 21. ByteDance Ltd. is a Cayman Islands corporation with offices in

15 the United States. *Id.* ¶ 22. ByteDance Inc. is a Delaware corporation. *Id.* ¶ 23. ByteDance Ltd.

16 is the parent and owner of TikTok Inc., TikTok Pte. Ltd., and ByteDance Inc. *Id.* ¶ 24. ByteDance

17 Ltd. developed the TikTok app around May 2017 and operates and controls the app in the United

18 States and elsewhere outside of China through its subsidiaries and affiliates, including the other

19 defendants in this case. *Id.* ¶¶ 27, 76.[2] The TikTok app "allows users to create short videos, which

20 often feature music in the background and can be sped up, slowed down, or edited with a filter." *Id.*

21 ¶ 76. On information and belief, defendants operate ByteDance Ltd.'s TikTok business in the

22 United States as a joint enterprise. *Id.* ¶ 32.

23     Meishe brings this action related to its "asserted highly confidential, independently

24 developed registered and unregistered source code, all of which is subject to copyright protection

25 (hereinafter 'Copyrighted Works')." *Id.* ¶ 1. Meishe registered portions of its software with the

27     [2] The TikTok app is the international version of a Chinese application called Douyin. *Id.* ¶
28 76.

United States District Court
Northern District of California

Copyright Protection Centre of China ("CPCC") with registration numbers: 2015SR227927 (transfer of 2014SR205312), 2018SR037751, 2018SR037747, 2018SR038324, 2018SR218096, 2018SR218287, 2019SR0899912, and 2020SR0291426. *Id.* ¶¶ 1, 74. Meishe lists completion dates for the CPCC-registered copyrights. *See id.* ¶ 104. Meishe is the "owner of copyrights in its highly confidential, independently-developed source code and derived object code, which have been fixed in tangible mediums before the filing date of this lawsuit regardless of registration status." *Id.* ¶ 74. Meishe's "asserted Copyrighted Works include specifically identified source code modules within the following Meishe software: Meishe's App v1.0, App v1.3 revision 2631, App v1.5, App v2.5.4, NvStreamingSDK v1.0.1, NvStreamingSDK v1.1.1, NvStreamingSDK v1.3.1, NvStreamingSDK 1.13.1, NvStreamingSDK v1.15.1, NvStreamingSDK v1.16.1 commit 4f049e2100cf419d0f3602c7f13f647edf79cac7, NvStreamingSDK 2.12.1, NvStreamingSDK2.13.1, NvStreamingSDK 2.14.1 commit 0f6e86a4fac61ff96c9465093ac45b1350726831, and NvBSEdit revision 63." *Id.* ¶¶ 4, 74. Meishe alleges that all its asserted source code has been provided to defendants on computers and it has further identified each asserted source code module in interrogatory responses. *See id.* ¶ 75, Dkt. No. 433, Ex. O.

Meishe "has the exclusive rights to reproduce, display, and distribute the Copyrighted Works," including the registered copyrights listed above, "as well as its copyrighted source code regardless of registration." *Id.* ¶ 105. Prior to filing the FOAC, Meishe provided defendants' counsel and experts a copy of the China copyright registrations and associated material and "all asserted Copyrighted Works including copyrighted registered and unregistered source code files, and Defendants experts have spent several days reviewing that code." *Id.* ¶¶ 4-6, 95.

Meishe alleges that defendants "infringe upon Meishe's Copyrighted Works, including its source code and software derived from being compiled from its source code, including but not limited to the TikTok software application and website (hereinafter, 'TikTok app'), the Faceu software application, the CapCut software application, the Lemon8 software application, the 轻颜 software application, and the BytePlus Video Editor SDK (collectively, 'Accused Software'). *Id.* ¶ 15.

In March 2021, Meishe discovered that a "series of apps belonging to ByteDance, Ltd. had

infringed Meishe's Copyrighted Works since at least 2018." *Id.* ¶ 79.  These apps include, but were not limited to, TikTok, Douyin, Jianying, and CapCut. *Id.* "Meishe personnel conducted an analysis between code of Meishe app and that of TikTok app [that] shows that the code used to implement video and audio editing functions in the two apps is strikingly similar, proving that Defendants copied Meishe's copyrighted work." *Id.*; *see also* ¶ 115.[3]  "Meishe's analysis showed that numerous source code methods contained identical names to Meishe's copyrighted source code, including typographical errors." *Id.* ¶ 80.

Defendants allegedly had access to Meishe's source code "at least through Meishe's former employee, Mr. Jing Xie, who is currently working for defendants." *Id.* ¶ 81.  Mr. Xie began his employment with a Meishe affiliate in 2007 and began his employment with Meishe in March 2015. *Id.* ¶¶ 85, 160, 199.  As a C++ R&D engineer, Mr. Xie "directly participated in the development of Meishe's software and the subsequent upgrades of various versions until his resignation on or around June 8, 2015." *Id.* ¶ 85.  Mr. Xie also "had access to and control over Meishe's trade secrets, proprietary software code, and/or other confidential information" during his employment with Meishe and its affiliate. *Id.* ¶ 84.  When Mr. Xie resigned on June 8, 2015, he "subsequently knowingly and illegally took Meishe's trade secrets, copyrighted computer code, and other confidential information" and "subsequently provided it to one or more later employers who incorporated that code into other software including but not limited to TikTok and the Accused Software." *Id.* ¶¶ 88, 165, 204.  According to Mr. Xie's LinkedIn and Maimai[4] pages, he began his employment at ByteDance as "multimedia audio and video director" around October 2017. *Id.* ¶ 90. Mr. Xie "was in charge of ByteDance software development groups responsible for audio/video creation and editing source code." *Id.* ¶¶ 91, 167, 206.  At certain times, he "was also in charge of the group of U.S. engineers responsible for integrating source code into the TikTok app." *Id.* "Defendants were aware of [his] prior employment with Meishe, and his work with Meishe's source

---

[3] Meishe conducted a comparison between "decompiled 'TikTok v8.5.0' object code" obtained from public channels and "decompiled 'Meishe v2.5.4' object code." *Id.* ¶ 80.  At that time, Meishe could not obtain the source code of the TikTok app.  *Id.*

[4] Maimai is a Chinese version of LinkedIn. *Id.* ¶ 90.

United States District Court
Northern District of California

1    code." *Id.* ¶¶ 92, 113, 172, 210.

2          In or around March 2021, Meishe audited Mr. Xie's activities and "discovered that on or

3    around June 3, 2015, he downloaded Meishe's Asserted Trade Secrets source code." *Id.* ¶¶ 170,

4    208.  During his employment with Meishe and its affiliate, each time Mr. Xie modified Meishe

5    software in the "SVN system," he first had to "check out the corresponding subtree of the repository

6    to get a so-called 'working copy.'" *Id.* ¶ 86.  The "SVN system recorded all the relevant operations

7    in its logs," and "[t]hese logs prove that Mr. Jing Xie accessed Meishe's source code and

8    downloaded the source code." *Id.*  On or around May 14, 2021, Meishe "notarized the SVN log and

9    checked the committed log of Jing Xie on SVN." *Id.* ¶¶ 170, 208.

10         Defendants' "source code contains identical, verbatim portions of Meishe's asserted

11   copyrighted independently-developed source code." *Id.* ¶¶ 107, 157, 196.  Certain "copied portions

12   also include typographical errors and source code comments created by Meishe's source code

13   authors." *Id.*  Meishe provides two side-by-side comparison examples of its code and defendants'

14   code in the FOAC.  *See id.* ¶¶ 107-108.  Meishe has specifically identified defendants' "source code

15   modules that contain identical portions of Meishe's source code, including copied typographical

16   errors and code comments" in its interrogatory responses.  *Id.* ¶¶ 109, 159, 197; *see* Dkt. No. 433,

17   Ex. P.  "Meishe has identified at least 115 of its source code modules associated with at least 134

18   ByteDance/TikTok source code modules . . . that contain directly copied code." *Id.* ¶ 109.  "Meishe

19   also identified specific functions that contain stolen source code." *Id.*; *see* Dkt. No. 433, Ex. P at

20   91-118.  "Meishe's source code has been utilized in the Accused Software for different operating

21   systems, including but not limited to Android and iOS." *Id.* ¶¶ 110, 159, 198.  Additionally, "many

22   of Defendants' source code module names are identical to Meishe's module names, with the

23   exception of a small prefix modification." *Id.*  Meishe provides examples of this in the FOAC.  *See*

24   *id.* ¶ 110.  Defendants allegedly "incorporated Meishe's Copyrighted Works into its products

25   starting in September 2018" and its "Copyrighted Works remain incorporated into Defendants'

26   products to this day." *Id.* ¶¶ 117-118.

