Judicate West
980 9th Street, Ste. 2200
Sacramento, CA 95814
Phone: 916 394-8490
Fax: 916 394-8495

Kendall J. Newman
Special Master

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEIJING MEISHE NETWORK TECHNOLOGY CO., LTD., <br><br>         Plaintiff, <br><br> vs. <br><br> TIKTOK INC., et al. <br><br>         Defendants. | Case No. 23-cv-06012-SI <br> Judge Susan Illston <br><br> JW CASE NO.:  A314886 <br><br> SPECIAL MASTER'S ORDER[1] REGARDING PLAINTIFF'S MOTION TO COMPEL SUPPLEMENTAL DISCOVERY ["ISSUE D": MOTION RE: EXTRATERRITORIALITY] |

      The undersigned Special Master issues the following Order regarding Plaintiff Beijing Meishe Network Technology, Co., Ltd.'s (Plaintiff) Motion to Compel Supplemental Discovery.

      On December 13, 2024, counsel appeared before the undersigned for a hearing regarding Plaintiff's Motion to Compel Supplemental Discovery.[2]  The Special Master previously directed a briefing schedule for the instant motion.  Dkt. No. 511.  Pursuant to that schedule, counsel

---

[1] "Pursuant to Rule 53(e), the Special Master shall issue orders on motions presented to him which shall be final and not require the Court's signature, subject to the parties' right to file objections as described below. If the Special Master considers it advisable to make a Report to the Court, he shall do so in accordance with Rule 53(f)."  Dkt. No. 423 at 3-4.

[2] The Court has set the non-expert discovery cutoff deadline as March 7, 2025.  Dkt. No. 492.  Expert designations are set for March 28, 2025.  *Id.*

timely filed opening papers, opposition papers, and reply papers.  The Special Master's briefing schedule also required that the reply papers describe counsels' good faith meet-and-confer attempts to resolve the instant dispute in person, virtually (i.e., on Zoom), or by phone if absolutely necessary.  Dkt. No. 511.  The Special Master has reviewed the papers and finds that this requirement has been satisfied; counsel has been genuinely unable to fully resolve the dispute despite their good faith efforts to do so.  Reply at 2.

During the hearing before the Special Master on December 13, 2024, Robert Harkins, Stephanie Wood, and Michael Woods appeared on behalf of Plaintiff.  David Okano and Andrew Zeve appeared on behalf of Defendants.  A court reporter transcribed the hearing.

**LEGAL STANDARDS**

***Relevance and Proportionality***

"Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable."  Fed. R. Civ. P. 26(b)(1).

Relevant information need not be admissible at trial to be discoverable. *Id*. Additionally, district courts have broad discretion to determine relevancy for discovery purposes. *See Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002).  Relevancy, for purposes of discovery, "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Nguyen v. Lotus by Johnny Dung Inc*., No. 8:17-cv-01317-JVS-JDE, 2019 WL 3064479, at *1 (C.D. Cal. June 5, 2019) (internal citations and quotation marks omitted).  "[D]iscovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  "Nor is discovery limited to the

merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits." *Id.*

***Defend Trade Secrets Act and Copyright Act***

There is a presumption against extraterritorial application of U.S. statutes. *See, e.g.*, *RJR Nabisco, Inc. v. European Comm*., 579 U.S. 325, 327 (2016). However, courts have permitted extraterritorial discovery in federal trade secret and copyright cases in limited circumstances.

For the Defend Trade Secrets Act ("DTSA"), neither the Supreme Court nor the Ninth Circuit have addressed whether the statute rebuts the general presumption against extraterritoriality. *See Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd*., 108 F.4th 458, 480 (7th Cir. 2024) ("Whether the DTSA rebuts the presumption against extraterritoriality at the first step of the *RJR Nabisco* inquiry is a question of first impression for our circuit, and as far as we can tell, for any circuit.")[3] However, 18 U.S.C. § 1837(2) provides: "[t]his ***chapter also applies to conduct occurring outside the United States if*** — (1) the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or (2) ***an act in furtherance of the offense was committed in the United States***." 18 U.S.C. § 1837(2) (emphasis added).

Similarly, the Copyright Act does not apply extraterritorially. *See L.A. News Serv. v. Reuters TV Int'l, Ltd*., 149 F.3d 987, 990–91 (9th Cir. 1998) *as amended on denial of reh'g and reh'g en banc* (Aug. 25, 1998); *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co*., 24 F.3d 1088, 1098 (9th Cir. 1994). However, under the "predicate act" doctrine, a copyright owner may only recover damages for foreign infringement if two conditions are met: (1) a completed act of copyright infringement occurred in the United States, and (2) the domestic infringement enabled the foreign infringement for which recovery is sought. *L.A. News Serv. v. Reuters Tel. Int'l, Ltd*., 340 F.3d 926, 928 (9th Cir. 2003) *as amended on denial of reh'g* (Oct. 7, 2003). To prove

---

[3] "Motorola can recover damages for all foreign sales involving the trade secrets acquired by theft." *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd*., 108 F.4th 458, 487–88 (7th Cir. 2024), *reh'g and reh'g in banc dismissed*, No. 22-2370, 2024 WL 4416886 (7th Cir. Oct. 4, 2024).

ultimate entitlement to extraterritorial damages in connection with the Copyright Act, mere identification of a domestic infringing act will not be sufficient.  To recover damages flowing from all alleged foreign acts of infringement; the foreign acts must be enabled or directly linked to the domestic act.  *See L.A. News Serv.*, 340 F.3d at 928; *Tubio v. Adidas Am. Inc.*, No. 22-cv-6424-GW, 2023 WL 9420334, *4 (C.D. Cal. Nov. 27, 2023); *see also Motorola*, 108 F.4th at 487.

Indeed, as explained in the *Moonbug* case, "Ninth Circuit case law clarifies that so long as an infringing act completely occurred within the U.S., a plaintiff may recover damages flowing from the extraterritorial exploitation of that act. *See Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 992 (9th Cir. 1998), *as amended on denial of reh'g and reh'g en banc* (Aug. 25, 1998) (holding that a plaintiff "is entitled to recover damages flowing from exploitation abroad of the domestic acts of infringement committed by defendants"); *Los Angeles News Serv. v. Reuters Television Int'l (USA) Ltd.*, 340 F.3d 926, 932 (9th Cir. 2003), *as amended on denial of reh'g* (Oct. 7, 2003) (limiting *Reuters* to apply to only extraterritorial unjust enrichment and not actual damages)." *Moonbug Ent. Ltd. v. Babybus (Fujian) Network Tech. Co.*, 2023 U.S. Dist. LEXIS 107335, *56-57 (N.D. Cal. June 21, 2023) (holding that because "the relevant copyright infringement stems all from actions by Babybus in the United States: 'uploading, marketing, and selling the accused videos and merchandise via United States vendors and video platforms' such that 'Dr. Vanderhart thus properly included viewership data flowing from the global exploitation of Babybus' purported copyright infringement which occurred on a U.S. platform.'").

