Judicate West
980 9th Street, Ste. 2200
Sacramento, CA 95814
Phone: 916 394-8490
Fax: 916 394-8495

Kendall J. Newman
Special Master

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEIJING MEISHE NETWORK TECHNOLOGY CO., LTD., <br><br>        Plaintiff, <br><br> vs. <br><br> TIKTOK INC., et al. <br><br>        Defendants. | Case No. 23-cv-06012-SI <br> Judge Susan Illston <br><br> JW CASE NO.:  A314886 <br><br> SPECIAL MASTER'S ORDER[1] REGARDING DEFENDANTS' MOTION TO COMPEL ["ISSUE E": MOTION RE: DOCUMENTS RELATED TO XAT/CDV] |

The undersigned Special Master issues the following Order regarding Defendants' Motion to Compel ["Issue E: Motion re Documents Related to XAT/CDV"].

On December 13, 2024, counsel appeared before the undersigned for a hearing regarding Defendants' pending motion.[2]  The Special Master previously directed a briefing schedule for the instant motion.  Dkt. No. 511.  Pursuant to that schedule, counsel timely filed opening papers,

---

[1] "Pursuant to Rule 53(e), the Special Master shall issue orders on motions presented to him which shall be final and not require the Court's signature, subject to the parties' right to file objections as described below. If the Special Master considers it advisable to make a Report to the Court, he shall do so in accordance with Rule 53(f)."  Dkt. No. 423 at 3-4.
[2] The Court has set the non-expert discovery cutoff deadline as March 7, 2025.  Dkt. No. 492.  Expert designations are set for March 28, 2025.  *Id.*

opposition papers, and reply papers.  The Special Master's briefing schedule also required that the reply papers describe counsels' good faith meet-and-confer attempts to resolve the instant dispute in person, virtually (i.e., on Zoom), or by phone if absolutely necessary.  Dkt. No. 511. The Special Master has reviewed the papers and finds that this requirement has been satisfied; counsel has been genuinely unable to fully resolve the dispute despite their good faith efforts to do so.  Reply at 7.

During the hearing before the Special Master on December 13, 2024, Robert Harkins, Stephanie Wood, and Michael Woods appeared on behalf of Plaintiff.  David Okano and Andrew Zeve appeared on behalf of Defendants.  A court reporter transcribed the hearing.

Defendants' pending motion seeks to: "(1) force Meishe's compliance with the court order to produce its written requests to XAT to provide discovery requested by Defendants (and any responses), (2) compel Meishe to obtain and produce the discovery requested by Defendants, and (3) compel Meishe to describe its legal and corporate relationship with XAT."  Mot. at 1.

## I.    BACKGROUND

According to Defendants, nonparty "XAT is a Meishe affiliate that developed source code at issue in this case and employed Mr. Xie, the individual that Meishe claims misappropriated its source code. *See* Dkt. 235 at 16-17. The name 'CDV' ("China Digital Video," the English translation of Xin Ao-Te)—not 'Meishe'— appears in the copyright management information contained in almost all the asserted source code. Meishe also concedes that 'much, if not most, of the research and development associated with the trade secrets misappropriated by Defendants was done at Xin Ao Te.' Ex.1, Plaintiff's Supp. And Revised Resp. to Defendants' Interrogatory No. 26. XAT is Meishe's largest shareholder, owning 30% of the company. *See* Ex. 2, 2022 CDV Fin. Report. Publicly available financial reports from 2022 list Meishe as an 'associate' of XAT, over which XAT has 'significant influence.' *Id*."  Mot. at 2.

Meishe has previously "requested and received documents from XAT during discovery in this case. *See* Ex. 3, Aug. 30, 2023, Hr'g Tr. 48:7–9." Mot. at 2.  "Based on Meishe's undisputed ability to obtain documents from XAT, Defendants have sought discovery on XAT for years. Defendants defined 'Meishe' to include its affiliate XAT in every document request

sent to Meishe. *See, e.g.*, Ex. 4, Defendants' Requests for Production of Documents to Plaintiff Nos. 71–75, at 1; Ex. 5, Defendants' Interrogatories to Plaintiff Nos. 38-40, at 1. In June 2023, Defendants also served discovery requests specifically directed at documents within Meishe's possession, custody, or control that were provided to Meishe by XAT. *See* Ex. 5, Defendants' Interrogatories to Plaintiff Nos. 39 and 40; Ex. 4, Defendants' Request for Production No. 74." Mot. at 2.

"On August 7, 2023, Meishe admitted it had requested some unspecified set of documents from XAT, that XAT had provided documents to Meishe, and that Meishe had produced those documents. *See* Ex. 6, Aug. 7, 2023 Roberts Ltr. The documents were produced as Meishe—not XAT—documents and could not be distinguished from other documents produced by Meishe. Meishe otherwise refused to produce XAT documents in its possession, custody, or control. To justify its refusal, Meishe claimed that XAT was a third-party over which Meishe did not have control. *See* Ex. 7, Oct. 16, 2023 Woods Ltr." Mot. at 2. Defendants raised the dispute with the Texas Court, prior to the transfer of this case to the Northern District of California.

The Texas Court held in part:

> *C. Defendants' Interrogatory No. 40 and Request for Production No. 74:* Defendants' request is GRANTED-IN-PART AND DENIED-IN-PART. Within 10 days, Plaintiff will produce copies of any specific requests for documents or information made by Plaintiff to Xin Ao-Te and Xin Ao-Te's responses to Plaintiff. If such requests were not made in writing, then Plaintiff will make a request for documents in writing to Xin Ao-Te and produce that request and any response to Defendants. Defendants' request to order Plaintiff to obtain and produce documents from Xin Ao Te is DENIED without prejudice. Defendants' request for documents and information on who has input into litigation strategy or financial interest in the litigation as set forth in subparts (1)-(5) of Interrogatory No. 40 and RFP No. 74 is DENIED.

Dkt. No. 362 at 2.

According to Plaintiff, "Meishe fully complied with the Court's Order. *See* Dkt. No. 362. The Texas Court ordered Meishe to produce any specific requests for documents made by Meishe to XAT and, if not already done, to make a specific request for documents to XAT in

writing. The Texas Court further directed that Meishe provide any requests to XAT and responses from XAT to Defendants. Contrary to Defendants' assumption that 'some transmittal email must exist,' Meishe determined that Meishe's request for Jing Xie's files early in the litigation was made face-to-face and XAT's response was to provide scanned documents in a chat message to Meishe using WeChat.[3] Mot. at 4. These Jing Xie employment documents were produced to Defendants. In response to the Court's Order, Meishe sent a letter to XAT requesting the exact information specified by Defendants. *See* Defendants' Ex. 8. Meishe provided this letter to Defendants and, to date, Meishe has received no response from XAT and Meishe has had no discussions with XAT regarding Defendants' request. [. . .] Meishe has fully complied with the Court's Order."  Opp'n at 5.

## II.    LEGAL STANDARDS

Under Federal Rule of Civil Procedure 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense[.]" "A party may request documents 'in the responding party's possession, custody, or control.'" *K-Fee Sys. GmbH v. Nespresso USA, Inc.*, No. 21-cv-03402-GW, 2022 WL 2156036, at *2 (C.D. Cal. May 2, 2022) (quoting Fed. R. Civ. P. 34). "A party has an obligation to conduct a reasonable inquiry into the factual basis of its discovery responses."  *Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP*, 256 F.R.D. 678, 680 (C.D. Cal. 2009).

A "party responding to a Rule 34 production request is under an affirmative duty to seek that information reasonably available to it from its employees, agents, or others **subject to its control**." *Leprino Foods Co. v. Avani Outpatient Surgical Ctr., Inc.*, No. 22-cv-7434-DSF-JC, 2024 WL 650434, at *3 (C.D. Cal. Jan. 4, 2024) (emphasis added).

"A party seeking production of documents bears the burden of establishing the opposing party's control over those documents."  *Nugent v. Secretlab US, Inc.*, No. 22-cv-08944-RFL (PHK), 2024 U.S. Dist. LEXIS 175988, at *5 (N.D. Cal. Sept. 27, 2024) (citing *United States v.*

---

[3] The assertion that Meishe made a face-to-face request for files from XAT and received them through WeChat is not supported with any declaration from Meishe.  Therefore, the assertion remains argument, not evidence.

*Int'l Union of Petroleum and Indus. Workers, AFL-CIO*, 870 F.2d 1450, 1452 (9th Cir. 1989)).

## III.    **DISCUSSION**

### A.    *Whether Meishe Must Produce Its Written Requests to XAT to Provide Discovery Requested by Defendants (and Any Responses)*

The undersigned finds that, to fully comply with the Texas Court's above-quoted discovery ruling (Dkt. No. 362), Meishe must provide further responses and production so as to reflect ***all*** of its "written requests to XAT to provide discovery requested by Defendants" ***including*** "all prior transmittal correspondence whereby Meishe requested documents from XAT and/or XAT sent documents to Meishe" ***and all*** "responses" by XAT thereto.  Mot. at 1, 9.