27         Defendants' code "includes portions of Plaintiff's Copyrighted Works that have never been

28   made public." *Id.* ¶ 119.  Defendants "have and will continue" to profit from "inducing users to

United States District Court
Northern District of California

download and use the TikTok app and other Accused Software." *Id.* ¶ 122.  Additionally, "[u]pon information and belief, on or around April 2020, Defendants took steps to obfuscate its software code in order to conceal its infringement." *Id.* ¶ 121.

Defendants were "aware of the infringing activity and induced, caused, or materially contributed to the infringing conduct." *Id.* ¶¶ 122, 124.  "Meishe previously filed multiple lawsuits against ByteDance alleging that ByteDance incorporated Meishe's protected code in its products." *Id.* ¶ 127.  "On June 29, 2023 the Beijing Intellectual Property Court ruled in favor of Meishe in six separate actions for copyright infringement against several Chinese subsidiaries of [] ByteDance, Ltd." *Id.* ¶ 128.  That court held, among other things, that the "ByteDance defendants infringed Meishe's copyrighted code" and the ByteDance defendants "had access to Meishe's SDK source code, without Meishe's permission." *Id.*

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  A pleading must contain allegations that have "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556

1     U.S. at 678. Dismissal under Rule 12(b)(6) is proper when the complaint "lacks a cognizable legal

2     theory" or "fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple,*

3     *Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).

4         If the Court dismisses the complaint, it must then decide whether to grant leave to amend.

5     The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no

6     request to amend the pleading was made, unless it determines that the pleading could not possibly

7     be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000)

8     (citations and internal quotation marks omitted).

9

10                         **DISCUSSION**

11   **I.**     **Copyright Infringement Claim**

12        **A.**      **Whether Meishe Has Plausibly Pled Access to Copyrighted Works Created**

13                 **After Mr. Xie Left Meishe**

14         In its April 23, 2024 order, the Court dismissed with leave to amend Meishe's copyright

15     infringement claims as to copyrighted works created after Mr. Xie's departure from Meishe, finding

16     that Meishe had pled insufficient facts to plausibly allege access to these copyrighted works. Dkt.

17     No. 429 at 10.

18         To establish copyright infringement, a plaintiff must prove "(1) ownership of a valid

19     copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc.*

20     *v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Where there is no direct evidence of copying,

21     "copying may be established by showing that the infringer had access to plaintiff's copyrighted work

22     and that the works at issue are substantially similar in their protected elements." *Cavalier v. Random*

23     *House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). "Access is proven when the plaintiff shows that the

24     defendant had an opportunity to view or to copy plaintiff's work." *Sid & Marty Krofft Television*

25     *Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977). "[A]n opportunity to

26     view or to copy plaintiff's work" is often described as "providing a 'reasonable opportunity' or

27     'reasonable possibility' of viewing the plaintiff's work." *Three Boys Music Corp. v. Bolton*, 212

28     F.3d 477, 482 (9th Cir. 2000). Copying may also be established by pleading facts plausibly showing

United States District Court
Northern District of California

7

1    "that the two works in question are strikingly similar."  *Malibu Textiles, Inc. v. Label Lane*

2    *International, Inc.*, 922 F.3d 946, 952 (9th Cir. 2019).  "Where two works are strikingly similar,

3    access may be inferred."  *Id.* (citing *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 987-88

4    (9th Cir. 2017)).

5         In the FOAC, Meishe alleges that in addition to source code developed by Meishe during

6    Mr. Xie's employment, "Defendants' source code also contains identical, verbatim copies of source

7    code developed after Mr. Jing Xie's departure."  FOAC ¶ 114.  "For example, certain source code

8    text that did not exist until Meishe app v.2.5.4 (which was completed around October 2016, over a

9    year after Mr. Jing Xie's departure from Meishe) is copied verbatim into Defendants' source code."

10   *Id.*    Meishe    provides    a    visual    comparison    of    excerpts    of    code    in    its    "App2.5.4

11   NVStreamingOperation.cpp" and defendants "TEStreaming Operation.cpp".  *See id.*  Meishe further

12   alleges that the identified text did not exist in Meishe's source code during Mr. Xie's employment

13   at Meishe.  *Id.*  Meishe provides a visual comparison of the last source code version allegedly in

14   development during Mr. Xie's employment, Meishe app1.5 completed on or around June 4, 2015,

15   and Meishe app v.2.5.4.  *See id.*  Mr. Xie left Meishe on or around June 8, 2015.  *Id.* ¶ 85.  Meishe

16   also alleges that multiple of defendants' employees in addition to Mr. Xie are identified as authors

17   of "verbatim code copied" from Meishe's Copyrighted Works.  *Id.* ¶ 111.

18        Defendants contend that development of Meishe app v.2.5.4 began while Mr. Xie was still

19   at Meishe so the excerpt in ¶ 114 of the FOAC "does not plausibly allege that striking similarities

20   exist in software code created after Mr. Xie left Meishe."  Dkt. No. 436 at 9.  Defendants contend

21   that the plausible explanation is that "in the four days between completion of Meishe app v.1.5 and

22   when Mr. Xie left Meishe, he had access to a portion of code that was included in Meishe app

23   v.2.5.4—but not to any other asserted source code created [] after he left Meishe."  Dkt. No. 448 at

24   4, 12.  Defendants point to Ex. O to the FOAC, which describes Meishe app v.2.5.4 as "[a]ll of the

25   asserted files listed above associated with app1.3, with removals, additions, or modifications to the

26   following files[.]"  Dkt. No. 433, Ex. O at 44.  App version 1.3 was created while Mr. Xie was at

27   Meishe.  *See* FOAC ¶ 114 (alleging that the last source code version in development during Mr.

28   Xie's employment was version 1.5).  However, defendants do not adequately address the allegation

United States District Court
Northern District of California

in ¶ 114 visually comparing Meishe app version 1.5 to version 2.5.4 and highlighting differences. *See* Dkt. No. 436 at 9 (describing this excerpt as showing "minor differences").  It is a reasonable inference that portions of the source code in app v.2.5.4 that defendants allegedly copied verbatim were not in existence prior to Mr. Xie's departure.

Defendants next contend that even if Meishe did allege striking similarity as to app v.2.5.4, "Meishe's complaint provides no plausible allegations of striking similarities from any other asserted copyrights created after Mr. Xie left Meishe." Dkt. No. 436 at 9.  Defendants point to one case from this circuit where a court found that the plaintiff failed to plead access or striking similarity as to some subject designs, but not others.  *See Klauber Brothers, Inc. v. City Chic Collective Ltd.*, No. 22-1743-MWF, 2022 WL 17184799, at *7-9 (C.D. Cal. Aug. 26, 2022).  *Klauber Brothers* involved three registered "two-dimensional artworks for purposes of lace production."  *Id.* at *1. The complaint included side-by-side comparisons of each of the three registered designs alongside the allegedly infringing products.  *See id.* at *2.

The Court finds Meishe's additional factual allegations sufficient to plausibly allege striking similarity with respect to at least one work created after Mr. Xie left Meishe (Meishe app v.2.5.4), and when two works are strikingly similar, access can be inferred.  *See Malibu Textiles*, 922 F.3d at 952.  Because Meishe has plausibly pled striking similarity as to one copyrighted work plausibly created after Mr. Xie left Meishe, the Court finds it reasonable to infer that defendants had access to other copyrighted source code created after Mr. Xie left Meishe.  Meishe may ultimately be unable to prove such access, but the Court has not been presented with controlling authority indicating that at this pleading stage, in a case involving copyrighted source code, the plaintiff must plead striking similarity as to each source code work.