Despite this contextual backdrop, the pending motion is a discovery motion.  It is not a motion regarding Plaintiff's *ultimate entitlement* to extraterritorial damages.  The parties' papers discuss DTSA and Copyright Act precedent and the ultimate showings that a plaintiff must prove up – i.e., a domestic "act in furtherance" (DTSA claim) and a completed domestic act of infringement (Copyright Act claim) – before extraterritorial damages can be awarded under these

statutes.[4]  But this ruling need not delve into a nuanced discussion of the cases analyzing whether a plaintiff's pleading was detailed enough to state a claim for such damages for purposes of a Rule 12(b)(6) motion, or a nuanced discussion of cases analyzing whether a plaintiff's evidence was sufficient to permit an award of extraterritorial damages.  Those cases provide necessary context, but they offer little practical guidance for the issues presented in the pending discovery motion.

Instead, the analysis here is governed by the "relevance" and "proportionality" requirements under Rule 26(b)(1).  "It is important to recall exactly what is before the court. This is a discovery motion. It is not a dispositive motion on the merits of the plaintiff's claim. The plaintiff is not limited to admissible evidence; it need not prove its claim. The plaintiff must show only that, given its claim, the requested discovery is relevant and proportional to the needs of this case." *Goes Int'l, AB v. Dodur Ltd*., No. 14-cv-05666-LB, 2016 U.S. Dist. LEXIS 13748, at *3 (N.D. Cal. Feb. 4, 2016).  Thus, the parties' cited cases involving ***discovery disputes*** in the context of DTSA and Copyright Act claims offer more guidance than cases involving dispositive motions or assessments of post-trial damages awards.

## RELEVANCE

Plaintiff seeks to compel supplemental discovery regarding the source code, financial data, and usage data for the foreign distribution and versions of Defendants' extraterritorial instrumentalities.  These Accused Instrumentalities are also referred to as the "Accused Software," namely: "the Faceu software application, the CapCut software application, the Lemon8 software application, the 轻颜 software application, and the BytePlus Video Editor SDK in addition to in the TikTok app."  (Dkt. No. 465 at 29-30; FOAC ¶ 15.)

Defendants argue that such discovery is not relevant. Defendants' "relevance" challenges

---

[4] For example, Defendant argues: "[M]ere identification of a domestic infringing act does not entitle a plaintiff to damages flowing from all alleged foreign acts of infringement. The foreign acts must be enabled or directly linked to the domestic act." Mot. at 6 (citing *L.A. News Serv.*, 340 F.3d at 928; *Tubio*, 2023 WL 9420334, *4; *Motorola*, 108 F.4th at 487 ("The Copyright Act does not apply extraterritorially, so to recover damages for foreign copyright infringement under *RJR Nabisco's* step two, a plaintiff is required to show specific causation.").

all focus on Plaintiff's requests for "financial data" and "usage data," i.e., discovery regarding extraterritorial damages. Defendants argue that the DTSA and the Copyright Act only permit recovery of extraterritorial damages upon certain threshold factual showings Plaintiff has not made, so the requested discovery is not relevant in this case. Opp'n at 5-11.

However, it is beyond dispute that the requested extraterritorial damages discovery has at least some relevance in this case. This is because the Court has ***already held*** that Plaintiffs' pleading adequately alleges a factual basis to apply Plaintiff's DTSA claim to Defendants' extraterritorial instrumentalities. The same is true for Plaintiff's Copyright Act claim. The Court's holding means that extraterritorial damages ***may*** ultimately be available to Plaintiff. Extraterritorial damages discovery pertaining to the Accused Instrumentalities is therefore at least minimally relevant for purposes of Rule 26(b).

Specifically, in the Court's Order regarding Defendants' motion to dismiss Plaintiff's Fourth Amended Complaint ("FOAC"), the Court held that Plaintiff had adequately alleged plausible DTSA and Copyright Act claims against the Accused Instrumentalities (called "Accused Software" in the Fourth Amended Complaint) including, in addition to the TikTok App, Defendants' CapCut, Faceu, Lemon8, 轻颜, and BytePlus Video Editor SDK. Dkt. No. 465 at 29-30. The Court held:

> ***Whether Meishe Has Alleged Plausible Claims Against "Accused Software" Beyond the TikTok App***
> Finally, defendants contend that Meishe's copyright and trade secret claims involving any software applications other than the TikTok app should be dismissed because there are "no plausible factual allegations that (1) these other apps infringe Meishe's asserted copyrights and trade secrets or (2) the named Defendants were involved in development or integration of any particular software into those other apps." Dkt. No. 436 at 22-23. Meishe responds by pointing to allegations in the FOAC and to defendants' September 22, 2023 third supplemental response to interrogatory No. 4, in which defendants identified "the following applications that use produced source code related to audio and video editing," including the Faceu, CapCut, Lemon8, and 轻颜 software applications. Dkt. No. 443 at 25; Id. Ex. A at 9.16 Meishe's previous complaint, the third amended complaint, was filed on April 20, 2023. *See* Dkt. No. 235.
> In the FOAC, Meishe alleges that defendants infringe upon

Meishe's Copyrighted Works through "the Faceu software application, the CapCut software application, the Lemon8 software application, the 轻颜 software application, and the BytePlus Video Editor SDK" in addition to in the TikTok app. FOAC ¶ 15. Collectively, these apps are referred to as the "Accused Software." *See id.* Meishe pleads allegations about the Accused Software throughout the FOAC. For example, Meishe alleges that "Defendants integrated the infringing Meishe audio/video creation and editing source code into its Accused Software." Id. ¶ 78. Regarding defendants' relationship to the Accused Software other than the TikTok app, Meishe alleges that "ByteDance Ltd. developed the Accused Software and operates and controls the software in the United States, and elsewhere outside of China, through its subsidiaries and affiliates." Id. ¶ 28. Meishe also alleges that defendants "actively and continuously induce users to download and use the TikTok app and other Accused Software . . ." and defendants "have also induced others . . . into distributing the infringing Accused Software." Id. ¶ 40, 124. With respect to the BytePlus Video Editor SDK, Meishe alleges that "BytePlus Ltd. is wholly-owned and controlled by ByteDance, Ltd." and the "BytePlus Video Editor SDK directly competes with Meishe's Video Editor SDK." Id. ¶¶ 47-48. Meishe alleges that the "code used to implement video and audio editing function" in the Meishe app and TikTok app is "strikingly similar" and alleges that it conducted "a comparison between decompiled 'TikTokv8.5.0' object code and decompiled 'Meishe v.2.5.4 object code." Id. ¶¶ 79-80. Meishe does not include comparable allegations as to any of the other Accused Software. Defendants contend that Meishe could have, but did not, "undertake the same investigation for this other software as it did for the Douyin and TikTok apps." Dkt. No. 448 at 13. However, defendants have not provided authority for the proposition that such an investigation is required before filing a complaint. ***Taking all well-pled facts in the complaint as true and drawing all inferences in Meishe's favor, the Court finds that the allegations as to the Accused Software*** [where Accused Software is collectively "the Faceu software application, the CapCut software application, the Lemon8 software application, the 轻颜 software application, and the BytePlus Video Editor SDK in addition to in the TikTok app."] ***in the FOAC are sufficient at this pleadings stage***. If defendants can later prove that none of the Accused Software other than the TikTok app includes source code relevant to Meishe's allegations, they can re-raise this issue in a motion on the merits.