In its Opposition, Meishe argues (with no supporting declaration) that it made no such "written" requests to XAT, and that it verbally requested documents that were later provided through the WeChat app.  Opp'n at 1, 3, 5.  If this is true, Meishe should supplement its discovery responses so as to make these representations in a formal discovery mechanism with supporting verifications or declarations.

Meishe also suggests (with no supporting declaration) it has already produced all of its written requests to XAT and XAT's responses (or lack thereof), so there is nothing further to be done.  Opp'n at 5.  Yet Meishe has not produced, and not clearly attempted to locate, any WeChat transcript.  Meishe must do so.

Meishe has not argued that it lacks control over XAT's written responses made ***to Meishe*** (on WeChat or otherwise), if any, following such requests.  In short, Meishe was ordered to produce, but has still not clearly produced, all written "responses" from XAT to Meishe.  Dkt. No. 362; Reply at 2.  Such responses would include the above-described WeChat transcript.

Meishe shall also supplement its production so as to provide any WeChat transcripts (and any other writings) reflecting XAT's submission of requested documents to Meishe, to the extent any such writings are within Meishe's possession, custody, or control.  *On Point Events*, 256 F.R.D. at 680 ("A party has an obligation to conduct a reasonable inquiry into the factual basis of its discovery responses.").  If such writings are not under Meishe's control, Meishe shall supplement its discovery responses so as to describe its attempts to obtain them.

Defendants also argue that Meishe refuses to confirm it did not instruct XAT to ignore Defendants' requests.  Defendants argue that they are entitled to know whether Meishe instructed XAT to ignore the requests.  "If XAT is a "third party" – as claimed by Meishe – Meishe's discussions with XAT are not protected from disclosure."  Mot. at 5.  This argument is well-taken.  Meishe's further responses to the discovery regarding its requests to XAT shall be provided.

Defendants' Motion is GRANTED IN PART in that Meishe must provide further responses and production so as to reflect *all* of its "written requests to XAT to provide discovery requested by Defendants" *including* "all prior transmittal correspondence whereby Meishe requested documents from XAT and/or XAT sent documents to Meishe" *and all* "responses" by XAT thereto (including but not limited to any WeChat transcripts).  If such responsive writings exist but are not under Meishe's control, Meishe shall serve further responses so as to describe its attempts to obtain the responsive writings, and shall include a supporting verification or declaration.

The undersigned is troubled by Meishe's lack of evidentiary support for many of the factual representations in its Opposition, including but not limited to those narrative representations specifically discussed above.  However, during the hearing the undersigned inquired with Meishe's counsel about its lack of evidence, and Meishe's counsel confirmed on the record that Meishe is willing to provide narrative declaration(s) from its personnel to support the factual and narrative assertions made in Meishe's papers.  Accordingly, Meishe shall do so.  Such declarations should come from one or more Meishe company personnel and shall describe Plaintiff's communications, if any, with XAT personnel regarding Defendants' request for production of XAT's documents, including any instructions Meishe gave to XAT personnel to ignore Defendants' requests, and including any transcripts from WeChat or any other responsive writings in Plaintiff's possession, custody, or control.

## B. *Whether Meishe Must Obtain and Produce the Discovery Requested by Defendants on Grounds Meishe Has "Control"*

Under Rule 34, parties must produce responsive documents within their "possession,

custody, or control." Fed. R. Civ. P. 34(a)(1).  "A party need not have 'actual possession of the requested document' to be obligated to produce it[;] [r]ather, 'control' is sufficient." *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp. Inc*., No. 14-cv-03053-MWF, 2018 WL 1157752, at *18 (C.D. Cal. Mar. 2, 2018); *Lodestar Anstalt v. Bacardi & Co., Ltd*., No. 16-cv-6411-CAS, 2018 WL 8786642, at *2 (C.D. Cal. Nov. 21, 2018) ("Control may extend to documents that are nominally held in another corporation's case, including … when stored with a sister corporation or unrelated entity, because of that entity's complicity in storing or withholding documents.").

"A ***party seeking production of documents bears the burden*** of establishing the opposing party's control over those documents."  *Nugent*, 2024 U.S. Dist. LEXIS 175988 at *5 (emphasis added).

Ninth Circuit authorities have held that a party has "control" for discovery purposes if the party has a "legal right" to obtain the document from the nonparty.[4]  *In re Citric Acid Litig*., 191 F.3d 1090, 1107-08 (9th Cir. 1999).  The Ninth Circuit has rejected a practical-ability-to-obtain-documents test.  *See id*.; *Nugent*, 2024 U.S. Dist. LEXIS 175988, at *44-45; *see also Seifi v. Mercedes-Benz U.S.A., LLC*, 2014 U.S. Dist. LEXIS 173745, 2014 WL 7187111, at *2 (N.D. Cal. Dec. 16, 2014) ("In the Ninth Circuit, a 'practical ability to obtain the requested documents' from a related organization is not enough to constitute control because the related organization 'could legally—and without breaching any contract—[ ] refuse to turn over such documents.' Instead, 'control' is defined as 'the legal right to obtain documents upon demand.'" (citing *In re Citric Acid Litig*., 191 F.3d at 1107-08) (citations omitted)); *Micron Tech., Inc. v. Tessera, Inc*., No. 06-mc-80096-JW (HRL), 2006 WL 1646133, at *1 (N.D. Cal. June 14, 2006) ("Documents

---

[4] "Varni claims that C&L–US has ***the practical ability to obtain documents*** from C&L–Switzerland ***because C&L–Switzerland has voluntarily furnished C&L–US with documents and information in the past***. With respect to the ECAMA documents, however, C&L–US asked C&L–Switzerland to produce those documents, but C&L–Switzerland refused. There is no mechanism for C&L–US to compel C&L–Switzerland to produce those documents, and it is not clear how Varni wants C&L–US to go about getting the ECAMA documents, ***since C&L–Switzerland could legally —and without breaching any contract—continue to refuse to turn over such documents***. Because C&L–US does not have ***legal control*** over C&L–Switzerland's documents, Varni could not compel C&L–US to produce those documents." *In re Citric Acid Litig*., 191 F.3d 1090, 1108 (9th Cir. 1999) (emphases added).

not actually possessed by the [requested] party may be considered within its control if the party has 'the legal right to obtain the documents on demand.'") (quoting *In re Citric Acid Litig*., 191 F.3d at 1107).

The Ninth Circuit has not specifically defined what constitutes a "legal right" to obtain the documents. *Tessera*, 2006 WL 733498, at *4. While a "[l]egal right suggests an ownership interest, a binding contract, a fiduciary duty, or some other legally enforceable arrangement[,]" *Micron Tech*., 2006 WL 1646133, at *1, courts engage in a factual and case specific inquiry to make the determination, *Tessera,* 2006 WL 733498, at *4; *accord Cryptography Rsch., Inc. v. Visa Int'l Serv. Ass'n*, No. 04-cv-04143-JW (HRL), 2005 WL 8162416, at *1–2 (N.D. Cal. Aug. 4, 2005). For example, a party seeking to compel nonparty documents in the "control" of the opposing party must "establish that a subsidiary has a legal right to obtain documents from its parent on demand before compelling those parties to produce documents." *Dugan v. Lloyds TSB Bank, PLC*, No. 12-cv-2549- WHA (NJV), 2013 U.S. Dist. LEXIS 126369, at *8 (N.D. Cal. Sept. 4, 2013).

In conducting fact-specific inquiries to assess "control" for discovery purposes, courts in the Ninth Circuit have examined several factors: "(1) commonality of ownership; (2) exchange or intermingling of directors, officers, or employees … ; (3) exchange of documents between the corporations in the ordinary course of business; and (4) involvement of the non-party corporation in the litigation." *Almont*, 2018 WL 1157752, at *19; *Lodestar*, 2018 U.S. Dist. LEXIS 228172, at *2 (finding control under the same factors); *see also K-Fee*, 2022 U.S. Dist. LEXIS 109063, at *4 (citing *Lodestar*, 2018 U.S. Dist. LEXIS 228172, at*4).

Some courts have considered additional factors.[5] Just a few months ago, a court in this District explained, "[i]n determining whether one corporate entity has 'control' for purposes of discovery over another entity, courts look to the following factors: (1) whether the corporations

---

[5] As described herein, on the current record Defendants' showing is not sufficient under the factors Defendants put forth in their own moving papers. Because Defendants have not met their burden as to those factors, the undersigned had no need to reach, and did not reach, the additional factors identified in Plaintiff's cited cases.

have interlocking corporate structure and management; (2) whether the corporations operate as a single unit in all aspects of the relevant business; (3) whether the corporations have identical stockholders and directors; (4) whether the subsidiary acted as the agent of the parent in the relevant transaction; (5) whether the subsidiary can secure documents from the parent to meet its own business needs; (6) whether the subsidiary has some ownership interest in the parent; (7) and other factual inquiries that are case specific." *Nugent*, 2024 U.S. Dist. LEXIS 175988, at *4-5.