### B.    Whether Meishe Has Sufficiently Alleged That its Copyrighted Works Are Exempted From the Registration Requirement Under 17 U.S.C. § 411

In its April 23, 2024 Order, the Court dismissed the copyright infringement claims with leave to amend to allege facts indicating that the works are not "United States works" within the meaning of 17 U.S.C. § 101.  Dkt. No. 429 at 16.

Foreign works are exempt from registering with the U.S. Copyright Office under 17 U.S.C. § 411(a), which is otherwise a prerequisite for standing.  *See Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 885 (2019).  The Copyright Act defines a "United States work" differently depending on whether the alleged work is a published work or an unpublished work.  *See* 17 U.S.C. § 101.  A published "United States work" is defined as a work that is first published –

(A) in the United States;

(B) simultaneously in the United States and another treaty party . . .

(C) simultaneously in the United States and a foreign nation that is not a treaty party; or

 (D) in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of audiovisual work legal entities with headquarters in, the United States."  *Id.*

An unpublished "United States work" is defined as a work in which "all the authors of the work are nationals, domiciliaries, or habitual residents of the United States, or, in the case of an unpublished audiovisual work, all the authors are legal entities with headquarters in the United States."  *Id.*  A plaintiff must "adequately allege that its works are not United States works in order to be exempt" from the registration requirement.  *UAB "Planner 5D" v. Facebook, Inc.*, No. 19-cv-03132-WHO, 2019 WL 6219223, at *6 (N.D. Cal. Nov. 21, 2019).

Meishe now alleges that its "Copyrighted Works are computer source code files that have never been made publicly available and have never been published.  As a result, the Copyrighted Works are all unpublished foreign works."  FOAC ¶ 9.  Meishe's Copyrighted Works include its registered and unregistered source code.  *Id.* ¶ 1.  Meishe alleges that its Copyrighted Works were authored by its Chinese employees in China.  *Id.* ¶ 13.

Meishe alleges in the alternative that if the Court were to find that "distribution of software applications derived from unpublished source code were to constitute a publication under copyright law, the Copyrighted Works are still foreign works . . ." *Id.* ¶ 10.  Meishe explains that source code is translated into object code, and object code files can be linked to form a software application or library file that can be used to provide functionality in other applications.  *Id.*  "While the Copyrighted Works were never published, software applications derived from that source code were

10

1   distributed, and for each application the distribution was made first in China before ever being

2   available in the United States." *Id.* ¶ 11. "Meishe's practice, and the requirements of app stores in

3   China, was to offer non-human-readable, computer-compiled software applications derived by

4   being from Meishe non-public source code to app stores in China for further distribution in China.

5   Having been first published in China, the app stores then made the compiled software applications

6   available for download in China, if approved." *Id.* "Meishe also offered non-human-readable,

7   computer-compiled software libraries derived from being from Meishe's nonpublic source code to

8   third-party developers as part of a software development kit (SDK) . . . Meishe's pattern of practice

9   was to first contact current and potential licensees of the Meishe SDK in China and offer the new

10  SDK software libraries for incorporation into their software." *Id.* ¶ 12.

11      Defendants contend that Meishe's Copyrighted Works were published, and its "admission

12  that the object code for the Meishe app was first distributed in public app stores in China is critical

13  and fatal." Dkt. No. 436 at 11.[5] Defendants go on to argue that Meishe's allegation that distribution

14  to a Chinese app store was a publication only in China is not plausible because "courts have found

15  that copyrights available to the public on the Internet carry a presumption of worldwide availability."

16  *Id.*[6] In support of this argument, defendants cite *Kernel Records Oy v. Mosley*, 694 F.3d 1294 (11th

17

18      [5] The parties dispute whether Meishe's Copyrighted Works were published. Defendants
    contend that "Meishe's act of distributing the object code is also a publication of its copyrighted
19  source code." Dkt. No. 436 at 11. They point to *GCA Corp. v. Chance*, No. C-82-1063-MHP, 1982
    WL 1281, at *2 (N.D. Cal. Aug. 31, 1982) in support. There, the plaintiff held registration
20  certificates for copyrights of its source code, and in determining the validity of the plaintiff's
    copyrights, the court held that "[b]ecause the object code is the encryption of the copyrighted source
21  code, the two are to be treated as one work; therefore, copyright of the source code protects the
    object code as well." *Id.* at *1-2. Defendants had contended that copyrighting the source code,
22  which they characterized as an unpublished work, did not protect the object code, the published
    work. *Id.* at *1. The court further held: "Nor has the copyright on the source code lost its validity
23  by publication as this code has never been published by plaintiff, a fact admitted to by defendants'
    witnesses." *Id.* The Court cannot conclude as a matter of law based on *GCA Corp.* and the other
24  out-of-circuit authorities defendants cite in their reply that Meishe's Copyrighted Works were
    published, but does not resolve this dispute because as discussed *infra*, it finds that Meishe's
25  allegations are sufficient to allege the works are not United States works regardless of whether they
    are deemed published or unpublished.

26

27      [6] "Publication" is defined under 17 U.S.C. § 101 as "the distribution of copies . . . of a work
    to the public for sale or other transfer of ownership . . . The offering to distribute copies or
28  phonorecords to a group of persons for purposes of further distribution . . . constitutes publication."
    Meishe alleges in the FOAC that if the Court were "to find that distribution of software applications

United States District Court
Northern District of California

Cir. 2012). There, the Eleventh Circuit explained that "[a]lthough it may be possible to presume simultaneous worldwide availability of a public website, such a presumption could not apply to restricted websites, peer-to-peer networks, and email." *Id.* at 1305-06. This decision was at the summary judgment stage and involved a copyright holder of a song suing parties associated with its release. *See id.* at 1296. Defendants also cite *UAB "Planner 5D"*, 2019 WL 6219223. There, the plaintiff operated a home design website that allowed users to create virtual interior design scenes using a library of virtual objects and claimed copyright ownership in these objects and scenes and in their compilation. *Id.* at *1. In determining whether the plaintiff had "sufficiently alleged that its works are unpublished," the court found the plaintiff's allegation that access and use of the objects and scenes was "strictly limited" by its Terms of Service and prohibited by the "structure" of the website was "not enough to plead that [the plaintiff's] works were merely displayed and not published. Plaintiff [] must allege facts that show that users were not able to copy the works on its website." *Id.* at *7. Drawing all plausible inferences in favor of Meishe, the Court cannot presume based on this authority that by distributing software applications derived from its source code to app stores in China for further distribution in China the software was simultaneously available in the United States.[7] It is plausible that the Chinese app stores were only publicly available to people in China.

The Court finds that Meishe has plausibly alleged that its Copyrighted Works were first published solely in China if published and authored solely by Chinese nationals if unpublished. Defendants' motion to dismiss on this basis is DENIED.

///

---

derived from unpublished source code were to constitute publication," offering computer-compiled software applications derived from Meishe source code to app stores in China for further distribution in China constituted that publication. *See* FOAC ¶¶ 10, 11.

[7] Defendants also cite two cases where federal courts in Florida and Arizona found plaintiffs' assertions and evidence insufficient to demonstrate works were foreign works at the summary judgment stage. *See* Dkt. No. 436 at 13. These cases do not support dismissing Meishe's allegations here at the pleadings stage.

United States District Court
Northern District of California

### C.   Whether Meishe Has Adequately Pled a Violation of 17 U.S.C. § 1202

In its April 23, 2024 Order, the Court dismissed the alleged violation of 17 U.S.C. § 1202, the Digital Millenium Copyright Act ("DMCA"), on the basis that "[w]ithout alleging some facts identifying what source code or software had CMI [copyright management information] removed or to describe what the removed or altered CMI was, without identifying what CMI was distributed and how it was distributed, and without pleading facts in support of the required mental state, Meishe has failed to state a claim under the DMCA." Dkt. No. 429 at 13.