Dkt. No. 462 at 28-30 (footnotes omitted) (underlining added).

In the same Order, the Court also addressed Plaintiff's DTSA Claim. Referring to 18 U.S.C. § 1837(2), the Court held that "[a]s to the US-incorporated defendants TikTok Inc. and

ByteDance Inc., the Court found the DTSA applies." Dkt. No. 465 at 19.  The Court further held that Plaintiff had adequately pleaded "an act in furtherance of the offense was committed in the United States" for non-U.S. incorporated Defendants ByteDance Ltd. and TikTok Pte. Ltd. that was applicable to all the Accused Instrumentalities:

> Meishe has plausibly alleged that its trade secrets were used in the United States. Drawing all inferences in plaintiff's favor, the Court finds that the ***allegations in the FOAC are sufficient to state that "an act in furtherance of the offense" of misappropriation was committed in the United States***. *See* 18 U.S.C. § 1837. The DTSA contemplates three theories of liability: acquisition, disclosure, or use. *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-cv-02177-SI, 2017 U.S. Dist. LEXIS 62109, at *9 (N.D. Cal. Apr. 24, 2017) (citing 18 U.S.C. § 1839(5)). ***Plaintiff has adequately pled at least use of its trade secrets in the United States by the non-U.S. incorporated defendants***. Defendants' motion to dismiss the DTSA claim on this basis is therefore DENIED.

Dkt. No. 465 at 19-20 (emphases added).

Thus, the Court's prior Order has already determined that the scope of Plaintiff's DTSA claim applies to Defendants' conduct outside the United States – e.g., the alleged use of Plaintiff's copied code in Defendants' foreign applications.  Mot. at 7-8.

The same is true for Plaintiff's Copyright Act claim.  As quoted above, the Court already rejected Defendant's argument that "copyright and trade secret claims involving any software applications other than the TikTok app should be dismissed because there are no plausible factual allegations that (1) these other apps infringe Meishe's asserted copyrights and trade secrets or (2) the named Defendants were involved in development or integration of any particular software into those other apps."  Dkt. No. 465 at 28-29.

The undersigned finds that the Court's determinations directly impact the "relevance" analysis in the instant discovery motion.  The Court has already determined that the FOAC adequately alleges that the non-U.S. incorporated Defendants have made "use" of trade secrets in the U.S.  The Court has already determined that the allegations in the operative FOAC "are sufficient to state that 'an act in furtherance of the offense' of misappropriation was committed in the United States. *See* 18 U.S.C. § 1837."  Dkt. No. 465 at 19-20 (emphases added).  Because

it has already been determined that the FOAC sufficiently alleges a "use" and "act in furtherance of the offense" within the United States, Plaintiff must have an opportunity to seek reasonable discovery to prove up these allegations, including allegations of entitlement to extraterritorial damages arising in connection therewith.  As a result, Plaintiff's requested extraterritorial discovery is at least ***relevant*** to issues in this litigation.

Plaintiff's cited case of *Goes* confirms this finding regarding relevance of extraterritorial damages discovery.  Here, as in *Goes*, "[t]he parties have given the court full and helpful briefing on the subject of [extraterritorial] damages. The issue is not simple. Precedent reaches varying decisions depending on the precise factual details of the case before it: where was the illegal copy made, where was it broadcast from, where broadcast to, and so on. Considering the circumstances of this case, as they now appear, the court holds that it is at least plausible that the plaintiff may recover extraterritorial damages. Certainly it is too early, and the factual record too embryonic, to rule those out as a matter of law. The discovery requests are therefore relevant to the plaintiff's copyright claim." *Goes*, 2016 WL 427369, at *2–4.  Here, Plaintiff's requested extraterritorial damages discovery is relevant for the same reasons stated in *Goes*.  Moreover, the Court has already held that Plaintiff's pleading plausibly alleges Plaintiff's claims in connection with the extraterritorial Accused Instrumentalities, such that extraterritorial damages discovery is relevant in this case.

None of Defendant's cited cases warrant overriding the Court's explicit determination that the FOAC contains allegations sufficient to support extending the DTSA and Copyright Act claims to the Accused Instrumentalities.

For instance, the court in *Oracle* prohibited requested extraterritorial discovery about "international customers" due to a lack of "relevance." *Oracle Am., Inc. v. Hewlett Packard Enter. Co*., No. 16CV01393JSTEDL, 2016 WL 11806000, at *3–4 (N.D. Cal. Nov. 7, 2016). But the lack of relevance was because the operative pleading "does not allege that HP committed complete acts of copyright infringement in the United States that it then exploited abroad, as required to fall within the ambit of L.A. News." *Id.*  Unlike here, the pleading in *Oracle* had not already been held to plausibly allege claims against the defendants' extraterritorial

instrumentalities.  Here, Plaintiff's pleading has been held to plausibly allege claims specifically in connection with the Accused Instrumentalities – identified by name, no less – in connection with the alleged misappropriation or infringement.  Extraterritorial discovery in connection with these extraterritorial instrumentalities is necessarily relevant in this case.

Similarly, under a heading entitled "Relevance," the court in *Tubio* disallowed requested extraterritorial discovery regarding "foreign sales and revenue information" in connection with the Copyright Act claim.  *Tubio*, 2023 WL 9420334, *4-5.  However, in that case, there had not already been a determination that the pleading plausibly alleged claims against the Defendant's extraterritorial instrumentalities, identified by name.  The court in *Tubio* even considered and rejected whether hypothetical new allegations regarding domestic predicate acts would be sufficient, if added to the pleading, to satisfy "relevance" and to permit the discovery.[5] However, even if this was a common or permissible exercise in analyzing potential relevance, here there are no hypothetical new allegations to consider – and no need for any.  The Court already held that Plaintiff's pleading plausibly alleged both DTSA and Copyright claims against Defendant's extraterritorial instrumentalities, by name, such that extraterritorial discovery in connection with these is necessarily relevant in this case.