Here, Defendants argue that (1) "Meishe is owned by XAT"; (2) "Meishe and XAT intermingle employees"; (3) "Meishe and XAT regularly exchange documents"; and (4) while the "full extent of XAT's involvement in this case is unknown due to Meishe's refusal to respond to Defendants' discovery requests[,] . . . it is undisputed that XAT is involved in the earlier-filed Chinese actions brought by Meishe." Mot. at 6-8.

Plaintiff's Opposition addresses Defendant's arguments in part by offering narrative explanations regarding Meishe's formation. Plaintiff explains: "China Video Digital (Beijing) Limited ("XAT" or "CDV"), established in 1990, is a leading company in China specializing in technologies and services for digital media content production and operations and is a prominent brand in China for television and video technology." Opp'n at 2. "In early 2014, a department of XAT – video360 – independently developed and published the initial version of the Meishe mobile application for audio and video editing. *See* Ex. 1; Ex. 2." Opp'n at 2. "Later in the same year, this department became a separate company – Plaintiff Beijing Meishe Network Technology Co., Ltd. – with XAT initially having a 40 percent ownership interest in Meishe. *See* Ex. 3." Opp'n at 2. "The employees from video360 of XAT became the founding employees of Meishe, and XAT provided Meishe with all rights to the Meishe mobile application including the associated copyrights and trade secrets. *See id.*; Ex. 4." Opp'n at 2. "In the early stages after the company was established, Meishe relied on XAT for certain services due to a lack of resources[fn.], including human resources, daily administration, and email systems." Opp'n at 2 (footnote omitted). "Meishe gradually switched to its own systems and resources as the company grew and prospered. Ex. 6 (Meishe notified its employees to switch to the Meishe

email system with a one year of transition period in 2020); Ex. 7 (Email with Meishe Email Address in late 2020)." Opp'n at 2.  "As Meishe grew and after several rounds of financing, XAT now only owns about 30 percent of Meishe. *See* Ex. 8."  Opp'n at 2.

Plaintiff's explanations about the beginnings of the Meishe entity appear in legal argument portions of the Opposition and are not supported by any declaration from a Meishe representative.  Therefore, Plaintiff's explanatory narrative is not truly evidence.  Nevertheless, Plaintiff's cited exhibits do tend to bolster its proffered explanation, i.e., that Plaintiff initially used XAT's email domain but shifted to its own in 2020, that XAT started with 40% ownership of Plaintiff but now owns 30%, that employees from XAT were the founding employees of Meishe.  In fact, these assertions are consistent with Defendants' arguments and evidence.  As discussed below, however, no evidence from either side sufficiently shows Plaintiff's ***current*** control – legal or practical – over XAT.

As described below, Defendants' evidence (i.e., showing XAT's ownership stake in Meishe, showing Meishe initially used XAT email addresses and Human Resources support, and showing XAT has described itself as "affiliated" with Meishe, etc.) does not suffice to show Plaintiff ***currently*** has "control" over XAT for purposes of document production in discovery.  For example, Defendants' Exhibits 26 and 28-29 appear to show Meishe's Human Resources officer sending emails on Meishe's behalf from a "cdv.com" email as recently as November 2020 – but the record does not include any emails with later dates.  Indeed, the undersigned finds that Defendants' evidence does not show that Plaintiff ***currently*** has legal control – or, for that matter, control in the form of a practical ability to obtain documents – over XAT for discovery purposes.

### *(1) Unity of Ownership*

XAT undisputedly has a 30% current ownership stake in Meishe, and this certainly reflects some level of "unity" between the two entities.  But XAT's undisputed ownership stake in Meishe does not itself suggest Meishe has "control" over its partial owner, XAT.

Defendants' moving papers cite to *Almont* in support of their "unity of ownership" argument.  Mot. at 6.  Defendants cite the case for the proposition that a party entity representing

it was "formerly" owned by a non-party entity was ultimately held to "control" the nonparty

entity for discovery purposes. However, Defendant has not shown that the finding of "control" in

*Almont* is warranted on the facts here, even if some level of "unity of ownership" exists.

In *Almont*, the party responding to discovery was determined to have "control" over a

nonparty's documents in part because a "unity of ownership" existed between the two entities.

After a full evidentiary hearing with testimony from witnesses, the court weighed credibility and

found that the evidence showed both entities shared the same attorney.  The evidence showed

that this attorney had signed a letter describing the nonparty entity as "formerly" the party entity:

"[a] letter from Ms. Jaroscak, counsel for SCM [party] and Imperium [nonparty], to NexTech,

evidences a unity of interest: 'I represent Imperium, ***formerly*** Surgery Center Management.'"

*Almont*, 2018 WL 1157752, at *20 (emphasis added).  The court rejected the party's argument

that the counsel's statement was a "mistake." *Almont*, 2018 WL 1157752, at *20.  "Mr. Oxman

claimed this letter was a mistake by Ms. Jaroscak's colleague, but Ms. Jaroscak testified that she

assumed she followed her routine practice in reviewing this letter before it was sent out over her

name."  The court held this was "evidence of unity of ownership between [nonparty] Imperium

(which is owned by the Medical Investment Trust) and any Counterclaim Defendants." *Almont*,

2018 WL 1157752, at *20.  The court also held that "[w]ith regard to unity of ownership/interest,

Ms. Jaroscak also testified that at least one of the beneficiaries of the Medical Investment Trust,

which are the equitable owners thereof, is Julian, Michael, or Cindy Omidi. [Citation to

evidence.] Michael and Julian Omidi also owned Beverly Hills SC [citation to evidence], and

likely owned other surgery centers that they organized and incorporated [citation to evidence],

and also SCM, which is currently owned by Mr. Pezeshk, their uncle and Cindy Omidi's brother

SC [citation to evidence]." *Almont,* 2018 WL 1157752, at *20 (citations to evidence omitted).

The court in *Almont* thus found a "unity of ownership," which weighed in favor of "control."

However, in *Almont* the ultimate finding of "control" was based on far more than a "unity

of ownership."  In *Almont*, the court essentially found that the responding party could not

credibly blame the nonparty database-operator for preventing the party's access to responsive

documents.  The court examined the details of the party's transfer of the database license to the

nonparty database-operator, and the transfer of responsive documents to that nonparty (to be stored in the database). *Almont,* 2018 WL 1157752, at *19. The court found that these transactions did not take place at arm's length, ultimately finding the nonparty to be the party's "alter ego" for discovery purposes. *Id.* at *19. Moreover, the nonparty database-operator had no assets and only one employee – who was asked by the responding party's counsel to take on the role – and who was "merely a figurehead" and spent almost no time on the job. *Id.* at *21. The court determined that the nonparty database-operator was a mere "shell company" of the responding party.[6] *Id.* As a result, the party claiming a lack of control over documents in the nonparty shell company's database was found to have "control" over its shell company for discovery purposes.

Defendants have not made similar showings here. While it is undisputed that nonparty XAT has a 30% ownership stake in Meishe, Defendants have not shown that its cited cases involve this level of "unity" of ownership. XAT has not been shown to be a mere "shell company" acting for Meishe's benefit, or vice versa. *See, e.g.*, *Almont,* 2018 WL 1157752, at *21. Nonparty XAT has not been shown to have engaged in transactions with Plaintiff at something other than "arms' length." *See, e.g.*, *id.* at *19. Nonparty XAT has not been shown to lack any employees and have only one "figurehead" employee who was appointed by Plaintiff's counsel, or vice versa. *See, e.g.*, *id.* at *20-21.