Section 1202(a) of the DMCA provides that: "No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement--(1) provide copyright management information that is false, or (2) distribute or import for distribution copyright management information that is false." 17 U.S.C. § 1202(a). Section 1202(b) provides that:

> No person shall, without the authority of the copyright owner or the law—(1) intentionally remove or alter any copyright management information; (2) distribute or import for distribution any copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or (3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or . . . having reasonable grounds to know that it will induce, enable, facilitate, or conceal an infringement of any right under this title.[8]

17 U.S.C. § 1202(b). In the Ninth Circuit, "a plaintiff bringing a Section 1202(b) claim must make an affirmative showing, such as by demonstrating a past 'pattern of conduct' or 'modus operandi', that the defendant was aware or had reasonable grounds to be aware of the probable future impact of its actions." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 674 (9th Cir. 2018). At the pleading stage, the plaintiff "must plead facts plausibly showing that the alleged infringer had this required mental state." *Andersen v. Stability AI Ltd.*, No. 23-cv-201-WHO, 2023 WL 7132064, at *10 (N.D. Cal. Oct. 30, 2023).

---

[8] The "knowing or . . . having reasonable grounds to know" requirement also applies to § 1202(a).

United States District Court
Northern District of California

Meishe adds the following allegations to the FOAC.[9]  "Each of Meishe's asserted source code modules contain [CMI] such as a copyright notice, a reservation of rights, the 'birth date', ownership and authorship . . . Defendants, in their source code, replaced Meishe's CMI with its own CMI."  FOAC ¶ 134; referencing Dkt. No. 182, Ex. B (side-by-side comparison of the first two pages of app1.5 "NvStreamingOperation.cpp" and ByteDance's "TEStreamingOperation.cpp").  Meishe further alleges that many of defendants' source code module names are identical to its module names with the exception of a "small prefix modification" and that defendants' "matching source code modules have removed Meishe's CMI" and replaced it with a copyright notice for ByteDance, Inc.  *Id.* ¶¶ 135-37.  "Defendants' matching source code modules identify the author as Mr. Jing Xie, as well as other of Defendants' software engineers."  *Id.* ¶ 138.  "Defendants' software engineers, including [Mr. Xie], removed Meishe's CMI and replaced it with their own in order to conceal the theft of source code from Meishe, take credit for creation of the copied code, and to conceal infringement."  *Id.* ¶ 139.  Meishe alleges facts about distribution of the source code by defendants and distribution of the TikTok App and other Accused Software allegedly derived from Meishe's source code with Meishe's CMI removed and replaced.  *Id.* ¶¶ 141-42.  Lastly, Meishe alleges that "the findings of the Beijing Intellectual Property Court . . . demonstrate a pattern of conduct or modus operandi of Defendants that Defendants were aware or had reasonable grounds to be aware [] that their actions would induce, enable, facilitate, or conceal infringement."  *Id.* ¶ 142.

Defendants first contend that Meishe has failed to identify any Meishe CMI that was removed or altered.  Dkt. No. 436 at 14; Dkt. No. 448 at 6.  The side-by-side comparison at Dkt. No. 182, Ex. B referenced by Meishe in the FOAC lists the copyright holder for app1.5 to be "Copyright China Digital Video (Beijing) Limited" and the author "NewAuto video team."  Meishe confirmed at the July 12, 2024 hearing that this is a predecessor to Meishe.

Defendants next contend that Meishe does not plausibly allege the required mental condition.  Dkt. No. 436 at 14; Dkt. No. 448 at 6-7.  "While at the pleading stage, mental conditions

---

[9] ¶ 133 of the FOAC is nearly identical to ¶ 77 of the TAC, which the Court concluded in its April 23, 2024 Order simply reiterated the legal standard and was insufficient.  *See* Dkt. No. 429 at 13.

generally need not be alleged with specificity, a plaintiff must still allege sufficient facts to support the reasonable inference that the defendant knew or had a reasonable basis to know that the removal or alteration of CMI . . . would aid infringement." *Anderson*, 2023 WL 7132064, at *10 (internal quotations marks and citations omitted). Defendants cite to *Philpot v. Alternet Media, Inc.*, No. 18-cv-4479-TSH, 2018 WL 6267876, at *5 (N.D. Cal. Nov. 30, 2018) in support of their position, where the court found the following allegations insufficient to plead the required mental state: "Alternet should have known its alleged removal of the CMI . . . would induce, enable, facilitate, or conceal an infringement." Meishe alleges more here. Defendants also point to *Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1175 (N.D. Cal. 2019), where the court agreed with defendants that the plaintiff's allegations were insufficient where he "merely alleged that his photographs 'were altered to remove certain of [his] copyright management information' without providing any facts to identify which photographs had CMI removed or to describe what the removed or altered CMI was" and "[r]egarding distribution, [] simply reiterate[d] the legal standard and allege[d] no facts in support." Again, Meishe has alleged more here.

In their reply, defendants pivot to another argument: because Meishe alleges its source code is hidden from the public and its CMI is contained in its source code files, "it is implausible for CMI that Meishe alleges users cannot see or even know whether it exists, to induce, enable, facilitate, or conceal alleged infringement." Dkt. No. 448 at 7. In support, Meishe points to *Tremblay v. OpenAI, Inc.*, where a court in this district reasoned in dismissing a §1202(b)(1) claim that even if the plaintiffs had provided facts showing the defendants' removed CMI from books used during the ChatGPT training process, the plaintiffs had not "shown how omitting CMI in the copies used in the training set gave Defendants reasonable grounds to know that ChatGPT's output would induce, enable, facilitate, or conceal infringement." Nos. 23-cv-03223-AMO, 23-cv-03416-AMO, 2024 WL 557720, at *4 (N.D. Cal. Feb. 12, 2024). In *Stevens*, a case at the summary judgment stage, the Ninth Circuit explained that the "induce, enable, facilitate or conceal" requirement "is intended to limit liability in some fashion – specifically, to instances in which the defendant knows or has a reasonable basis to know that the removal or alteration of CMI or the distribution of works with

CMI removed *will* aid infringement." 899 F.3d at 674-75.[10]  *Tremblay* is factually distinct and did not involve allegations that the defendant removed CMI from source code that it then distributed. Drawing all inferences in favor of Meishe, the Court finds that Meishe's new allegations plausibly plead the requisite mental state.[11]

Lastly, defendants contend that actionable conduct under the DMCA requires that the original work and copy be identical and that Meishe does not plead facts "to support a plausible claim that the software Defendants allegedly copied is identical to its own." Dkt. No. 436 at 15; Dkt. No. 448 at 7.  Meishe alleges that defendants' source code contains identical, verbatim portions of Meishe's source code.  *See* FOAC ¶¶ 107-109.  Defendants argue that "[e]ven if portions are identical, the copy and original works in total must be identical." Dkt. No. 448 at 7.  In support, defendants point to *Doe 1 v. GitHub, Inc.*, where a court in this district held that Section 1202(b) claims require that copies be "identical." No. 22-cv-06823-JST, 2024 WL 235217, at *8 (N.D. Cal. Jan. 3, 2024).  As plaintiffs point out, the supporting cases cited in the *GitHub* opinion did not involve alleged copying of source code.  *See id.* at *9.[12]

---

[10] The court concluded that to satisfy the knowledge requirement, "the plaintiff must provide evidence from which one can infer that future infringement is likely, albeit not certain, to occur as a result of the removal or alteration of CMI."  *Stevens*, 899 F.3d at 675.