Finally, the court in *Art Attacks* disallowed requested extraterritorial discovery regarding "foreign earnings and profits" and "foreign sales activities" because the absence of allegations regarding predicate domestic acts in the pleading revealed a lack of relevance. *See Art Attacks Ink, LLC v. MGA Ent., Inc.*, No. 04CV1035-J (BLM), 2005 WL 8160189, at *3–4 (S.D. Cal.

---

[5] "Adidas asserts that the "[m]erchandise development was done in Argentina and Germany, and the items in question were manufactured in China and Colombia." (*Id.* at 8). Tubio does not appear to disagree, instead arguing that he needs to discovery to "confirm or deny the existence of predicate acts that would entitle [him] to extraterritorial damages." (*Id.* at 3). At the hearing, Tubio's counsel asserted he had recently learned that Adidas AG may have consulted with Adidas personnel in Oregon before manufacturing the replicas of the in Boca Juniors jersey. But even if this is accurate, the Court finds that it is insufficient to constitute a "predicate act of infringement occurring within the United States [that] enabled further reproduction abroad." *Reuters*, 149 F.3d at 992. Adidas has substantially produced all responsive information regarding activity that took place within the United States. Without evidence of a material predicate act that occurred within the United States, the Court declines to use the narrow exception to the Subafilms broad ruling and order extraterritorial discovery." *Tubio v. Adidas Am. Inc.*, No. 22-cv-6424-GW, 2023 WL 9420334, *4-5 (C.D. Cal. Nov. 27, 2023).

Dec. 27, 2005). However, in *Art Attacks*, there had been no previous order finding that the pleading plausibly alleged Copyright Act and DTSA claims in connection with the Defendant's extraterritorial instrumentalities, identified by name.[6] *See id.*

Ultimately, because the Court has already specifically determined that Plaintiff has adequately alleged a factual basis its DTSA and Copyright Act claims ***in connection with Defendants' extraterritorial Accused Software***, the requested extraterritorial discovery necessarily has at least some degree of relevance in this case, including with respect to the damages that might potentially be recoverable in connection with those claims.

However, threshold "relevance" is not the end of the analysis. The analysis proceeds to whether the "proportionality" requirement is satisfied here.

## PROPORTIONALITY

As Defendants argue, "Judge Illston's order [finding] applicability of the DTSA to foreign named defendants [does not mean that] Meishe is separately entitled to worldwide discovery for all foreign versions of the Accused Software. *See* Dkt. 456 at 19–20. While the Court held that the DTSA could apply to the foreign defendants, it did not grant Meishe unbounded foreign discovery. *See* Dkt. 456 at 19–20." Opp'n at 9. Defendants are correct that a ruling on a pleadings motion does not also serve as an order granting discovery without limitations for all sufficiently-pleaded claims. The scope of appropriately "proportional" extraterritorial discovery is the issue now presented.

As stated above, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative

---

[6] "[Plaintiff] failed to articulate specific reasons why this Court should construe United States copyright law to apply extraterritorially in this case. In particular, a review of Plaintiff's Second Amended Complaint, and specifically, its copyright infringement claim, reveals that Plaintiff has not alleged that Defendants' foreign earnings and profits are derived in any way from copyright infringement occurring in the United States. In short, the copyright infringement claim, as drafted, simply lists the elements of copyright infringement without further specification, and without reference to Defendants' foreign sales activities. As such, this Court cannot allow Plaintiff to obtain and peruse documents and information detailing Defendants' foreign financial activities simply because it has alleged copyright infringement in general." *Art Attacks*, 2005 WL 8160189, at *3–4.

access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable."  Fed. R. Civ. P. 26(b)(1).

"A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them. The court's responsibility, using all the information provided by the parties, is to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery."  *See* Adv. Comm. Notes to 2015 Amendment to Rule 26(b)(1). As cited above herein, Local Rule 37-2 states: "For each such request [motion to compel], the moving papers must detail the basis for the party's contention that it is entitled to the requested discovery and must show how the proportionality and other requirements of Fed. R. Civ. P. 26(b)(2) are satisfied."

Here, Plaintiffs seek to compel supplemental discovery regarding three general categories in connection with the Accused Instrumentalities: (1) source code, (2) financial data, and (3) usage data.  While the parties' papers often tend to lump these three categories together, a meaningful "proportionality" analysis requires considering the categories separately.

On one hand, the requested supplemental discovery regarding "source code" bears on a showing of alleged misappropriation of trade secret and/or infringement of copywritten material belonging to Plaintiff.  On the other hand, supplemental discovery regarding "financial data" and "usage data" bears on a showing of damages arising therefrom.

### *Supplemental Discovery re: "Source Code"*

Plaintiff's requested supplemental "source code" discovery in connection with the Accused Instrumentalities – as narrowed at page 2 of the Motion to "the audio and video editing portion of the source code"[7] – satisfies the "proportionality" requirement of Rule 26(b)(1).

---

[7] Plaintiff's argue that "Defendants' productions and responses should include, *at a minimum, the audio and video editing portion of the source code* . . . ."  Mot. at 2 (emphasis added).

Defendants argue that extraterritorial discovery cannot truly be "proportional" at this point unless Plaintiff first ***specifically identifies*** the portion(s) of its code Plaintiff contends the Accused Instrumentalities have used. Opp'n at 3. According to Defendants, "despite Meishe's refusal to identify source code it contends was copied with specificity beyond code used in one 2018 version of the TikTok Android app, Defendants have made available source code related to audio and video editing for dozens of versions of both the U.S. TikTok Android and iOS apps. Defendants have also produced financial information for global use of the U.S. versions of the TikTok Android and iOS apps." Opp'n at 3; Ex. 6; Ex. 7; Ex. 8; Ex. 9; Ex. 10; Ex. 11; Ex. 12; Ex. 13; Ex. 14. "Defendants have produced financial information for global use of the U.S. version of the CapCut and Lemon8 Android and iOS apps to the extent the named Defendants maintain this information in the ordinary course of business." Opp'n at 3, Ex. 15.