Similarly, Defendants have not made a showing of "commonality of ownership" like the

_____

[6] "For purposes of this discovery issue, the Court finds that Imperium is a shell or sham company, whose alleged corporate separateness may be disregarded under alter ego factors. Imperium has no employees, no revenue, and no costs that are material. There is no evidence that it regularly generates financial statements or that it files tax returns. Its former CEO, Dr. Au, testified that Imperium's business function is to 'manage' Salus Medical and Royalty Surgical, but when asked what that entails, Dr. Au said, 'I'm not sure.' Nov. 14, 2017 Tr. 85:6-11. As CEO of Imperium, he 'answered to the lawyers,' who were also lawyers for Counterclaim Defendants." *Almont*, 2018 WL 1157752, at *21. "The conclusion that Imperium is a shell or sham company is also strongly supported by the testimony of Janzen Hidalgo, its current CEO. In early 2017, Mr. Hidalgo began as Imperium's CEO, Secretary, Treasurer and sole Board member. Up to that time, Mr. Hidalgo's total business training and experience amounted to six months as an accounting student. He was asked to do these jobs (as well as to be the sole Trustee of the Medical Investment Trust—owner of Imperium) by 'lawyers' all of whom also represent Counterclaim Defendants. Mr. Hidalgo is a full-time, active duty seaman in the U.S. Navy—stationed in San Diego, California. He typically works from sun up to sun down in his position in the Navy. He devotes only 3 hours per month to his duties as CEO, Secretary, Treasurer, and Board member at Imperium. And Imperium has no other employees." *Id.*

one in *Thales*. *See Thales Avionics Inc. v. Matsushita Avionics Sys. Corp*., No. SACV04454JVSMLGX, 2006 WL 6534230, at *5 (C.D. Cal. Mar. 8, 2006). In *Thales*, the party seeking discovery, Panasonic, argued that "the Thales entities hold themselves out together as one organization, the Thales group[;] [t]he Thales group website states that 'Thales is a global electronics company serving Aerospace, Defense and Security & Services markets worldwide.'" *Id*. "Panasonic avers that there is commonality of ownership between the entities in question, which demonstrates that Thales has custody and control over Quentin's emails. As stated above, Thales is a wholly-owned subsidiary of Thales Avionics. [Citation to evidence.] Thales Avionics is wholly-owned by Thales S.A. *Id*. In addition, the Thales Group includes the plaintiff, Thales, Thales Avionics, Thales S.A., and other Thales related entities. [Citation to evidence.] Thales and Thales Avionics constitute the 'Aerospace Division,' one of six divisions of the Thales group." *Id.* (citations to evidence omitted). The court ultimately held that "[g]iven the coordination between the Thales entities, and the corporate structure . . . there is commonality of ownership between the entities in question." *Id*.

Here, Defendants have not made a showing of "unity" or "commonality" of ownership similar to the one in *Thales*. Defendants have not shown that Meishe is wholly-owned by XAT, or that there is currently "coordination" between the entities in a single business operation, or that they are part of one single "corporate structure" with different divisions, for example. *See id.*

The undersigned clarifies that, for Defendants to show Meishe has "control" over XAT's documents, it is not sufficient to show that XAT simply has an ownership stake in Meishe or that the two entities are in a parent-subsidiary relationship. *See Dugan*, 2013 U.S. Dist. LEXIS 126369, at *8; *see also Genentech, Inc. v. Trs. of the Univ. of Pa*., 2011 U.S. Dist. LEXIS 128526, at *9-10 (N.D. Cal. Nov. 7, 2011) ("The fact that Genentech is wholly owned by Roche, and Roche controls Genentech's Herceptin operations . . . suggests at most that Roche has the legal right to obtain documents pertaining to Genentech. Penn has not shown that the converse is true"); *Hambrecht Wine Group, L.P. v. Millennium Imp. LLC*, 2006 U.S. Dist. LEXIS 86279, at *5-6 (N.D. Cal. Nov. 14, 2006) ("[P]laintiff fails to distinguish between a parent's control over a subsidiary, and a subsidiary's control over its parent. Thus, although plaintiff might be able to

argue successfully that after the acquisition LVMH had control over Millennium's documents, plaintiff certainly has shown no legal right possessed by Millennium to exert any control over LVMH's documents."). "[E]ven being a wholly-owned subsidiary is not necessarily sufficient to demonstrate that the subsidiary company has control over the parent company's documents." *Mgi Digit. Tech. S.A. v. Duplo United States Corp*., 2023 U.S. Dist. LEXIS 187301, at *8 (C.D. Cal. Aug. 4, 2023) ("The argument that Duplo Japan holds a 28% ownership stake in Duplo USA was … unavailing."); *Nugent*, 2024 WL 4331812, at *14 ("[T]he fact that Secretlab US is a wholly-owned subsidiary of Secretlab SG does not, by itself, negate a conclusion of 'control[.]'")

Indeed, as Plaintiff argues at page 8 of the Opposition, in *Tessera*, the Court held that even though the Korean parent company owns 96.7 percent of the U.S. subsidiary, the two companies undertook joint efforts in research and development of the technology, and two companies have overlapping directors and share counsel, there was still no showing of a "legal right" for the subsidiary to obtain documents from the parent.  *Tessera*, 2006 U.S. Dist. LEXIS 25114, at *15-18.  Similarly, in *Dugan*, the Court found subsidiary did not have "control" over documents of parent corporation even though there is evidence that the parent "provided documents … to support [the subsidiary's] defense;" that the parent and subsidiary "share[d] the same internal legal group; that the two [had] the exact same ten-member Board of Directors; and that [the parent corporation] played a critical role in administering and profiting from the loans at issue," because the two are separate entities. *Dugan*, 2013 U.S. Dist. LEXIS 126369, at *9-10. Thus, the undersigned finds that the parent-subsidiary relationship alone does not suffice to show "control" here.

Ultimately, the "unity of interest" showing made here does not weigh heavily in favor of a finding of "control."

### (2) Intermingling Employees

As discussed above herein, while a parent-subsidiary relationship is not itself determinative in the "control" analysis, the "intermingling of employees" between a subsidiary and parent is a factor to consider in that analysis.  However, courts have clarified that an "employee of one subsidiary may have previously worked for the parent or another subsidiary.

This common employment situation does not give rise to an inference of control within the meaning of Fed. R. Civ. P. 34." *K-Fee*, 2022 U.S. Dist. LEXIS 109063, at *6-7.  The undersigned looks to Defendants' cited cases in support of the "intermingling" factor.

Defendants argue that "Meishe and XAT intermingle employees," that Meishe's "core team" comes from XAT, that Meishe's hiring is coordinated by XAT, that Meishe's Human Resources group "provides the employee with an XAT employee handbook," and that "Meishe and XAT also intermingle officers: Pengcheng Zheng, the CEO of Meishe, has held the role of Vice President at XAT, overseeing XAT's new business development department, while managing the overall operations of Meishe at the same time."  Mot. at 6 (citing Exs. 11-25).

Defendants argue that, faced with "intermingling of directors, officers, or employees," courts have required a "subsidiary … to respond to a Rule 34 request which includes the parent company's documents."  Mot. at 6 (citing *Thales*, 2006 WL 6534230, at *5; *Nugent*, 2024 WL 4331812, at *12 (finding legal control and granting motion to compel where two corporations shared management and directors); *Echo Film v. DigiWorld Studios, Inc*., No. 09-cv-01455-JFW, 2009 WL 10672570, at *2 (C.D. Cal. Nov. 18, 2009) (similar); *Lodestar*, 2018 WL 8786642, at *2 (similar)).)

In *Thales*, a wholly-owned subsidiary corporation was held to have "control" over its parent corporation's documents for purposes of discovery in part because "[t]here is significant overlap of officers, directors, and employees among the Thales entities."  *Thales*, 2006 WL 6534230, at *5.  "Panasonic asserts that 'the Thales Aerospace Division consists of officers and directors of both Thales and Thales Avionics who share responsibility for the IFE business.'"  *Id*.  "Panasonic additionally avers that '[t]he integrated nature of the IFE business results in a regular exchange of documents among directors, officers and employees of the various Thales entities involved in the IFE business.'"  *Id*.  The court in *Thales* concluded, "[t]here is some evidence of overlap of directors, officers, and employees among the Thales entities."  *Id*.

Here, Defendants' evidence also shows some degree of overlap between XAT's personnel and Meishe's: at one time, Pengcheng Zheng apparently served simultaneously as Meishe's CEO of Meishe and also a Vice President of XAT.  But there is no evidence that any

Pengcheng Zheng **currently** does so, and no evidence that any other overlapping employees "share responsibility for" a single enterprise, such as "the IFE business" in *Thales.  See id.* Moreover, Meishe argues that its initial staff came from XAT because Meishe "spun off" from XAT, but that there is no **_evidence_** of a **_current_** "significant overlap" among employees between the two entities.  Indeed, there is no evidence of any current or ongoing shared business enterprise between the two entities.  The "intermingling" of employees in *Thales* is therefore not analogous.

Moreover, Plaintiff presented authorities questioning the analysis in *Thales*, and Defendants' Reply did not address these or discuss *Thales* further.[7]  The undersigned finds that *Thales* does not weigh in favor of a finding of "control" here.

In *Nugent*, the court found "all of the personnel, officers, directors, operations, and computer systems for Secretlab US are not merely integrated into but are dominated by and subsumed within Secretlab SG," in addition to the fact that both companies share the same CEO, CSO, and General Counsel. *See Nugent*, 2024 U.S. Dist. LEXIS 175988, at *27-29.  "Secretlab US has no employees, only a handful of corporate officers and board members. All work for Secretlab US is handled either by Secretlab SG or by third party contractors for online sales, warehousing, and delivery. Secretlab SG employees, based in Singapore, identify the warehousing contractors for Secretlab US. Secretlab SG's legal department provides all legal services for Secretlab US. The officers and directors of Secretlab US are also, at the same time, officers and directors of Secretlab SG." *Id.* at *6-7.