[11] Defendants take issue with ¶ 139 of the FOAC, arguing that Meishe's factual allegations are directed toward Mr. Xie, not defendants. Dkt. No. 436 at 14.  Reading the allegations as a whole and drawing all reasonable inferences in favor of Meishe, the Court disagrees.  Furthermore, Mr. Xie's mental state, as an employee of defendants, could be attributed to defendants.  *See Spectravest, Inc. v. Fleet St., Ltd.*, No. C-88-4539 RFP, 1989 U.S. Dist. LEXIS 16594, at *11 (N.D. Cal. Aug. 22, 1989) ("Defendant Fleet Street contends that it is not liable for copyright infringement as it was unaware of Ms. Katz' actions.  However, the normal rule of *respondeat superior* applies to copyright infringement by an employee who is acting within the scope of her employment.").
Defendants also refer the Court to *LIVN Worldwide Ltd. v. Vubiquity Inc.*, No. 21-cv-9589-AB, 2022 WL 18278580 (C.D. Cal. July 22, 2022).  This case involved allegations that the defendant uploaded an episode series on the iTunes platform for sale and download by the public and in doing so "knowingly provided false copyright and release date information for the [s]eries." *Id.* at *1.  The plaintiff was the exclusive licensee authorized to distribute and sell the series. *Id.*  The court found that the alleged facts did not plausibly establish an intent to induce or enable infringement "because falsely identifying a copyright owner does not seem to further, or have any correlation with, iTunes subscribers buying the series, or with any sort of infringement in this case." *Id.* at *6.  This case is factually distinct, and likewise does not persuade the Court that Meishe's allegations here are insufficient.

[12] Additionally, one of these cases noted that the plaintiff was correct that the defendants had not cited controlling case law on this point but went on to note that other courts had applied the "identical work standard" and found "the reasoning of these cases to be persuasive." *Advanta-STAR*

Meishe points to cases where courts in this circuit have declined to require that the work that removes CMI be an exact copy of the original work. *See Oracle Int'l Corp. v. Rimini St., Inc.*, No. 2:14-cv-01699-MMD-DJA, 2023 U.S. Dist. LEXIS 126766, at *279-80 (D. Nev. July 24, 2023) (rejecting at a bench trial the defendant's argument that a work that removes CMI must be an exact copy of the original work because "[t]his construction of the DMCA would weaken the statute's intended protections for copyright holders"); *Splunk Inc. v. Cribl, Inc.*, 662 F. Supp. 3d 1029, 1054 (N.D. Cal. 2023) (finding sufficient to infer knowledge on a motion to dismiss the plaintiff's allegations that the defendant "derived go-S2S from Splunk's copyrighted source code with the intention of using it for his own personal financial gain" and that the defendant "removed [] headers from proprietary source code and posted that source code to a personal, publicly accessible webpage . . . [and] later added an open-source license that 'falsely identif[ied] [CEO Sharp] as the author and/or owner of the copyright in the go-S2S code'"). Given this split in authority and the factual differences between this case and the cases on which defendants rely, the Court cannot conclude as a matter of law at this pleading stage that plaintiff's claims should be dismissed on this basis.

///

---

*Auto. Research Corp. of Am. v. Search Optics, LLC*, 672 F. Supp. 3d 1035, 1057 (S.D. Cal. 2023).

Defendants also refer the Court to two cases from the Southern District of New York. In one, the court held that "a party that puts its own CMI on work distinct from work owned by a copyright holder is not liable under Section 1202(a), even if the party's work incorporates the copyright holder's work." *Michael Grecco Prods., Inc. v. Time USA, LLC*, No. 20-cv-4875 (NRB), 2021 WL 3192543, at *5 (S.D.N.Y. July 27, 2021). In this case, the defendant created unique Time covers "using plaintiff's [p]hotographs, on which Time overlayed the Time logo, the trademarked Time red border, and text. At no time did the defendants claim ownership of the [p]hotographs." *Id.* The second case involved allegations that the defendants removed CMI from a photograph and added their own information to the image. *Crowley v. Jones*, 608 F. Supp. 3d 78, 90 (S.D.N.Y. 2022). The court similarly held with respect to a section 1202(a) claim that "a defendant cannot violate the DMCA by associating its name with a derivative work that is unquestionably a distinct work, even if the derivative work infringes a copyright." *Id.* (internal quotation marks and citations omitted).

**II.** **Misappropriation of Trade Secrets Claims**

    **A.** **Whether Meishe Has Sufficiently Alleged Domestic Acts in Furtherance of the Alleged Misappropriation Under the Defend Trade Secrets Act**

In its April 23, 2024 Order, the Court dismissed the Defend Trade Secrets Act ("DTSA") claim as to the non-US incorporated defendants ByteDance Ltd. and TikTok Pte. Ltd. with leave to amend to indicate what "acts in furtherance of the offense" were committed in the United States. Dkt. No. 429 at 19. As to the US-incorporated defendants TikTok Inc. and ByteDance Inc., the Court found the DTSA applies. *Id.* In the FOAC, Meishe adds a long paragraph of allegations regarding "acts in furtherance of offense" that were committed in the United States. *See* FOAC ¶¶ 180, 217.

Defendants contend that no acts in furtherance of the offense were committed in the United States because the "misappropriation operation" took place entirely in China and "operating, controlling, or selling software that allegedly 'embodies' Meishe's trade secrets—which, according to Meishe, were created, misappropriated, and used *in China* to create the software—does not establish that the offense of misappropriation was 'at work' in the United States." Dkt. No. 436 at 16-17. Meishe contends that acquisition, disclosure, or use of a trade secret are all misappropriations, not just the original taking. Dkt. No. 443 at 16. In their reply, defendants do not address the statutory definition of "misappropriation" that Meishe points to. *See* Dkt. No. 448 at 8-9.

Defendants cite *MedImpact Healthcare Sys., Inc. v. IVQIA Inc.*, No. 19-cv-1865-GPC-LL, 2020 WL 5064253 (S.D. Cal. Aug. 27, 2020) in support of their position. There, the court noted that "'act in furtherance of the offense' is not defined under the DTSA and district courts look to the common law as it is regularly used in federal conspiracy law." *Id.* at *15. The court then went on to quote a district court decision from the Eastern District of Texas which held: "Applied to the DTSA, *Yates* makes clear that the act in furtherance of the offense of trade secret misappropriation need not be the offense itself or any element of the offense, but it must 'manifest that the [offense] is at work' and is not simply 'a project in the minds of the' offenders or a 'fully completed operation.' Put another way, an act that occurs before the operation is underway or after it is fully

completed is not an act 'in furtherance of' the offense.'" *Luminati Networks Ltd. v. BIScience Inc.*, NO. 2:18-CV-00483-JRG, 2019 WL 2084426, at *9 (E.D. Tex. May 13, 2019) (quoting *Yates v. United States*, 354 U.S. 298, 334 (1957)). *Yates* dealt with federal conspiracy law and conspiracy as a continuing offense. *Luminati* ultimately found that the plaintiff had plausibly stated a claim actionable under the DTSA where it alleged that by "using . . . [Luminati's] trade secrets, [BiScience] has committed acts in the State of Texas and the United States." *Id.* at *11. The court found this allegation sufficient to draw a reasonable inference that the defendant used the plaintiff's trade secrets in the United States to sell its residential proxy service, "or at least committed acts in furtherance of such sales in the United States." *Id.* Meishe has alleged more here.

In *MedImpact*, the court noted that defendants "narrowly focus their argument on the act of misappropriation; however an 'act in furtherance of the offense' includes misappropriated conduct that is 'at work.'" 2020 WL 5064253, at *15. The court found sufficient domestic acts were pled where the plaintiff alleged that the defendants' representatives communicated with employees of plaintiff and plaintiff, accessed servers hosting plaintiff's software, and sent misleading communications in California. *See id.* The court reasoned that it was "during these communications that trade secret misappropriation was 'at work' by keeping MedImpact in the dark while Defendants executed their trade secret misappropriation. *Id.*

Defendants also point to *ProV Int'l Inc. v. Lucca*, No. 8:19-cv-978-T-23AAS, 2019 WL 5578880, at *3 (M.D. Fla. Oct. 29, 2019), where the court dismissed a DTSA claim where the complaint contained "no allegation suggesting that the defendants attempted to recruit an employee from the United States, that the defendants acquired in the United States the defendants' 'trade secrets,' or that the defendants used the trade secrets in the United States." Here, Meishe has plausibly alleged that its trade secrets were used in the United States.