On Reply, Plaintiff provides a sufficient level of detail regarding the code it alleges was copied, and has sufficiently explained how it alleges that code can be traced to the Accused Instrumentalities. Plaintiff explains:

> First, ***Defendants identified*** in their Supplemental Responses to Meishe's First Set of Interrogatories (No. 4), dated September 22, 2023, ***that all the Accused Instrumentalities, including the apps used globally (outside of China), use at least some of the TikTok audio and video editing source code*** which Meishe has already inspected and determined includes copied Meishe source code (that contains Meishe's copyrighted material and trade secrets). *See* Mot. at 6. Defendants attempt to minimize this fact by stating that Meishe has only provided a line-by-line identification of copied Meishe code for one version of TikTok Android source code. *See* Opp. at 7. But Meishe provided this identification in a single version of TikTok source code pursuant to a request from Your Honor (*see* Aug. 16, 2024 Hrg. Tr. at 22:13-25) and Defendants' argument ignores that Meishe has repeatedly stated, including in the FOAC, that Meishe has identified substantial copied Meishe source code in numerous versions of the TikTok Android and iOS source code.
>
> Second, on the evening prior to Meishe filing its Motion, Defendants served a supplemental response to Meishe's Interrogatory No. 1 that identified – for the first time – certain U.S. versions of the CapCut, Faceu, Lemon8, and the BytePlus Video Editor SDK applications[fn.] that used certain of the 50 + versions of TikTok Android source code which Defendants have made available for inspection. *See* Ex. H, Defendants' Supplemental

Responses to Plaintiff's Interrogatory No. 1, dated November 5, 2024. Defendants attempt to avoid any connection between copied Meishe source code and these versions of the Accused Instrumentalities by arguing that Meishe has only provided a line-by-line identification of TikTok Android version 8.4.0, which Defendants allege was not used in the CapCut, Faceu, Lemon8, and the BytePlus Video Editor SDK applications. *See* Opp. at 7. But this argument is irrelevant as Meishe has repeatedly stated that it has identified copied Meishe code in all the TikTok Android code Meishe has reviewed. ***Nonetheless, Meishe has now provided Defendants with an exemplary line number identification of copied Meishe source code in TikTok Android versions 15.0.0 and 25.0.0, showing consistent copying throughout Defendants' source code versions including those referenced in Defendants' Nov. 5 interrogatory responses. See Ex. I, Meishe Letter to Defendants, dated November 30, 2024. Thus, Meishe has now confirmed that the versions of Accused Instrumentalities identified by Defendants in their recent interrogatory responses reasonably include copied Meishe source code.***

Third, using information from Defendants, Meishe has established that the source code Mr. Jing Xie took from Meishe was incorporated into Defendants' source code in China, and then that code was integrated into at least the U.S. version of TikTok in the United States. *See* Mot. at 11; FOAC (Dkt. No. 433) at ¶123. Moreover, as stated in the FOAC, the TikTok CEO, and former ByteDance CFO, Shou Zi Chew confirmed in testimony before the U.S. Congress that before source code written by someone not in the United States is integrated, including integrated into apps in the United States, it will be reviewed by a team of engineers within the United States. *Id*. ***So, the copied Meishe code was integrated into the TikTok app in the U.S., and at least some of that TikTok code (by Defendants' own admission) is used on other of Defendants' applications in the U.S. and globally (outside of China). Meishe also understand that the foreign versions of TikTok use essentially the application code as the U.S. version.*** Meishe submits that this alone is sufficient for Meishe to obtain discovery to confirm Meishe's copyright infringement and misappropriation of trade secrets claims for Defendants' use of Meishe's protected material around the world.

Reply at 2-3 (footnotes omitted and emphasis added); *see also* Ex. I to Reply (letter and spreadsheet specifically identifying allegedly-copied code where it allegedly overlaps with Defendants' code).

The undersigned finds that Plaintiff's Reply provides a sufficiently detailed explanation for the basis of Plaintiff's contention that it is entitled to the requested discovery. *See, e.g.*, Local

Rule 37-2 ("For each such request [motion to compel], the moving papers must **detail the basis** for the party's contention that it is entitled to the requested discovery and must **show how** the proportionality and other requirements of Fed. R. Civ. P. 26(b)(2) are satisfied.") (emphasis added). Moreover, Plaintiff's moving papers convey a willingness to reasonably narrow the scope of the request for supplemental "source code" discovery, i.e., to only "the audio and video editing portion of the source code." Mot. at 2. Having provided this detail and narrowed the scope of the requested "source code" discovery, Plaintiff has shown that the proportionality requirement is satisfied.

Plaintiff has shown that this supplemental "source code" discovery, as narrowed, is important in resolving issues central to this case. Indeed, such discovery might reveal that the Accused Instrumentalities copied Plaintiff's source code material. And if Defendants have evidence showing Plaintiff did not adequately protect that code (for example) or did not copyright it (for example), Defendants can still present such evidence in their defense. The fact that Defendants may ultimately be able to show an Accused Instrumentality's use of Plaintiff's code was not actionable infringement or misappropriation is not a sufficient reason to prohibit the requested supplemental "source code" discovery at this time.

Defendants have not shown that the requested supplemental "source code" discovery would be particularly burdensome or expensive. **Indeed, Defendants have not offered any evidentiary support to quantify the burden or expense of responding to the discovery.** *See, e.g.*, *Yphantides v. County of San Diego*, No. 21CV1575-GPC(BLM), 2022 WL 3362271, at *7 (S.D. Cal. Aug. 15, 2022) ("A responding party must demonstrate that the discovery sought would be unduly burdensome to produce. [Citation.] To satisfy this burden, the responding party must provide sufficient detail regarding the time, money, and procedures required to produce the requested documents. [Citation.] Unsupported, conclusory statements regarding expense and burden are not sufficient to illustrate why requested discovery is not proportional.") (citations omitted). As Plaintiff argues, "Defendants failed to provide any evidence for this Court to consider as to Defendants' resources, Defendants' access to the relevant information, or as to the 'burden or expense,' for this Court to weigh." Reply at 9. Defendants have not identified

evidence quantifying the burden or expense of providing the requested supplemental "source code" discovery, so they have not shown the requested discovery to lack proportionality.

Moreover, the parties have already established a mechanism for the confidential review of source code in this case, and have already agreed to the terms of a protective order governing this kind of information.  The requested supplemental "source code" discovery can be enveloped into those already-existing protective measures.

The undersigned finds that Plaintiffs have articulated the importance of the subject "source code" discovery.   Further, the requested supplemental "source code" discovery – as narrowed to "the audio and video editing portion of the source code" (Mot. at 2) – would not require unlimited access to portions of code beyond the scope of Plaintiff's allegedly-copied code.