Defendants have made no showing of intermingling personnel similar to the one in *Nugent*.  The "intermingling" of employees in *Nugent* is not analogous and does not weigh in favor of a finding of control.

---

[7] As Plaintiff notes, *Thales* relied on out-of-circuit cases that define "control" more broadly than the Ninth Circuit did in *Citric Acid.  See Otos v. WHPacific, Inc.*, No. 2:16-cv-01623-RAJ, 2017 U.S. Dist. LEXIS 86755, at *4 (W.D. Wash. June 6, 2017) (criticizing the opinion for improperly broadening the definition of "control"); *see also SiteLock LLC v. GoDaddy.com LLC*, No. CV-19-02746-PHX-DWL, 2023 U.S. Dist. LEXIS 82377, at *80 (D. Ariz. May 10, 2023) (same).

In *Echo Film*, the party and nonparty entity both shared the same CEO, and the moving party provided evidence indicating "an overlap of 13 employees" in addition to the CEO, plus a "website press release indicating that Studio Vault, Festival Vault, Dark Vault, and Light Vault are 'divisions' holding different genres of Cinemavault Releasing International, Inc.'s libraries." *Echo Film v. DigiWorld Studios, Inc*., No. CV0901455JFWAGRX, 2009 WL 10672570, at *2 (C.D. Cal. Nov. 18, 2009). Similarly, in *Lodestar*, there was a finding of "intermingling" because "Andre Levy submitted a declaration in this case acknowledging that he is the chairman of both Lodestar and Protégé." *Lodestar*, 2018 WL 8786642, at *2. "Protégé is the company that advertises and markets plaintiff's goods, including all products sold in the United States." *Id*. In both cases, evidence of current "intermingling" employees and a shared business enterprise supported an ultimate determination of "control."

However, as discussed above in connection with *Thales*, here Defendants' evidence does not suggest a ***current*** "significant overlap" among employees of XAT and Meishe. There is no evidence of any ***currently*** overlapping employees who "share responsibility for" a single business enterprise; there is no evidence of something like shared "divisions" of a single enterprise that shared employees are working together toward (as in *Echo Films*), such as one entity advertising or marketing the other's goods (as in *Lodestar*). XAT and Meishe do not have the same "chairman" (as in *Lodestar*). The "intermingling" of employees in *Echo Film* and in *Lodestar* is therefore not analogous, and the "intermingling" factor does not weigh strongly in favor of a finding of "control."

Meishe argues that "no officers or other employees of Meishe currently hold positions in XAT [fn.2]." Opp'n at 7 (citing no evidence). Meishe states that it has no current overlapping officers or employees and Meishe and XAT no longer share any resources.[8] Opp'n at 7-8. The

---

[8] "Defendants point to multiple documents to show Meishe employees working for XAT – but these documents were created before Meishe even existed. Ex. 10; Ex. 11. In addition, as explained above, in its early stages Meishe relied on the support resources of XAT, including administrative and human resources, to sustain its daily operations and development, but Meishe was and is a separate company. As of 2020, Meishe has formed its own logistical team to handle daily management." Opp'n at 7-8 (citing no evidence).

undersigned again notes, however, that Plaintiff has not provided any such information in a sworn statement from a Meishe representative.  Therefore, these assertions are merely argument, not evidence.

Regardless, it remains **Defendants' burden** to show control here.  *See Stella Sys., LLC v. MedeAnalytics, Inc.*, No. 14-cv-880-LB, 2015 WL 1870052, *2-4 (N.D. Cal. Apr. 22, 2015) (despite lack of evidence from moving party explaining use of nonparty's name in email addresses, "[t]he court nonetheless thinks that *the determinative legal issue is that of the burden*, which falls on [the party seeking to compel discovery]" (emphasis added)).  Here, Defendants' evidence does not show any current overlap in employees or any currently-shared resources or between XAT and Meishe.  On Reply, Defendants argue that "a history of intermingling employees and officers . . . supports a finding of control, even if the practice has ceased."  Reply at 4 (citing *Almont*, 2018 WL 1157752, at *20 (finding control based on historic overlap of CEOs).  However, in *Almont* the separate entities had shared the same CEO who was "simultaneously managing" both the party and non-party entity controlling the document database.  The court in *Almont* weighed various other factors that are not present in the record here before concluding that the non-party was a mere "shell company" for the party company's purposes.  The "intermingling" in *Almont* is not analogous and does not weigh strongly in favor of a finding of  Meishe's "control" over XAT.

Ultimately, the showing of "intermingling" here does not weigh heavily in favor of a finding of current "control."

### (3) Regularly Exchange Documents in the Ordinary Course of Business

Defendants argue that "Meishe and XAT regularly exchange documents. Meishe employees have long used XAT email addresses to send and receive documents."  Mot. at 7 (citing Ex. 26, MEISHE-TT_00076308; Ex. 27, MEISHE-TT_00205537; Ex. 28, MEISHE-TT_00076405; Ex. 29, MEISHE-TT_00203447).  Defendants also argue that "Meishe's Technical Vice President (Tiehua Liu) is the contact person on three of the asserted copyright registrations, each of which list Meishe as the applicant, yet Mr. Liu's contact information on the registrations is an XAT email address."  Mot. at 7 (citing Ex. 30, MEISHE-TT_00001609; Ex.

31, MEISHE-TT_00001617; Ex. 32, MEISHE-TT_00001625.").

Defendants have not shown that Meishe's use of XAT's email addresses during a given period supports the conclusion that the two entities currently and "regularly exchange documents" in their ordinary course of business. None of Defendants' cases held a party's use of email addresses ending in the nonparty's name reflected a "regular exchange of documents in the ordinary course of business." Similarly, the undersigned is not persuaded that evidence Meishe's Technical Vice President (Tiehua Liu) used an XAT email address on three of Meishe's copyright registrations demonstrates that the two entities currently or "regularly exchange documents."

Defendant also argues that a "regular exchange of documents" in the "ordinary course of business" can be seen from the evidence that Meishe simply "asked for and received documents from XAT when it was convenient for Meishe in this case[,]" then produced the documents in discovery. Mot. at 7 (citing Ex. 6, Aug. 7, 2023 Roberts Ltr.; Ex 7, Oct. 16, 2023 Woods Ltr.; Ex. 33, Aug. 6, 2024 Okano Ltr.). Defendants argue that Meishe "cannot, in good faith, take the position that information is in their 'control' when it helps their interests, but not when [Defendants] are seeking relevant information in discovery." Mot. at 7 (citing *Almont*, 2018 WL 1157752, at *20; *K-fee*, 2022 WL 2156036, at *3 (finding legal control and granting motion to compel when party would "likely rely on documents that it voluntarily obtain[ed] … while steadfastly refusing to produce any other information from its affiliates … claiming lack of 'control' over the same affiliates"). It is undisputed that (1) XAT provided Meishe documents in this case when requested by Meishe, and (2) Meishe produced XAT's documents. Reply at 3 (citing *Lodestar*, 2018 WL 8786642, at *2 ("The Court finds that Protégé has been involved in the litigation. Lodestar has produced emails from Protégé email accounts.")).

This chain of events confirms that Meishe has the ability to ask XAT for documents, but it does not indicate one way or the other whether XAT has any real obligation to comply with Meishe's requests. Similarly, it does not indicate one way or the other whether Meishe typically obtains XAT's documents in its "regular course of business." At this time, Defendant's proffered evidence supports the ***possibility*** that Meishe ***might*** have control over XAT's

documents, but it does not reveal that Meishe does, in fact, have legal – or even practical – "control" over XAT documents for purposes of discovery.