Drawing all inferences in plaintiff's favor, the Court finds that the allegations in the FOAC are sufficient to state that "an act in furtherance of the offense" of misappropriation was committed in the United States. *See* 18 U.S.C. § 1837. The DTSA contemplates three theories of liability: acquisition, disclosure, or use. *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-cv-02177-SI, 2017 U.S. Dist. LEXIS 62109, at *9 (N.D. Cal. Apr. 24, 2017) (citing 18 U.S.C.

§ 1839(5)).  Plaintiff has adequately pled at least use of its trade secrets in the United States by the non-U.S. incorporated defendants.  Defendants' motion to dismiss the DTSA claim on this basis is therefore DENIED.

**B.      Whether Meishe Has Adequately Identified its Trade Secrets Beyond What the Court Found Sufficiently Pled in its April 23, 2024 Order**

In its April 23, 2024 Order, the Court found the following trade secret allegations sufficient for notice pleading: that Meishe is the owner of "proprietary, independently-developed software code that allows for video and audio editing, video and audio processing, video and audio release, personalized audio and video recommendations, webcasting" and "information about which portions of Meishe's software were most likely to be popular if incorporated into video editing features in smart phone applications."  Dkt. No. 429 at 18-19.  The Court granted leave to amend to clarify whether the alleged trade secrets include anything other than these trade secrets.

Meishe now alleges that its trade secrets also include Meishe's Copyrighted Works, "including the non-public source code modules indicated in" an Exhibit to the FOAC.  *Id.* ¶ 150; Dkt. No. 433, Ex. O.  This exhibit is voluminous.  Meishe alleges that this source code includes:

> Meishe's framework for processing video and audio streaming media, including but not limited to, for example, the length control mechanism of the AV processing pipeline, the streaming media engine, the node schema processing architecture for video special effect processing, the parallel processing architecture in the streaming media engine workflow, the video data common abstract interface form, video processing of the general abstract interface form, general abstract interface form of audio processing, and the multi-track processing architecture for video sources.

FOAC ¶ 150.  Meishe also asserts "trades [sic] secrets related to Meishe's confidential internal plans for future development of Meishe software and which portions of Meishe's software were most likely to be popular if incorporated into audio/video creation and editing features in smart phone and other applications."  *Id.*  Meishe alleges that its asserted trade secrets are identified with specificity in an interrogatory response.  *Id.* ¶ 151; *see* Dkt. No. 433, Ex. Q.

Defendants contend that Meishe's new allegations are deficient "because it is impossible to discern where any alleged trade secret 'begins and ends.'"  Dkt. No. 436 at 18.

United States District Court
Northern District of California

"A plaintiff need not spell out the details of the trade secret." *Autodesk, Inc. v. ZWCAD Software Co.*, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015).  However, "[t]he plaintiff should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998) (internal quotation marks and citations and emphasis omitted).  "The pleadings must give defendants 'reasonable notice of the issues which must be met at the time of trial and . . . provide reasonable guidance in ascertaining the scope of appropriate discovery.'" *Teradata Corp. v. SAP SE*, No. 18-cv-3670-WHO, 2018 WL 6528009, at *4 (N.D. Cal. Dec. 12, 2018) (quoting *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 252–53 (1968)); *see also Cisco Sys. v. Wilson Chung*, 462 F. Supp. 3d 1024, 1049 (N.D. Cal. 2020) ("the test is whether the complaint's level of detail is sufficient to ascertain at least the boundaries within which the secrets lie and the scope of appropriate discovery") (citation and internal quotation marks omitted).

The Court finds Meishe's additional trade secret allegations sufficiently particular, particularly when considered alongside its February 20, 2024 interrogatory response at Dkt. No. 433, Ex. Q.  Meishe's alleged trade secrets are voluminous, but that alone does not mean the allegations should be dismissed on the pleadings.  Although it may be inadequate for "plaintiffs to cite and incorporate by reference hundreds of documents that purportedly reference or reflect the trade secret information," *InteliClear, LLC v. ETC Global Holds., Inc.*, 978 F.3d 653, 658 (9th Cir. 2020), here Meishe has cited and incorporated by reference just two documents, one of which includes a long list of source code.  At the July 12, 2024 hearing, Meishe confirmed that it is alleging that each line entry in Exhibit O of the FOAC includes a trade secret source code that was misappropriated by defendants.  Whether any of this source code is in the public domain is a factual dispute inappropriate for resolution at the motion to dismiss stage.  Defendants motion to dismiss the additional trade secret allegations in the FOAC is therefore DENIED.[13]

---

[13] Defendants take issue with the language "other confidential business information" in ¶ 149 of the FOAC.  *See* Dkt. No. 436 at 18.  In its April 23, 2024 Order, the Court found it unclear what this referred to.  *See* Dkt. No. 429 at 18.  In its opposition, Meishe asserts that it clarified with the addition of "Meishe's confidential internal plans for future development of Meishe software,"

United States District Court
Northern District of California

### C.      Whether Meishe's Pleadings Establish that the TUTSA Applies

Defendants contend that Meishe's continued reliance on the TUTSA is improper given the case's transfer to this Court and the Fifth Circuit's determination that the conduct underlying Meishe's claims has no connection to Texas.  Dkt. No. 436 at 15, 20.  According to defendants, TUTSA does not apply to an out-of-state forum based on out-of-state conduct and Meishe fails to plead facts establishing that Texas law applies under choice-of-law rules.  *Id.* at 20.

Meishe first contends that defendants waived this argument by not raising it in their renewed motion to dismiss plaintiff's third amended complaint.  Dkt. No. 443 at 20-21.  While defendants should have raised this argument in that motion, the Court will nevertheless reach the issue because the previous motion was a renewed motion of the motion to dismiss filed in Texas.

When defendants seek transfer under 28 U.S.C. § 1404, the transferee court is "obligated to apply the state law that would have been applied if there had been no change in venue."  *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964).  In other words, a "change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms."  *Id.*  The Fifth Circuit ordered this case transferred to this District based on its finding that this District was "a clearly more convenient venue" such that the Western District of Texas's decision denying defendants motion to transfer was a "clear abuse of discretion."  *In re TikTok, Inc.*, 85 F.4th 352, 358-59, 366 (5th Cir. 2023).

Defendants first argue that the TUTSA does not apply extraterritorially.  According to the Texas Supreme Court, "[u]nless the intention to have a statute operate beyond the limits of the state . . . is clearly expressed or indicated by its language, purpose, subject matter, or history, no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state . . . enacting it . . . [T]he presumption is that the statute is intended to have no extraterritorial effect."  *Marmon v. Mustang Aviation, Inc.*, 430 S.W.2d 182, 187 (Tex. 1968) (quoting 50 Am. Jur. 510, Statutes § 487).  Defendants contend that there is nothing in TUTSA indicating or clearly expressing

---

examples of which are provided in Ex. Q to the FOAC.  *See* FOAC ¶ 150, Dkt. No. 433, Ex. Q at 21.  To the extent "other confidential business information" refers to these confidential internal plans, the Court will allow the allegation as pled.