With respect to "the parties' relative access to relevant information," it is undisputed that only Defendants have access to the information being sought in the requested supplemental discovery.  This factor weighs in favor of the supplemental "source code" discovery.

Plaintiff also argues that Defendants are large entities and that they have ample resources to provide the requested discovery.  However, "consideration of the parties' resources does not foreclose discovery requests addressed to an impecunious party, nor justify unlimited discovery requests addressed to a wealthy party. The 1983 Committee Note cautioned that '[t]he court must apply the standards in an even-handed manner that will prevent use of discovery to wage a war of attrition or as a device to coerce a party, whether financially weak or affluent.'"  *See* Adv. Comm. Notes to 2015 Amendment to Rule 26(b)(1).

The undersigned finds that Plaintiff's requested supplemental "source code" discovery – narrowed to "the audio and video editing portion of the source code" (Mot. at 2) – satisfies the proportionality requirement of Rule 26(b)(1).  Defendants shall provide supplemental discovery in connection with Plaintiff's Common Interrogatory No. 1 and RFP No. 5.

***Supplemental Discovery re: "Financial Data" and "Usage Data" (Damages)***

Given the above-quoted excerpt from Plaintiff's Reply (and Exhibit I thereto), Plaintiff has shown its requested supplemental discovery regarding extraterritorial damages (i.e., financial

data and usage data) satisfies the "proportionality" requirement.

Initially, Plaintiff's moving papers were short on specifics.  They stated that Plaintiff "***confirmed***, through inspection of Defendants' TikTok source code, that multiple versions of this code include a substantial amount of copied Meishe code." Mot. at 11 (emphasis added). They stated that "Meishe has ***determined*** that its source code, containing Meishe's copyrighted material and trade secrets, was incorporated into at least the U.S. versions of Defendants' TikTok app. As also noted above, defendants have confirmed that the U.S. versions of the TikTok source code, which Meishe has reviewed and identified copied Meishe code, ***has been used*** in the foreign distribution and versions of all the Accused Instrumentalities. Thus, Meishe's copied source code – containing its copyrighted material and trade secrets – could be used in Defendants' applications literally all over the world." Mot. at 13 (emphasis added).  Plaintiff's moving papers then stated Plaintiff may be entitled to extraterritorial damages discovery for the Accused Software because "foreign versions of these apps use the same TikTok source code which ***Meishe has determined*** includes copyrighted Meishe code." Mot. at 12 (emphasis added).

A meaningful analysis of what would truly be "proportionate" extraterritorial damages discovery, given the particular facts and circumstances of this case, requires at least some details and an explanation reasonably linking Plaintiff's allegedly-copied audio/video editing code to the audio/video editing code used by Accused Instrumentalities.  Plaintiff's opening papers did not explain in any detail how it had actually "determined" the "foreign versions . . . include[] copyrighted Meishe code." Mot. at 12.

Defendants argue "Meishe has only identified with specificity allegedly copied source code from Android VESDK v.2.0.1.23, which was used in one version of the U.S. TikTok app. Android VESDK v.2.0.1.23 was not used in the later-added Accused Software—foreign or domestic. Put simply, Meishe does not (and cannot) explain how alleged misappropriation in the U.S. version of the Accused Software caused the foreign sales from foreign versions of the Accused Software."  Opp'n at 10.  Defendants also dispute Plaintiff's statement that Defendants ever "confirmed" the foreign versions of the Accused Instrumentalities use Plaintiff's source code; Defendants clarify that they confirmed ***only*** that the foreign versions of the Accused

Instrumentalities use code that was already ***produced*** in discovery.

On Reply, Plaintiff provides a more detailed explanation as to why it contends the audio/video editing portions of the Accused Instrumentalities allegedly use code copied from Plaintiff. As quoted more fully above, "Meishe has now provided Defendants with an exemplary line number identification of copied Meishe source code in TikTok Android versions 15.0.0 and 25.0.0, showing consistent copying throughout Defendants' source code versions including those referenced in Defendants' Nov. 5 interrogatory responses. *See* Ex. I, Meishe Letter to Defendants, dated November 30, 2024. Thus, Meishe has now confirmed that the versions of Accused Instrumentalities identified by Defendants in their recent interrogatory responses reasonably include copied Meishe source code." Reply at 2-3 (excerpted in full above).

The *Goes* case is analogous. In *Goes*, the plaintiff sought damages based on both domestic and foreign sales for the defendant's worldwide distribution of the plaintiff's pirated versions of copyrighted video games. *Goes*, 2016 WL 427369, at \*2. The court in *Goes* ordered extraterritorial damages discovery after finding it to be both relevant and "proportional" under Rule 26(b)(1). In analyzing the discovery motion the court had "largely accepted the factual representations[8] of the parties' lawyers (where this did not require preferring one party's version of flatly contested facts), and ha[d] given more weight to those facts that are supported by some evidentiary filing — i.e., something like merits proof." *Goes Int'l, AB v. Dodur Ltd.,* No. 14-CV-05666-LB, 2016 WL 427369, at \*2–4 (N.D. Cal. Feb. 4, 2016).

Here, similar to *Goes*, given the explanation in Plaintiff's Reply as to the Accused Instrumentalities' potential use of specific copied code from Plaintiff, the facts are not

---

[8] "[T]he facts appear to be as follows. It is undisputed that the defendant downloaded the plaintiff's protected game from, and uploaded its own (allegedly infringing) games to, the Internet by way of Apple, Inc.'s 'AppStore.' The AppStore is where potential users could download the game. The infringing games have been downloaded at least 51,000 times in the United States. The defendant argues that its games were not uploaded onto U.S. computer servers; rather, they were uploaded onto Apple servers in China, from where Apple (not the defendant) may have made copies onto its U.S. equipment. In any case, the defendant argues that uploading alone is not a complete act of infringement that will trigger a damages recovery under U.S. copyright law. Maybe most centrally — given the court's personal-jurisdiction ruling and for now, until facts are better developed — in uploading its games to the AppStore, the defendant also (maybe purposely, maybe inadvertently) prompted Apple to distribute the challenged software worldwide." *Goes*, 2016 WL 427369, at \*2–4.

unexplained or "flatly contested." *See id*. It would be premature to prevent the requested extraterritorial damages discovery. As in *Goes,* such discovery is proportional to the needs of the case. Especially given the relatively short remaining timeframe remaining for fact discovery before trial, the undersigned declines Defendants' invitation to effectively eliminate Plaintiff's ability to prove up such potential damages as a matter of law through an order on a discovery motion. Plaintiff's requested extraterritorial damages discovery has been shown to be "proportional" under Rule 26(b)(1).