Defendant's cited cases of *Lodestar*, *Almont* and *K-fee* are not closely analogous here.  In *Lodestar*, the court explicitly found that "Lodestar and Protégé exchange documents in the ordinary course of business. As previously noted, Protégé advertises and markets Lodestar's products sold in the United States. Further, the names and/or email addresses of numerous Protégé employees appear on hundreds of documents produced by Lodestar in this case . . . ." *Lodestar*, 2018 WL 8786642, at *2.  As discussed above, the two entities in *Lodestar* also had a single currently-overlapping "chairman" and worked together in a shared business enterprise, such that the party's production of the nonparty's employee names and email addresses supported an ultimate determination of "control."  Again, as discussed above, here there has been no showing that XAT and Meishe work together in the same manner as the entities in *Lodestar*, and no showing of any currently-overlapping managers.  There has been no showing that either XAT or Meishe "advertises or markets" the other entity's products, for example, or that the two entities work together such that Meishe would have had easy access to "hundreds of documents" with names and email addresses of XAT employees.  *See id.*

In *Almont*, there was evidence confirming the party claiming to have no control over documents in the nonparty's database actually had unlimited, free access to it.  The court examined the evidence and found that the party's personnel had "access to [the database] in the ordinary course of business" with "no restrictions."  *Almont*, 2018 WL 1157752, at *20.  The court explained: "The evidence also shows, as detailed in the findings of fact above, that *in the course of Imperium's business, Counterclaim Defendants have had access after the May 2014 Assignment to use [the] NexTech [database] as it benefitted them in this and other litigation. Imperium also allows access to billing and patient records located in the NexTech database to or for the benefits Counterclaim Defendants—without charge—for the purpose of billing patients ([citation to evidence]) or for "patient continuity." [citation to evidence.] And Counterclaim Defendant Michael Omidi has access to NexTech in the ordinary course of business, and no restrictions have been imposed by Imperium on his use. [citation to evidence.] Thus,*

*Counterclaim Defendants have been permitted to use NexTech when it is in their interest to do so.* Counterclaim Defendants cannot, in good faith, take the position that information is in their 'control' when it helps their interests, but not when Counterclaim Plaintiffs are seeking relevant information in discovery. This tactic is an example of a 'sharp' or inequitable practice that courts must guard against in determining the issue of 'control' in the discovery context." *Almont*, 2018 WL 1157752, at *20 (emphasis added).

Here, the evidence simply does not rise to the same level as in *Almont*.  There has been no showing that Meishe's having requested and obtained documents from XAT (and providing them in discovery) – in one instance – is analogous to evidence of having unlimited, free ongoing access to XAT's-controlled "database," as in *Almont*.  *See id*.

Defendants also cited to *K-fee* for purposes of the "regular exchange of documents" factor, that case did not address this factor in any real depth: "the factor regarding "exchange of documents in the ordinary course of business is not really a factor in this case because Nespresso agreed to produce responsive documents to which it has access in the ordinary course of business." *K-fee*, 2022 WL 2156036, at *7.[9]

Finally, Plaintiff has cited cases holding that a party's use of a nonparty's email address was not sufficient to show "control" over the nonparty.  In *Stella,* "Mede points to emails in which Mr. Stepanovskiy—as recently as September 27, 2014—uses '@digitalchampion.net' and '@schoolchampion.com' domain names. (ECF Nos. 131at 3, 131–9 at 2, 131–10 at 2.) (According to Mede, School Champion was a predecessor company to Digital Champion. (*See* ECF No. 131 at 3.)) Thus, in the late September email, Mr. Stepanovskiy's email address appears as 'oleksiy.stepanovskiy@digitalchampion.net.' (ECF No.131–9 at 2.)" *Stella*, 2015 WL 1870052, at *2-4.  The court found that even though this email address evidence was unrebutted,

---

[9] However, the court in *K-fee* considered the party's reliance on nonparty documents "that it voluntarily obtain[ed]" while "refusing to produce any other information from its affiliates" as part of the next factor, the nonparty's involvement in the litigation (discussed below).  *K-fee*, 2022 WL 2156036, at *3 (finding legal control and granting motion to compel when party would "likely rely on documents that it voluntarily obtain[ed] … while steadfastly refusing to produce any other information from its affiliates … claiming lack of 'control' over the same affiliates").

"control" had not been shown.  "The Stella parties' rebuttal is not the most decisive ever mounted. Why Mr. Stepanovskiy shows up as Digital Champion's CEO on a finished proposal to another company, and why as recently as the end of September 2014 he was using an email account with a Digital Champion domain name, are oddities not fully resolved by Stella's explanation that Mr. Stepanovskiy 'was in discussions to become the CEO of Digital Champion.' *The court nonetheless thinks that the determinative legal issue is that of the burden, which falls on Mede*. On the record before it, the court cannot say that Mede has shown that Stella or Mr. Stepanovskiy 'controls' the requested Digital Champion code. If the court did order the Stella parties to obtain and produce that code, to Mede or to a third-party analyst, on the evidence before the court, that order may well be a practical nullity."  *Stella*, 2015 WL 1870052, at *2-4 (denying motion to compel without prejudice due to insufficient evidence showing "control") (emphasis added).

Ultimately, on the current record, there has not been a showing that XAT and Meishe "regularly exchange documents" in their ordinary course of business, so this factor does not weigh heavily in favor of a finding of "control."

### *(4) Nonparty's Involvement in this Case*

Defendants argue that nonparty XAT is undoubtedly involved in this case, but that Plaintiff's gamesmanship has prevented discovery as to the extent of this involvement. The "full extent of XAT's involvement in this case is unknown due to Meishe's refusal to respond to Defendants' discovery requests. But it is undisputed that XAT is involved in the earlier-filed Chinese actions brought by Meishe. *See* Dkt. 36 at 9. In the actions in China, XAT submitted 'a written statement,' alleging that written attribution of ownership to XAT of the 'Meishe SDK software' was 'a clerical error.' Ex. 34, Chinese Douyin Decision at 8. As discussed supra, the same apparent ownership of the asserted copyrights in this case by XAT—not Meishe— is at issue here."  Mot. at 7-8.

As to the evidence of XAT's involvement in other similar actions brought by Meishe and proceeding in China, such involvement may well be consistent with XAT's involvement in this action pending in the United States – but is not *itself* evidence of such involvement.  Plaintiffs

did not directly address this argument or evidence in their Opposition.  Courts facing a similar absence of explanation from the opposing party have nevertheless focused on the moving party's "burden" in connection with the factors supporting "control."  *See, e.g.*, *Stella*, 2015 WL 1870052, at *2-4.

Defendants argue that "Meishe has sufficient legal control over XAT to obtain and produce the documents requested by Defendants."  Mot. at 7-8.  Defendants cite to *Almont* in support of this factor.  *Almont*, 2018 WL 1157752, at *19-21; *see also Lodestar*, 2018 WL 8786642, at *2 ("The Court finds that Protégé has been involved in the litigation. Lodestar has produced emails from Protégé email accounts."); *K-fee*, 2022 WL 2156036, at *3 (finding legal control and granting motion to compel when party would "likely rely on documents that it voluntarily obtain[ed] … while steadfastly refusing to produce any other information from its affiliates … claiming lack of 'control' over the same affiliates").

However, the fact that a nonparty "voluntarily furnished" some "documents and information in the past" does not mean that the party can force the nonparty to produce other documents.  *K-Fee*, 2022 U.S. Dist. LEXIS 109063, at *5 (discussing *Citric Acid*).[10]  Here, on the current evidence, just because Meishe once requested and received certain documents from XAT, it does not necessarily follow that Meishe can obtain XAT documents. *See, e.g.*, *Seifi*, 2014 U.S. Dist. LEXIS 173745, at *7 (rejecting Seifi's assertion that "because Defendant has produced some Daimler AG documents it must have access to all such documents and databases").[11]

---

[10] As summarized in *K-fee*: "'Control is defined as the legal right to obtain documents upon demand.' *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999) (citation omitted). '[P]roof of theoretical control is insufficient; a showing of actual control is required.' *Id*. The Ninth Circuit rejected a practical-ability-to-obtain-documents test. The moving party had argued that the responding party had the practical ability to obtain documents from categories as business models, marketing campaigns, advertising, suppliers, new products, and technical expertise. [citations] a foreign affiliate because the affiliate had 'voluntarily furnished' other 'documents and information in the past.' The court observed that the foreign affiliate 'could legally and without breaching any contract continue to refuse to turn over such documents.' Because the responding party 'does not have legal control over [the foreign affiliate's] documents,' the moving party 'could not compel [the responding party] to produce those documents.' *Id*.; *United States v. Int'l Union of Petroleum & Industrial Workers*, 870 F.2d 1450, 1454 (9th Cir. 1989) (rejecting 'inherent relationship' test)." *K-Fee*, 2022 U.S. Dist. LEXIS 109063 at *4-5 (citations omitted).
[11] "Plaintiff also suggests that because Defendant has produced some Daimler AG documents it must have access to all such documents and databases. This falls well below the showing necessary to establish legal control: Plaintiffs

The undersigned finds that this factor may at some point weigh strongly in favor of a finding of "control."  However, ***at this point*** there is insufficient evidence regarding the nature and extent of XAT's involvement, if any, in this case.  Mot. at 7-8 (the "full extent of XAT's involvement in this case is unknown due to Meishe's refusal to respond to Defendants' discovery requests."). As discussed elsewhere herein, Meishe is being ordered to provide further discovery responses that may bear on this showing.

Therefore, given Defendants' showing on each of the factors set forth in Defendants' moving papers, at this time Defendants' motion must be DENIED WITHOUT PREJUDICE as to the "control" issue.