Meishe also takes issue with the phrase "including, but not limited to, for example" in ¶ 150 of the FOAC.  To the extent this part of ¶ 150 summarizes the source code modules contained in Ex. O to the FOAC, the Court finds it sufficiently particular.

that the Texas legislature intended that it should apply to actions that did not take place in Texas. Dkt. No. 436 at 21.  Neither party cites case law addressing TUTSA's extraterritorial application. The Court does not find it necessary to resolve whether the TUTSA applies extraterritorially, however, because Meishe has alleged actions that took place in Texas.  *See* FOAC ¶¶ 15, 38, 51-53, 65-66, 68-69, 89, 183, 214 (alleging, for example, that the "TikTok app has been widely distributed in the Western District of Texas"; "Defendants offer products and/or services, including those accused herein of infringement, to customers and potential customers located in Texas"; defendants "have derived revenues from their infringing acts occurring within the Western District of Texas"; defendants induced users of the Accused Software to use the infringing systems in Texas; and "[o]n information and belief, Defendants have a regular and established place of business in the Western District of Texas").[14]

Defendants next contend that applicable choice of law rules "independently preclude Meishe's reliance on Texas law based on the allegations in the FAC."  Dkt. No. 436 at 21.  When a case is transferred under 28 U.S.C. § 1404, the transferee court applies the choice-of-law rules of the state from which the case was transferred, here Texas.  *Newton v. Thomason*, 22 F.3d 1455, 1459 (9th Cir. 1994); *Van Dusen v. Barrack*, 376 U.S. 612, 642 (1964).  Under Texas choice-of-law principles, "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law."  *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979).  When addressing choice-of-law disputes, "[i]f the laws of the states do not conflict, then no choice-of-law analysis is necessary" and courts "simply apply the law of the forum state."  *Mumblow v. Monroe Broadcasting, Inc.*, 401 F.3d 616, 620 (5th Cir. 2005) (citations and internal quotation marks omitted).  There must be a conflict between the substantive state laws.  *See Schneider Nat. Transport v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002) (holding that the law of the forum state, Texas, should apply because there was "no conflict between the substantive state law of Texas and Pennsylvania"); *W.R. Grace & Co. v. Continental Cas. Co.*, 896 F.2d 865, 875 (5th Cir. 1990) ("in situations where the substantive decisional law of all relevant jurisdictions is the same, a court need

---

[14] The definitions of "misappropriation" under the TUTSA and DTSA are identical.  *See* Tex. Civ. Prac. & Rem. § 134A.00(3); 18 U.S.C. § 1839(5).

United States District Court
Northern District of California

not go through the motions of making a choice of law"). If a conflict exists, Texas courts use the "most significant relationship approach" set forth in the *Restatement (Second) of Conflict of Laws*. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984).

In their reply, defendants contend that there is a conflict of law because Meishe opposes the application of California Code of Civil Procedure § 2019.210 to its trade secret claims on the basis that it is asserting a TUTSA, not CUTSA, claim. *See* Dkt. No. 541 (Opposition to defendants' Motion to Compel Plaintiff to Identify its Trade Secrets and Stay Discovery in the Interim pursuant to § 2019.210). This is not a conflict between the substantive trade secret misappropriation laws of Texas and California. Furthermore, Meishe has alleged claims under a Texas statute, the TUTSA. Defendants have not cited legal authority where a TUTSA claim was dismissed on the basis that another state had a more significant relationship to the facts of the case or where a court applied California substantive law to a TUTSA claim. This is not a case involving a common law tort claim where the Court must determine which state's law to apply. Because TUTSA is a Texas statute, Texas law will apply to the TUTSA claim. *See* Texas Civil Prac. & Rem. Code Title 6 § 134A.007 ("Except as provided by Subsection (b), this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret"). Meishe need not replead this claim under the analogous California Uniform Trade Secrets Act.

## III.     Lanham Act False Advertising Claim

In its order on defendants' renewed motion to dismiss plaintiff's third amended complaint, the Court ruled that Meishe had insufficiently alleged a false advertising claim under § 43(a)(1)(B) because it was not clear that any of the alleged statements were made in the context of "commercial advertising or promotion" and Meishe had not alleged how these statements were likely to influence purchasing decisions by consumers. Dkt. No. 429 at 25. Defendants contend that the newly plead statements Meishe relies on fail for the same reasons. *See* Dkt. No. 436 at 4-6. Meishe contends that the FOAC explains "the use of Defendants' statements in commercial advertising and promotion, including how the statements are designed to be used to overcome consumers concerns, garner advertising customers, and market audio/video content creation and sharing on its platform."

United States District Court
Northern District of California

Dkt. No. 443 at 3.

A claim for false advertising under § 43(a)(1)(B) requires a plaintiff to show that "(1) a statement made in a commercial advertisement or promotion is false or misleading; (2) that it actually deceives or has the tendency to deceive a substantial segment of its audience; (3) that it's likely to influence purchasing decisions and (4) that the plaintiff has been or is likely to be injured by the false advertisement." *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 828 (9th Cir. 2011). The Lanham Act does not define "advertising" or "promotion," but the Ninth Circuit has adopted the following definition: "(1) commercial speech, (2) by a defendant who is in commercial competition with plaintiff, (3) for the purpose of influencing consumers to buy defendant's goods or services, and (4) that is sufficiently disseminated to the relevant purchasing public." *Ariix, LLC v. NutriSearch Corporation*, 985 F.3d 1107, 1115 (9th Cir. 2021).[15]

Meishe asserts that to determine what constitutes "commercial speech," the Court should look to the U.S. Supreme Court's test in *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983), which is used in the First Amendment context. *See* Dkt. No. 443 at 5. Defendants contend that the *Bolger* test is inapposite and that even under a First Amendment test, defendants' alleged statements are not actionable. Dkt. No. 448 at 1-2.

*Ariix* held that "[c]ommercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'" 985 F.3d at 1115 (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)). It further held that "[c]ourts view this definition as just a starting point, however, and instead try to give effect to a common-sense direction between commercial speech and other varieties of speech." *Id.* (citations and internal quotation marks omitted). *Bolster* held that the "core notion of commercial speech" is "speech which does no more than propose a commercial transaction." 463 U.S. at 66. *Ariix* also cited *Bolger* in support of an assertion that "speech that does not propose a commercial transaction on its face can still be commercial speech." 985 F.3d at 1115. Thus, the Court finds it appropriate to apply *Bolger's* definition of commercial

---

[15] In *Ariix*, the Ninth Circuit noted that the Supreme Court's decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), "likely abrogated" the element of "commercial competition." 985 F.3d at 1120. The Court's analysis does not turn on whether the parties are in "commercial competition."

United States District Court
Northern District of California

speech to the Lanham Act context. *See L.A. Taxi Cooperative v. Uber Technologies, Inc.*, 114 F. Supp. 3d 852, 864 (N.D. Cal. 2015) (applying First Amendment context definition of commercial speech to Lanham Act false advertising claim).

In the FOAC, Meishe repeats allegations about statements in defendants' copyright notice at tiktok.com, the ByteDance Code of Conduct, TikTok's Intellectual Property Policy, and TikTok's terms of service that were alleged in the TAC. *Compare* TAC ¶¶ 158-59 with FOAC ¶¶ 235, 237. Meishe argues that the additional pled facts in the FOAC "provide context as to why these statements are 'commercial speech.'" Dkt. No. 443 at 5. Meishe adds the following allegations. "TikTok's terms of service are linked on the download page for its app." FOAC ¶ 238. Meishe alleges that studies have found that TikTok users have two primary concerns, one of which is "issues related to copyright holders and the use of intellectual property on the TikTok platform." FOAC ¶ 229 (citing an online article). "In order to overcome consumer concerns and market audio/video content creation and sharing on its platform, TikTok promotes that it respects and values intellectual property rights." *Id.* ¶ 233. As an example, Meishe quotes an article from the World Trademark Review:

> For its part, a spokesperson for TikTok told WTR that the platform will take action against IP infringement when it is reported. "We highly value and respect intellectual property rights," the spokesperson said. "You may find relevant information with regard to our guidelines on intellectual property rights through our Terms of Service. In our guideline, we clearly state that users should not post, share, or send any content that violates someone else's copyrights, trademarks, or other intellectual property rights. In addition, we have both an in-app report function as well as an official email ('feedback@tiktok.com') where brands or individuals can report suspected IP infringement cases – we have a dedicated team to handle the reported cases in a timely manner."

*See id.* ¶ 234. Meishe further adds the allegation that TikTok "lists 'attribution notices for third party software that may be contained in portions of this product,' but fails to mention Meishe." *Id.* ¶ 236. Meishe also adds an allegation involving a quote from a TikTok U.S. Data Security page entitled About Project Texas stating:

> every single line of source code that goes into the protected environment, whether it comes from TikTok, ByteDance, open source, or third-party, will be inspected and tested. This includes any updates to the code on an ongoing basis. The TTP and a third-party source code inspector will work to ensure that everything is performing as intended, and only validated code will be able to operate in the secure environment; if the source code does not pass inspection, it can't run.