It is true that unlike the extraterritorial damages discovery at issue in *Goes*, which sought the named defendant's "revenue from distribution of the challenged games outside the United States," here the requested extraterritorial damages discovery is somewhat more complicated. It is not a straightforward matter of simply tracing "revenue" from the global distribution of two specifically-identified pirated video games. *See id*. But Plaintiff's Reply included a more detailed explanation regarding the allegedly-stolen code, one that warrants at least a basis for discovering Defendants' "revenues from distribution of" those Accused Instrumentalities that have allegedly used Plaintiff's code.

Further, as in *Goes,* "[t]he information specifically in question — that showing the defendant's revenue from distribution of the challenged games outside the United States — should be relatively ready to hand. Or readily gotten using data-analysis software." *Goes*, 2016 WL 427369, at *2–4. Defendants have not made any showing to the contrary here.

Similarly, in *Warm*, the plaintiff sought damages based on the sale of its copyrighted designs by the defendant in both the U.S. and Hong Kong. *Warm v. Innermost Ltd*., No. 21-cv-4402-MWF, 2024 WL 3467803, *4–5 (C.D. Cal. June 25, 2024). The plaintiffs sought discovery of extraterritorial sales data for the same lighting designs that had been copied and distributed domestically. The extraterritorial damages discovery was ordered, because "Plaintiff is entitled to investigate whether Defendants made any international sales that violate U.S. copyright or trademark laws, and global sales data may help prove their claims." *Id*. at *5. On one hand, lighting designs are not particularly analogous to source code. Discovery regarding the number of specifically-identified "glaze pendant" lights and "circus pendant" lights that were

sold internationally in a given timeframe appears relatively straightforward. The facts of *Warm* simply did not require consideration of some of the complicated factors in play here. Nevertheless, Plaintiff's requested damages discovery warrants a reasonable identification of Plaintiff's source code that was allegedly misused by Defendants, plus some reasonable explanation tracing the Accused Instrumentalities' use of *that same code*. Plaintiff's Reply is sufficient. The requested extraterritorial financial and usage data for those instrumentalities – apps that, on Plaintiff's explanation, appear to have potentially used identified portions Plaintiff's code distributed globally (specified in Ex. I to the Reply) – is discovery proportional to the needs of this case.

Some of Defendants' cited cases suggest that some ***evidentiary*** showing is first needed so as to ensure there is a potential factual basis for extraterritorial damages. For instance, in *Tubio*, the court denied the motion to compel extraterritorial discovery regarding "foreign sales and revenue" arising from alleged infringement of the plaintiff's soccer jersey design. "Adidas has substantially produced all responsive information regarding activity that took place within the United States. Without ***evidence*** of a material predicate act that occurred within the United States, the Court declines to use the narrow exception to the *Subafilms* broad ruling and order extraterritorial discovery." *Tubio*, 2023 WL 9420334, *4-5 (emphasis added). However, in *Tubio*, the court denied plaintiff discovery related to extraterritorial damages for copyright infringement because it found plaintiff was using discovery to develop new claims (which the plaintiff essentially admitted). *See id.* Here, "Meishe has supported its allegations as to the foreign distribution and foreign versions of the Accused Instrumentalities with information directly from Defendants that source code Meishe has inspected, and contains copied Meishe source code, is used in the Accused Instrumentalities abroad." Reply at 7.

Similarly, in *ART Attacks Ink, LLC v. MGA Entm't, Inc*., No. 04-cv-1035-J (BLM), 2005 WL 8160189, *3 (S.D. Cal. Dec. 27, 2005), the plaintiff sought to justify extraterritorial discovery through several theories, including a contention that "Defendants' alleged infringement ha[d] stifled its ability to capitalize on its works in foreign markets, despite being 'well positioned' to do so." The court determined the Plaintiff had not met its burden under this

theory because it "fail[ed] to present any ***evidence***" supporting its contention, and an "unsupported contention alone … [wa]s not enough." *Id*. (emphasis added).  The *ART Attacks* plaintiff sought to justify extraterritorial discovery under the Copyright Act by "alleg[ing] copyright infringement in general." *Id.* at *4.  The court in *Art Attacks* rejected the plaintiff's request, finding the plaintiff had failed to "articulate specific reasons" to support its allegation. *Id*. (emphasis added). The court concluded that it "c[ould] not allow Plaintiff to obtain and peruse documents and information detailing Defendants' foreign financial activities simply because it ha[d] alleged copyright infringement in general."  *Id*.  However, in *ART Attacks*, the court's rejection of plaintiff's argument under the copyright act was in part because plaintiff merely listed elements of copyright infringement without reference to Defendants' foreign sales activities. *See id.*  Here, Plaintiff has expressly alleged Defendants' domestic infringement and exploitation of that infringement in the U.S. and abroad. *See* FOAC ¶¶ 120-123.

These two district court cases, *Tubio* and *Art Attacks*, suggest that sometimes, depending on the facts and circumstances of the case, discovery regarding extraterritorial damages might warrant a threshold evidentiary showing as to the basis for such damages.  However, neither case discussed this point in connection with a "proportionality" analysis, and that is the analysis at issue here.  Neither case cited to authorities pronouncing, as a rule, that some threshold evidentiary showing must always be made before proportionality can be determined.  Neither case cited to authorities pronouncing, as a rule, that plaintiffs must prove up their claims with evidence before they can conduct relevant discovery.

The undersigned declines to find that evidence is necessarily required before the requested extraterritorial discovery is deemed appropriate.  A factually ***detailed explanation*** is needed, however, and Plaintiff's Reply provides it.  *See, e.g.*, Local Rule 37-2 ("For each such request [motion to compel], the moving papers must ***detail the basis*** for the party's contention that it is entitled to the requested discovery and must ***show how*** the proportionality and other requirements of Fed. R. Civ. P. 26(b)(2) are satisfied.") (emphasis added).  Plaintiff has provided sufficient explanatory detail articulating a potential factual basis for the Accused Instrumentalities' alleged use of specific copied components of Plaintiff's code, such that

discovery regarding extraterritorial damages in connection with those Instrumentalities is proportionate.

Plaintiff's explanatory detail shows the "likely benefit" of the requested discovery outweighs the unquantified, unsupported burden and expense of responding to it.  Fed. R. Civ. P. 26(b)(1).  The same is true for "importance of the discovery in resolving the issues." *Id.* Plaintiff has reasonably tailored the scope of its damages-related discovery.  Plaintiff's current request for supplemental discovery regarding extraterritorial damages (i.e., "financial data" and "usage data") has at least some indicated "nexus" to the disputes in this case.[9]  *See Gilead Scis., Inc. v. Merck & Co, Inc*., No. 5:13-CV-04057-BLF, 2016 WL 146574, at \*2 (N.D. Cal. Jan. 13, 2016).