The undersigned is mindful of the equities and concerns presented if Meishe later attempts to introduce or rely on XAT documents, i.e., after having claimed an inability to access such documents due to a lack of "control" over XAT.  Thus, the denial is ***without prejudice*** to refiling by Defendants.  As Defendants argue in the Reply, when courts in this district have denied discovery based on an apparent lack of control, they have done so without prejudice and have separately compelled discovery into the underlying relationship.  *See, e.g.*, *Stella*, 2015 WL 1870052, at *4 ("Especially given the state of the facts surrounding Mr. Stepanovskiy's relationship with Digital Champion, in the interest of clarity and certainty, the court thinks that Mr. Stepanovskiy should file a declaration fully explaining his relationship with Digital Champion.").  That same approach is warranted here.

During the hearing the undersigned inquired with Meishe's counsel about the lack of evidence supporting Meishe's descriptions and timeline of the relationship between XAT and Meishe.  Meishe's counsel confirmed on the record that Meishe is willing to provide declaration(s) from its personnel to support the factual and narrative assertions made in Meishe's papers.  Meishe shall do so as described further below.

---

must show that Defendant has the legal right to compel production of the documents from Daimler."  *Seifi*, 2014 U.S. Dist. LEXIS 173745, at *7.  Moving party "failed to provide 'factual support for [their] conclusion that the requested documents are within [responding party's] custody or control' and the motion to compel must be denied."  *Id*. at *11 (internal quotation marks omitted).

### C.  *Whether Meishe Must Describe its Legal and Corporate Relationship with XAT*

Defendants argue that "Meishe must fully respond to discovery on its relationship with XAT."  Reply at 5; Mot. at 8.  Defendants argue that to date, Meishe has refused:

> to respond to Defendants' Interrogatory 40 and Request for Production 74, seeking information about Meishe's relationship with XAT, be it contractual, legal, or otherwise. Do they share accounting services, security services, are they on the same network, etc.? Meishe responds with the incorrect assertion that it "has produced documents disclosing its relationship with XAT" and has therefore complied with its discovery obligations. Opp. at 9-10. Meishe has not, for example, described in any way its relationship with XAT in response to Defendants' interrogatories. *See* Ex. 35, Plaintiff's Supp. Resp. to Defendants' Interrogatory Nos. 39-40; Ex. 36, Plaintiff's Resp. to Defendants' Request for Production No. 74.

Reply at 5.

Defendant has articulated the relevance of its requested discovery on its relationship with XAT.  Meishe has not shown that it would be particularly burdensome or expensive to provide further responses to Request for Production No. 74[12] and Interrogatory No. 40[13].  Instead, Meishe's argument is largely that it has already produced sufficient documents and responses to

---

[12] "REQUEST NO. 74: All documents related to your legal, contractual, business, formal, informal, implied, and/or express relationships with Your parent, subsidiary, affiliate, related, sister, and/or predecessor entities, including but not limited to Xin Ao-Te and any entity that (1) has input into Your litigation strategy or ability to resolve this litigation through settlement; (2) has a financial or legal interest in this litigation; (3) possesses limited or full decision-making authority into any aspect of Your litigation strategy; (4) receives updates on the status of this litigation; and/or (5) has participated in any way in this litigation, including but not limited to providing evidence used by, relied on, or intended to be used by or relied on by You, the documents responsive to this Request including but not limited to: documents sufficient to show the identity of all directors, officers, and board members of any such entities; documents sufficient to show all ownership interests in any such entities; documents showing all ownership interests in the copyrights or alleged trade secrets asserted in this case; and documents sufficient to show ownership of Your office, leases, and anything used or accessed by You in the ordinary course of business." Reply Ex. 36.

[13] "INTERROGATORY NO. 40: Identify and describe Your legal contractual, business, formal, informal, implied, and/or express relationships with Your parent, subsidiary, affiliate, related, sister, and/or predecessor entities, including but not limited to Xin Ao-Te and any entity that (1) has input into Your litigation strategy or ability to resolve this litigation through settlement; (2) has a financial or legal interest in this litigation; (3) possesses limited or full decision-making authority into any aspect of Your litigation strategy; (4) receives updates on the status of this litigation; and/or (5) has participated in any way in this litigation, including but not limited to, whether You exchange documents or information with any such entities in the ordinary course of business, and whether and to what documents and information of any such entities to which You have access or the ability to request such access."  Reply Ex. 35.

adequately reveal its "relationship with XAT."[14]

Meishe's argument is unavailing. That Meishe has produced *some* responsive documents pertaining to its relationship with XAT does not mean it has fulfilled its obligation of producing *all* responsive documents. Meishe must provide further substantive responses to document requests, produce responsive documents, and provide further substantive responses to interrogatories regarding its relationship with XAT.

**However**, as to one particular segment of these requested documents, Meishe need not provide further responses. Specifically, Meishe need not provide further responses to portions of requests seeking any "documents and information on who has input into litigation strategy or financial interest in the litigation." Meishe is correct that the "Texas Court already heard" and denied Defendants' request for such further responses: "[As to] *Defendants' Interrogatory No. 40 and Request for Production No. 74 [. . .]* Defendants' request to order Plaintiff to obtain and produce documents from Xin Ao Te *is DENIED without prejudice*. *Defendants' request for documents and information on who has input into litigation strategy or financial interest in the litigation as set forth in subparts (1)-(5) of Interrogatory No. 40 and RFP No. 74 is DENIED*." Dkt. No. 362 at 2 (emphasis added).

Thus, the Texas Court already denied Defendants' request to compel further responses to "Defendants' request for documents and information on who has input into litigation strategy or financial interest in the litigation." Dkt. No. 362 at 2. The Texas Court did not specify that this portion of the ruling was "without prejudice," unlike other denials within the same ruling.

The issue having already been ruled upon in this case, the undersigned declines to address it further, and Defendant's Motion is DENIED IN PART in this regard. Meishe need not provide further responses to those portions of Defendants' RFP No. 74 and Interrogatory No. 40

---

[14] "So that Meishe may request documents sought by Defendants from XAT, Defendants provided Meishe specific requests for documents from XAT. On October 6, 2023, Meishe sent a letter to XAT requesting the exact documents that Defendants sought from XAT. *See* Defendants' Ex. 8. Meishe subsequently provided this letter to Defendants and, to date, Meishe has received no response from XAT. Further, Meishe has had no discussions with XAT regarding this letter or Defendants' request for documents." Opp'n at 3-5.

that seek "documents and information on who has input into litigation strategy or financial interest in the litigation as set forth in subparts (1)-(5) of Interrogatory No. 40 and RFP No. 74."

However, outside the scope of this limited denial in connection with Defendants' "request for documents and information on who has input into litigation strategy or financial interest in the litigation," Meishe shall provide further responses pertaining to its relationship with XAT.   The undersigned notes that appropriate mechanisms like redactions and privilege logs would enable production of responsive but sensitive materials.  Meishe has not shown otherwise.

Defendants' Motion is GRANTED IN PART in that Meishe must provide further substantive responses to document requests, produce responsive documents, and provide further substantive responses to interrogatories regarding its relationship with XAT.  However, Defendant's Motion is DENIED IN PART in that Meishe need not provide further responses to requests for any "documents and information on who has input into litigation strategy or financial interest in the litigation," as that ruling has already been made previously in this case.

Further, insofar as Defendants seek to "compel Meishe to describe its legal and corporate relationship with XAT" (Mot. at 1), one or more declarations from one or more Meishe employee or employees with knowledge of this relationship – and how it may have evolved from inception to the present – would appear to the undersigned to be an efficient mechanism for providing the relevant information.  Therefore, during the hearing, the undersigned proposed that Plaintiff serve one or more declarations from Plaintiff's personnel, and Plaintiff's counsel agreed on the record.  As discussed during the hearing with input from Defendants' counsel, the declaration(s) from Plaintiff's personnel shall address the following topics:

(1) The relationship between Meishe and XAT from inception to present,

(2) Whether any documents or agreements exist that bear on the terms of Meishe's separation from XAT, including any cooperation agreements, and including any documents addressing intellectual property as between Meishe and XAT

    a.  If such documents exist, Meishe's declaration shall clearly state this and shall also clearly state whether any copies of such documents will be provided with

the declaration.

(3) How that relationship has evolved from inception to present;

(4) Whether Meishe and XAT ever shared any databases or networks from inception to present;

(5) Whether Meishe and XAT ever shared any simultaneously overlapping employees from inception to present;

(6) Whether Meishe and XAT shared any human resources support staff from inception to present;

(7) Whether Meishe and XAT shared any other resources from inception to present;

(8) Whether Meishe and XAT ever regularly exchanged documents in their ordinary course of business from inception to present;

(9) The dates any such overlap or sharing ceased, and how.

Such declaration(s) from Meishe shall be served within 30 calendar days from the date the Special Master files this Order with the Court, whereupon the Order will also be served electronically on all parties.