United States District Court
Northern District of California

*Id.* ¶ 239.

Meishe argues that defendants had an economic motive in making the statements and policies identified in the FOAC – "to address users' concerns about Defendants' intellectual property practices so consumers would use TikTok." Dkt. No. 443 at 7. Meishe further contends that defendants offered the alleged statements and policies "to overcome users' concerns about Defendants' misuse of others' intellectual property and to influence consumers to use or to continue to use TikTok." *Id.*

The Court agrees with defendants that Meishe has not plausibly alleged commercial speech for purposes of a Lanham Act claim. *See Maffick LLC v. Facebook, Inc.*, No. 20-cv-5222-JD, 2021 WL 1893074, at *3 (N.D. Cal. May 11, 2021) ("Conduct that is not commercial, and does not involve the sale of goods and services, is outside the 'dangers that the Lanham Act was designed to address,' and consequently not actionable under Section 43(a)"); *Prager University v. Google LLC*, 951 F.3d 991, 996, 1000 (9th Cir. 2020) (holding that statements related to YouTube's Restricted Mode, which when activated by a user makes certain age-inappropriate conduct unavailable, such as statements in the terms of service, community guidelines, and contracts, do not constitute "commercial advertising or promotion" as the Lanham Act requires because the statements were made to explain a user tool, not for a promotional purpose); *Children's Health Def. v. Facebook Inc.*, 546 F. Supp. 3d 909, 935 (N.D. Cal. 2021) (reasoning that a warning label and fact-checks published on the plaintiff's Facebook page were not disparaging plaintiff's goods or services, nor promoting the goods or services of Facebook, the CDC, or fact-checking organizations, and were "simply providing information" and finding that the plaintiff's attempt to "fit its claims under the rubric of the Lanham Act by arguing that 'Defendants were seeking to influence consumers to buy the goods and/or services of Facebook's fact-checking partners'" therefore failed); *L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 864 (N.D. Cal. 2015) (finding that challenged media statements were "'inextricably intertwined' with the reporters' coverage of a matter of public concern, i.e. whether Uber is safe for riders," and could not constitute commercial speech actionable under the Lanham Act).

The cases plaintiff relies on involve First Amendment claims and are easily distinguishable.

In *Hunt v. City of L.A.*, the Ninth Circuit held that "[w]here the facts present a close question, strong support that the speech should be characterized as commercial speech is found where the speech is an advertisement, the speech refers to a particular product, and the speaker has an economic motivation." 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger*, 463 U.S. at 66-67). This case involved the plaintiffs' sales of shea butter and incense. *Id.* at 714, 716. The court reasoned that the plaintiffs "clearly proposed a commercial transaction. Indeed, the core of Plaintiffs' speech is directed to their products and why a consumer should buy them." *Id.* at 716. Here, the cited speech is not an advertisement and does not refer to a particular product but rather to defendants' intellectual property and security policies. *Bolger* involved informational pamphlets that were conceded to be advertisements. 463 U.S. at 66. *Yeager v. Cingular Wireless LLC* involved a publication whose central theme was how the defendant's emergency preparedness program enhanced its wireless services. 673 F. Supp. 2d 1089, 1097 (E.D. Cal. 2009). The defendant's name as a service provider was mentioned multiple times in the publication. *Id.* The publication "did not seek to inform the reader about emergency preparedness generally, but rather how defendant's wireless service specifically had been improved to handle such emergencies." *Id.* The court found it reasonable to infer that the defendant had an economic motivation underlying the publication's distribution. *Id.* Here, the alleged statements are not about defendants' specific products but rather about its policies generally.

Defendants' motion to dismiss as to the Lanham Act claim is thus GRANTED without leave to amend.

## IV. Whether Meishe Has Alleged Plausible Claims Against "Accused Software" Beyond the TikTok App

Finally, defendants contend that Meishe's copyright and trade secret claims involving any software applications other than the TikTok app should be dismissed because there are "no plausible factual allegations that (1) these other apps infringe Meishe's asserted copyrights and trade secrets or (2) the named Defendants were involved in development or integration of any particular software into those other apps." Dkt. No. 436 at 22-23. Meishe responds by pointing to allegations in the

FOAC and to defendants' September 22, 2023 third supplemental response to interrogatory No. 4, in which defendants identified "the following applications that use produced source code related to audio and video editing," including the Faceu, CapCut, Lemon8, and 轻颜 software applications. Dkt. No. 443 at 25; *Id.* Ex. A at 9.[16]  Meishe's previous complaint, the third amended complaint, was filed on April 20, 2023.  *See* Dkt. No. 235.

In the FOAC, Meishe alleges that defendants infringe upon Meishe's Copyrighted Works through "the Faceu software application, the CapCut software application, the Lemon8 software application, the 轻颜 software application, and the BytePlus Video Editor SDK" in addition to in the TikTok app.  FOAC ¶ 15.  Collectively, these apps are referred to as the "Accused Software." *See id.*  Meishe pleads allegations about the Accused Software throughout the FOAC.  For example, Meishe alleges that "Defendants integrated the infringing Meishe audio/video creation and editing source code into its Accused Software."  *Id.* ¶ 78.

Regarding defendants' relationship to the Accused Software other than the TikTok app, Meishe alleges that "ByteDance Ltd. developed the Accused Software and operates and controls the software in the United States, and elsewhere outside of China, through its subsidiaries and affiliates."  *Id.* ¶ 28.  Meishe also alleges that defendants "actively and continuously induce users to download and use the TikTok app and other Accused Software . . ." and defendants "have also induced others . . . into distributing the infringing Accused Software."  *Id.* ¶ 40, 124.  With respect to the BytePlus Video Editor SDK, Meishe alleges that "BytePlus Ltd. is wholly-owned and controlled by ByteDance, Ltd." and the "BytePlus Video Editor SDK directly competes with Meishe's Video Editor SDK."  *Id.* ¶¶ 47-48.

Meishe alleges that the "code used to implement video and audio editing function" in the Meishe app and TikTok app is "strikingly similar" and alleges that it conducted "a comparison between decompiled 'TikTokv8.5.0' object code and decompiled 'Meishe v.2.5.4 object code."  *Id.*

---

[16] Defendants take much issue with Meishe's reference to this interrogatory response in its reply.  *See* Dkt. No. 448 at 12-13.  The Court finds this interrogatory response relevant to the extent it helps to explain why Meishe did not include allegations against the other Accused Software in its previous complaint.  However, the Court does not rely on this response in concluding that the allegations in the FOAC as to the Accused Software are sufficient and thus does not reach these arguments.

United States District Court
Northern District of California

¶¶ 79-80.  Meishe does not include comparable allegations as to any of the other Accused Software.  Defendants contend that Meishe could have, but did not, "undertake the same investigation for this other software as it did for the Douyin and TikTok apps."  Dkt. No. 448 at 13.  However, defendants have not provided authority for the proposition that such an investigation is required before filing a complaint.  Taking all well-pled facts in the complaint as true and drawing all inferences in Meishe's favor, the Court finds that the allegations as to the Accused Software in the FOAC are sufficient at this pleadings stage.  If defendants can later prove that none of the Accused Software other than the TikTok app includes source code relevant to Meishe's allegations, they can re-raise this issue in a motion on the merits.[17]

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART AND DENIES IN PART defendants' motion to dismiss plaintiff's Fourth Amended Complaint.

**IT IS SO ORDERED**.

Dated: July 23, 2024

SUSAN ILLSTON
United States District Judge

---

[17] Defendants raise an additional argument only in a footnote: that "Meishe's complaint should be treated as limited to only audio/video creation and editing functionality of the TikTok app and not its many functions . . . that are not implicated by any plausible allegations in the complaint." Dkt. No. 436 at 23 n.10.  Because defendants relegate this argument to a footnote, the Court declines to consider it.  *See Cheever v. Huawei*, No. 18-cv-06715-JST, 2019 WL 8883942, at *3 (N.D. Cal. Dec. 4, 2019); *Estate of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014) ("Arguments raised only in footnotes, or only on reply, are generally deemed waived.").