The undersigned finds that Plaintiff's requested supplemental discovery regarding "financial data" and "usage data" satisfies the proportionality requirement of Rule 26(b)(1).  As a result, Defendants shall provide supplemental discovery in connection with the following: Plaintiff's Common Interrogatory No. 2, Individual Interrogatory No. 1 as to each Defendant, and RFP Nos. 4, 7, 30 and 47-49.

## ORDER APPOINTING SPECIAL MASTER

On April 4, 2024, the Court entered an Order Appointing Hon. Kendall J. Newman, Ret. As Special Master And Referring Discovery Disputes ("Order Appointing Special Master"). Dkt. No. 423.

The Order Appointing Special Master provides that, "Pursuant to Rule 53(b)(2)(A), the

---

[9] Defendants cite to *Gilead*, which addressed "disproportionate" discovery requests:

> [Merck's requests put] Gilead in the position of having to produce discovery on all sorts of compounds that bear no indication of any nexus to the disputes in this case. This is untenable. It would be like requiring GM to produce discovery on Buicks and Chevys in a patent case about Cadillacs simply because all three happen to be cars. In the absence of any reason to doubt the proof Gilead has tendered about the identity of the disputed compounds, and given the cost and potential delay introduced by the requested production, Merck's request is precisely the kind of disproportionate discovery that Rule 26—old or new—was intended to preclude.

*Gilead Scis., Inc. v. Merck & Co, Inc*., No. 5:13-CV-04057-BLF, 2016 WL 146574, at \*2 (N.D. Cal. Jan. 13, 2016).

Special Master shall assist the Court with all discovery disputes and managing the conduct of discovery to promote efficiency and savings of time and cost, and dealing with any other matters which the Court may direct him to undertake. The Special Master shall have the authority to set the date, time and place for all hearings, to preside over hearings, to take evidence, to conduct telephonic conferences to resolve disputes arising during depositions, and to issue orders awarding non-contempt sanctions, including, without limitation, the award of attorneys' fees, as provided by Rules 37 and 45. . . ." Dkt. No. 423 at 2-3.

"Pursuant to Rule 53(e), the Special Master shall issue orders on motions presented to him which shall be final and not require the Court's signature, subject to the parties' right to file objections as described below. If the Special Master considers it advisable to make a Report to the Court, he shall do so in accordance with Rule 53(f)." Dkt. No. 423 at 3-4.

The Order Appointing Special Master also includes procedures for objections to the Special Master's orders, reports, and recommendations. "Pursuant to Rule 53(b)(2)(D) and 53(g), the procedures described in paragraphs 14 through 17 herein shall govern any action on the Special Master's orders, reports, and/or recommendations." Dkt. No. 423 at 4. "Any party wishing to file objections to or a motion to adopt or modify the Special Master's orders, reports, and/or recommendations must file such objections or motion with the Court within 14 days from the day the Special Master filed the order, report, and/or recommendation via ECF. Any order issued by the Special Master shall remain in effect pending any such objection or motion." *Id.* at 4.

"Pursuant to Rule 53(g)(3)-(5), the Court shall review findings of fact made or recommended by the Special Master for clear error. The Court shall review de novo any conclusions of law made or recommended by the Special Master. The Court will set aside the Special Master's ruling on a procedural matter only for an abuse of discretion." *Id.* at 4. "Pursuant to Rule 53(g)(1), in acting on an order, report, or recommendation of the Special Master, the Court shall afford the parties an opportunity to present their positions and, in its discretion, may receive evidence, and may adopt or affirm; modify; wholly or partly reject or reverse; resubmit to the Special Master with instructions; or make any further orders it deems

appropriate." *Id.* at 4.

**SPECIAL MASTER'S FEE ALLOCATION**

The Order Appointing Special Master specifies how the Special Master's compensation is to be allocated in this matter.  "Pursuant to Rule 53(b)(2)(E) and 53(h), the Special Master shall be compensated at an hourly rate to be set by Judge Newman, Ret. after consultation with the parties, plus the Administrative Fee charged by Judicate West, and shall be reimbursed for any out-of-pocket expenses (e.g., expenses for telephone conference calls). The Special Master shall not charge for travel time. Judge Newman, Ret. shall prepare a monthly invoice for his services, which he shall provide to counsel. Plaintiff and defendants shall each pay half of the monthly invoice, unless the Special Master or the Court directs otherwise. Counsel shall each be responsible for promptly forwarding payment of the Special Master's invoice." Dkt. No. 423 at 3 (Order Appointing Special Master).

Here, the Special Master has complied with this provision and has provided his monthly invoicing to counsel, reflecting the time necessary for the Special Master to address the issues herein, with the assistance of his research attorney.

Rule 53(g) provides further that "The court must allocate payment among the parties after considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master."

Here, the Special Master finds that Plaintiff and Defendants shall each pay half of the Special Master's monthly invoice in connection with the instant Order.

The Special Master will file a copy of this Order with the Court, whereupon the Order will also be served electronically on all parties.[10]

**CONCLUSION**

For these and all the foregoing reasons, the Special Master hereby **ORDERS** that:

---

[10] Fed. Rule Civ. Proc. § 53(d)-(e) ("A master who issues an order must file it and promptly serve a copy on each party. The clerk must enter the order on the docket.") and ("A master must report to the court as required by the appointing order. The master must file the report and promptly serve a copy on each party, unless the court orders otherwise.").

1.  Plaintiff's Motion to Compel Supplemental Discovery is GRANTED, consistent with the foregoing, such that:

    a.  Plaintiff's requested supplemental "source code" discovery – narrowed to "the audio and video editing portion of the source code" (Mot. at 2) – satisfies the proportionality requirement of Rule 26(b)(1), such that Defendants shall provide supplemental discovery in connection with Plaintiff's Common Interrogatory No. 1 and RFP No. 5.  The supplemental discovery shall be served within 30 calendar days from the date the Special Master files this Order with the Court, whereupon the Order will also be served electronically on all parties.

    b.  Defendants shall also serve supplemental discovery in connection with the following: Plaintiff's Common Interrogatory No. 2, Individual Interrogatory No. 1 as to each Defendant, and RFP Nos. 4, 7, 30 and 47-49.   The supplemental discovery shall be served within 30 calendar days from the date the Special Master files this Order with the Court, whereupon the Order will also be served electronically on all parties.

2.  Plaintiff and Defendants shall each pay half of the Special Master's monthly invoice in connection with the instant Order.


IT IS SO ORDERED.


Dated: December 16, 2024

Honorable Kendall J. Newman (Ret.)
Special Master