## IV.    ORDER APPOINTING SPECIAL MASTER

On April 4, 2024, the Court entered an Order Appointing Hon. Kendall J. Newman, Ret. As Special Master And Referring Discovery Disputes ("Order Appointing Special Master"). Dkt. No. 423.

The Order Appointing Special Master provides that, "Pursuant to Rule 53(b)(2)(A), the Special Master shall assist the Court with all discovery disputes and managing the conduct of discovery to promote efficiency and savings of time and cost, and dealing with any other matters which the Court may direct him to undertake. The Special Master shall have the authority to set the date, time and place for all hearings, to preside over hearings, to take evidence, to conduct telephonic conferences to resolve disputes arising during depositions, and to issue orders awarding non-contempt sanctions, including, without limitation, the award of attorneys' fees, as provided by Rules 37 and 45. . . ." Dkt. No. 423 at 2-3.

"Pursuant to Rule 53(e), the Special Master shall issue orders on motions presented to

him which shall be final and not require the Court's signature, subject to the parties' right to file objections as described below. If the Special Master considers it advisable to make a Report to the Court, he shall do so in accordance with Rule 53(f)."  Dkt. No. 423 at 3-4.

The Order Appointing Special Master also includes procedures for objections to the Special Master's orders, reports, and recommendations. "Pursuant to Rule 53(b)(2)(D) and 53(g), the procedures described in paragraphs 14 through 17 herein shall govern any action on the Special Master's orders, reports, and/or recommendations."  Dkt. No. 423 at 4.  "Any party wishing to file objections to or a motion to adopt or modify the Special Master's orders, reports, and/or recommendations must file such objections or motion with the Court within 14 days from the day the Special Master filed the order, report, and/or recommendation via ECF. Any order issued by the Special Master shall remain in effect pending any such objection or motion."  *Id.* at 4.

"Pursuant to Rule 53(g)(3)-(5), the Court shall review findings of fact made or recommended by the Special Master for clear error. The Court shall review de novo any conclusions of law made or recommended by the Special Master. The Court will set aside the Special Master's ruling on a procedural matter only for an abuse of discretion."  *Id.* at 4. "Pursuant to Rule 53(g)(1), in acting on an order, report, or recommendation of the Special Master, the Court shall afford the parties an opportunity to present their positions and, in its discretion, may receive evidence, and may adopt or affirm; modify; wholly or partly reject or reverse; resubmit to the Special Master with instructions; or make any further orders it deems appropriate."  *Id.* at 4.

## V.    SPECIAL MASTER'S FEE ALLOCATION

The Order Appointing Special Master specifies how the Special Master's compensation is to be allocated in this matter.  "Pursuant to Rule 53(b)(2)(E) and 53(h), the Special Master shall be compensated at an hourly rate to be set by Judge Newman, Ret. after consultation with the parties, plus the Administrative Fee charged by Judicate West, and shall be reimbursed for any out-of-pocket expenses (e.g., expenses for telephone conference calls). The Special Master shall not charge for travel time. Judge Newman, Ret. shall prepare a monthly invoice for his

services, which he shall provide to counsel. Plaintiff and defendants shall each pay half of the monthly invoice, unless the Special Master or the Court directs otherwise. Counsel shall each be responsible for promptly forwarding payment of the Special Master's invoice." Dkt. No. 423 at 3 (Order Appointing Special Master).

Here, the Special Master has complied with this provision and has provided his monthly invoicing to counsel, reflecting the time necessary for the Special Master to address the issues herein, with the assistance of his research attorney.

Rule 53(g) provides further that "The court must allocate payment among the parties after considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master."

Here, the Special Master finds that Plaintiff and Defendants shall each pay half of the Special Master's monthly invoice in connection with the instant Order.

The Special Master will file a copy of this Order with the Court, whereupon the Order will also be served electronically on all parties.[15]

## VI.    CONCLUSION

For these and all the foregoing reasons, the Special Master hereby **ORDERS** that:

    A.  As to whether Meishe must produce its written requests to XAT to provide discovery requested by Defendants (and any responses), Defendants' Motion is GRANTED IN PART in that:

        a.  Meishe must provide further responses and production so as to reflect all of its "written requests to XAT to provide discovery requested by Defendants" including "all prior transmittal correspondence whereby Meishe requested documents from XAT and/or XAT sent documents to

---

[15] Fed. R. Civ. P. 53(d)-(e) ("A master who issues an order must file it and promptly serve a copy on each party. The clerk must enter the order on the docket.") and ("A master must report to the court as required by the appointing order. The master must file the report and promptly serve a copy on each party, unless the court orders otherwise.").

Meishe" and all "responses" by XAT thereto (including but not limited to any WeChat transcripts).

    i.  If no further responsive writings exist, Meishe shall serve further responses that describe its attempts to obtain and produce them, and shall include a supporting verification or declaration.

    ii.  If such responsive writings exist but are not under Meishe's control, Meishe shall serve further responses that describe its attempts to obtain and produce them, and shall include a supporting verification or declaration.

b.  During the hearing, Meishe's counsel confirmed on the record Meishe's willingness to provide narrative declaration(s) from its personnel to support the factual and narrative assertions made in Meishe's papers opposing this requested relief.  Accordingly, Meishe shall do so.  Such declarations should come from one or more Meishe company personnel and shall describe Plaintiff's communications, if any, with XAT personnel regarding Defendants' request for production of XAT's documents, including any instructions Meishe gave to XAT personnel to ignore Defendants' requests, and including any transcripts from WeChat or any other responsive writings in Plaintiff's possession, custody, or control.

B.  As to whether Meishe must obtain and produce the discovery requested by Defendants, the Motion is DENIED WITHOUT PREJUDICE due to lack of evidence sufficient to support Meishe's having current "control" over XAT for discovery purposes.

a.  However, during the hearing, Meishe's counsel confirmed on the record Meishe's willingness to provide declaration(s) from its personnel to support the factual and narrative assertions made in Meishe's papers opposing this requested relief.  Accordingly, Meishe shall do so.

C. As to whether Meishe must provide further responses regarding its relationship with XAT, Defendant's Motion is DENIED IN PART in that Meishe need not provide further responses to those portions of Defendants' RFP No. 74 and Interrogatory No. 40 that seek "documents and information on who has input into litigation strategy or financial interest in the litigation as set forth in subparts (1)-(5) of Interrogatory No. 40 and RFP No. 74."

    a. However, outside the scope of this limited denial specifically in connection with Defendants' "request for documents and information on who has input into litigation strategy or financial interest in the litigation," Defendants' Motion is GRANTED IN PART in that Meishe shall provide further substantive responses to Defendants' RFP No. 74 and Interrogatory No. 40, and shall produce all responsive documents.

D. Unless the parties stipulate in writing to a different date, all further responses ordered herein shall be served within 30 calendar days from the date the Special Master files this Order with the Court, whereupon the Order will also be served electronically on all parties.

E. Unless the parties stipulate in writing to a different date, all document productions ordered herein shall be served within 30 calendar days from the date the Special Master files this Order with the Court, whereupon the Order will also be served electronically on all parties.

F. As agreed on the record during the hearing, Plaintiff shall serve one or more declarations from Plaintiff's personnel, which shall address the following topics:

    a. The relationship between Meishe and XAT from inception to present,

    b. Whether any documents or agreements exist that bear on the terms of Meishe's separation from XAT, including any cooperation agreements, and including any documents addressing intellectual property as between Meishe and XAT

32

c.   If such documents exist, Meishe's declaration shall clearly state this and shall also clearly state whether any copies of such documents will be provided with the declaration.

d.   How that relationship has evolved from inception to present;

e.   Whether Meishe and XAT ever shared any databases and/or networks from inception to present;

f.   Whether Meishe and XAT ever shared any simultaneously overlapping employees from inception to present;

g.   Whether Meishe and XAT shared any human resources support staff from inception to present;

h.   Whether Meishe and XAT shared any other resources from inception to present;

i.   Whether Meishe and XAT ever regularly exchanged documents in their ordinary course of business from inception to present;

j.   The dates any such overlap or sharing ceased, and how.

k.   Such declaration(s) from Meishe shall be served within 30 calendar days from the date the Special Master files this Order with the Court, whereupon the Order will also be served electronically on all parties.

G.   The undersigned is mindful of the equities and concerns presented if Meishe later attempts to introduce or rely on XAT documents, i.e., after having claimed an inability to access such documents due to a lack of "control" over XAT. Whether Plaintiff does or does not ultimately access XAT's documents, the undersigned strongly encourages the trial judge to look with disfavor upon documents introduced by any party during summary judgment proceedings and/or trial proceedings where that party previously claimed to lack control over such documents during discovery.

////

////

33

H.  Plaintiff and Defendants shall each pay half of the Special Master's monthly invoice in connection with the instant Order.

IT IS SO ORDERED.

Dated: December 16, 2024

_____

Honorable Kendall J. Newman (Ret.)
Special Master