Judicate West
980 9th Street, Ste. 2200
Sacramento, CA 95814
Phone: 916 394-8490
Fax: 916 394-8495

Kendall J. Newman
Special Master

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEIJING MEISHE NETWORK TECHNOLOGY CO., LTD., <br><br> Plaintiff, <br><br> vs. <br><br> TIKTOK INC., et al. <br><br> Defendants. | Case No. 23-cv-06012-SI <br> Judge Susan Illston <br><br> JW CASE NO.:   A314886 <br><br> SPECIAL MASTER'S ORDER[1] REGARDING DEFENDANTS' MOTION TO COMPEL DISCOVERY OF DECOMPILED OBJECT CODE AND SOFTWARE APPLICATIONS ["ISSUE F"] |

The undersigned Special Master issues the following Order regarding Defendants'

Motion to Compel Discovery of Decompiled Object Code and Software Applications [Issue F].

On January 24, 2025, counsel appeared before the undersigned for a hearing regarding

Plaintiff's Motion.[2] The Special Master previously directed a briefing schedule for the instant

---

[1] "Pursuant to Rule 53(e), the Special Master shall issue orders on motions presented to him which shall be final and not require the Court's signature, subject to the parties' right to file objections as described below. If the Special Master considers it advisable to make a Report to the Court, he shall do so in accordance with Rule 53(f)."  Dkt. No. 423 at 3-4.

[2] The Court has set the non-expert discovery cutoff deadline as March 7, 2025.  Dkt. No. 492.  Expert designations are set for March 28, 2025. *Id.*

1

motion. Dkt. No. 511. Pursuant to that schedule, counsel timely filed opening papers, opposition papers, and reply papers. The Special Master's briefing schedule also required that the reply papers describe counsels' good faith meet-and-confer attempts to resolve the instant dispute in person, virtually (i.e., on Zoom), or by phone if absolutely necessary. Dkt. No. 511. The Special Master has reviewed the papers and finds that this requirement has been satisfied; counsel has been genuinely unable to fully resolve the dispute despite their good faith efforts to do so. Reply at 5.

During the hearing before the Special Master on January 24, 2025, Michael Woods and Tom Dunham of Cherian, LLP appeared on behalf of Plaintiff. David Okano, Andrew Zeve, Radhesh Devendran, and Phil Ou of White & Case, LLP appeared on behalf of Defendants. A court reporter transcribed the hearing.

## I. LEGAL STANDARDS

Federal Rule of Civil Procedure 37 enables the propounding party to bring a motion to compel responses to discovery. Fed. R. Civ. P. 37(a)(3)(B).

"Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

The party seeking to compel discovery has the burden of establishing that its request satisfies the relevance requirement of Rule 26 of the Federal Rules of Civil Procedure. *Soto v. City of Concord*, 162 F.R.D. 603, 610 (N.D. Cal. 1995). Parties may obtain discovery regarding "any matter that bears on or that reasonably could lead to other matters that could bear on any issue that is or may be raised in the case." *Vasudevan Software, Inc. v. Int'l Bus. Mach. Corp.*, No. 09-cv-5897 RS, 2011 WL 1599646, *1 (N.D. Cal. Apr. 27, 2011). Relevancy should be

"construed liberally and with common sense." *Soto*, 162 F.R.D. at 610 (internal citation omitted).

Relevant information need not be admissible at trial to be discoverable. *Id*. Additionally, district courts have broad discretion to determine relevancy for discovery purposes. *See Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002). Relevancy, for purposes of discovery, "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Nguyen v. Lotus by Johnny Dung Inc.*, No. 8:17-cv-01317-JVS-JDE, 2019 WL 3064479, at *1 (C.D. Cal. June 5, 2019) (internal citations and quotation marks omitted). "[D]iscovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). "Nor is discovery limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits." *Id.*

## II. DISCUSSION

### A. Relevance

"Defendants requested Meishe to produce decompiled object code and compiled application code for the Meishe apps and SDK in response to RFP Nos. 5 and 44.[3] *See* Ex. 5. Meishe recently produced what it identified as software applications for Meishe app v.1.0, v.1.5, and v.2.5.4, but not v1.3 rev2631." Mot. at 2 (citing Ex. 6). According to Defendants, "Meishe did not produce the requested decompiled object code. *See id.* Meishe represented that it used a software program called IDA Pro to decompile the relevant files, and only utilized what was displayed on the software window, without "generating files of decompiled object code." Mot. at 2. Defendants move to compel Plaintiff to produce decompiled object code for software that forms the basis for Plaintiff's claims: Meishe app v. 1.5, v.2.5.4, and Meishe Software

---

[3] RFP No. 5: "all documents and things demonstrating how and when Meishe first learned of the infringement of the Accused Copyrights and misappropriation of trade secrets alleged in this litigation." See Ex. 7, at 8.
RFP No. 44: "All software applications or other files that You contend include compiled or uncompiled source code You allege is protected by the Asserted Copyrights or Alleged Misappropriated Trade Secrets that were provided to public app stores." See Ex. 8, at 8.

3

Development Kit ("SDK") v.1.0.1; and "computer-compiled software applications" for Meishe app v. 1.0, v.1.3rev.2631, v.1.5, and v.2.5.4.  Mot. at 1.

Defendants articulate the relevance of the requested discovery as follows.  "Meishe's Fourth Amended Complaint ("FOAC") alleges Mr. Jing Xie "participated in the development of Meishe's software until his resignation" on June 8, 2015. *See* Ex. 1, ¶¶ 85, 87. Meishe alleges that when Mr. Xie left Meishe, he took "Meishe's trade secrets, copyrighted computer code, and other confidential information" and put them in the TikTok app. *See id.* ¶ 88. Meishe, however, alleges that it did not discover Mr. Xie's alleged conduct until March 2021, when it allegedly discovered a series of apps belonging to Defendants infringed Meishe's copyrights since 2018. *See id.* at ¶ 79. Meishe conducted a comparison between the decompiled TikTok app v.8.5.0 object code and decompiled Meishe app v.2.5.4 object code to discover alleged similarities. *See id.* at ¶ 80."  Mot. at 1.

"Decompilation is a reverse engineering technique with the goal of converting object code back into source code. "Source code" refers to human-readable instructions written by a programmer, while "object code" is machine-readable binary code generated by a computer program called a "compiler" that translates source code into a set of instructions a computer can read and execute. Meishe makes similar allegations in the earlier-filed Chinese litigations, introduced to this case by Meishe in a notice of supplemental authority. See Ex. 2. Meishe asserted there that it compared decompiled object code for Meishe app v.1.5 and Meishe SDK v.1.0.1 with decompiled object code for certain products it now accuses of infringement in this case, such as the FaceU, and 轻颜 apps. See, e.g., Ex. 3, at 7-8; Ex. 4, at 7-8.  Meishe's FOAC also represents that for its apps (Meishe app versions 1.0, 1.3 rev.2631, 1.5 and 2.5.4), Meishe offered the "non-human-readable, computer-compiled software applications" (i.e., object code) to app stores in China for further distribution in China. See Ex. 1, at ¶ 11."  Mot. at 1.

"Meishe's application code will allow Defendants to run and test Meishe's asserted software applications. This is important to Defendants' understanding of what user-facing features correspond to its asserted source code and how those features operate in practice. An understanding of the video editing features and capabilities of Meishe's asserted software, is

4

1   relevant to at least damages and the scope of Meishe's alleged trade secrets." Mot. at 3.

2         Further, Defendants argue that "decompiled Meishe object code is critical to understanding Meishe's pre-suit investigation, as alleged in Meishe's complaint, which is important to Defendants' statute of limitation defense to Meishe's trade secret claims under both the Defend Trade Secrets Act ("DTSA") and Texas Uniform Trade Secrets Act ("TUTSA")." Mot. at 3. Defendants argue that under both statutes, trade secret claims may not be brought more than three years after the alleged misappropriation is discovered "or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d); *Providence Title Co. v. Truly Title, Inc.*, No. 4:21-cv-147-SDJ, 2024 WL 1932418, *7 (E.D. Tex. May 2, 2024) (first quoting 18 U.S.C. § 1836(d) (DTSA); then citing Tex. Civ. Prac. & Rem. Code Ann. § 16.010(a) (TUTSA)). The three-year statute of limitations on trade secret claims does not run with each act of misappropriation but begins to run "at the time the defendant makes its first adverse use of the trade secret." *Security People, Inc. v. Medeco Security Locks, Inc.*, 59 F. Supp. 2d 1040, 1043 (N.D. Cal. 1999) (citing *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*, 407 F.2d 288, 292-93 (9th Cir. 1969)); *Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 657 (N.D. Cal. 1993). Defendants also argue that "[t]he details of Meishe's purported discovery of the alleged misappropriation, including its comparison of decompiled code, are crucial for Defendants to prove what Meishe should have discovered three years before it filed its trade secret claims. And even where the statute of limitations is not triggered, Meishe's failure to exercise reasonable diligence can also establish failure to take reasonable measures to keep its alleged trade secrets secret." Mot. at 4 (citing *Ashton-Tate Corp. v. Ross*, 728 F. Supp. 597, 599 (N.D. Cal. 1989) (holding that when software developer knew co-creator of software had disclosed trade secrets to another company, his right to sue accrued as to both defendants when original disclosure was made), aff'd, 916 F.2d 516 (9th Cir. 1990); *Genentech, Inc. v. JHL Biotech, Inc.*, No. C 18-6582 WHA, 2019 WL 2476617, *5 (N.D. Cal. June 13, 2019)).

      Defendants also explain another basis for the relevance of the requested discovery. Mot. at 5. According to Defendants, whether Meishe's application and decompiled object code caused all or portions of Meishe's asserted trade secrets to become "generally known," and

"readily ascertainable by proper means" when the code can be decompiled by tools like IDA Pro. *See id.* (citing *Insulet Corp. v. EOFlow, Co. Ltd.*, 104 F.4th 873, 882 (Fed. Cir. 2024) ("[I]f information is 'readily ascertainable through proper means' such as reverse engineering, it is not eligible for trade secret protection."); Tex. Civ. Prac. & Rem. Code § 134A.002(4) ('proper means' includes "discovery by independent development, reverse engineering unless prohibited"). Defendants argue that analysis of decompiled object code in *Aristocrat Techs., Inc. v. Light & Wonder, Inc.*, No. 2:24-cv-382-GMN, 2024 WL 4415361, *3–4 (D. Nev. Sept. 20, 2024) is instructive here. In *Aristocrat*, the court considered testimony of experts and decompiled code as part of its determination of whether the plaintiff's asserted trade secrets were entitled to trade secret protection. *Id*. Defendants argue that under *Aristocrat*, whether Meishe's publicly available application code can be reverse engineered to reveal its alleged trade secrets is relevant here, and discovery of decompiled object code that Meishe allegedly created as part of its pre-suit investigation is warranted.

Plaintiff's Opposition does not dispute the relevance of the requested discovery.

The Special Master finds that Defendants have shown the requested discovery to be relevant. However, threshold "relevance" is not the end of the analysis. The analysis proceeds to whether the "proportionality" requirement is satisfied.

**B. Proportionality**

As stated above, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

"A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them. The court's responsibility, using all the information provided by the parties, is

to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery." *See* Adv. Comm. Notes to 2015 Amendment to Rule 26(b)(1). As cited above herein, Local Rule 37-2 states: "For each such request [motion to compel], the moving papers must detail the basis for the party's contention that it is entitled to the requested discovery and must show how the proportionality and other requirements of Fed. R. Civ. P. 26(b)(2) are satisfied."

Defendant argues the following with respect to "proportionality." Mot. at 5. "[T]he request is narrowly tailored to specific versions of the Meishe app no longer available on app stores, and decompiled code that Meishe relied upon in its complaint and the China litigation[,]" that "Meishe has access to the material Defendants seek" because even though "Meishe claims it never "generate[d] files of decompiled object code[,]" it admits that it used IDA Pro to decompile certain files, and IDA Pro decompiles code within a database file, *and stores results* in that file. Mot. at 9; Ex. 9 (IDA Pro "saves the results of your analysis in the IDA Database"). Defendants argue that whether or not Plaintiff actually exported its analysis to a separate "file of decompiled object code" — Meishe must produce all responsive records of the decompiling that it has control over. Mot. at 5. Finally, Defendant argues that "whether Meishe's trade secret claims are time-barred, or its alleged trade secrets can be protected under the DTSA or TUTSA are potentially dispositive issues for Meishe's trade secret claims" and therefore important to this litigation, with the benefit of the discovery outweighing any burden on Meishe. Mot. at 5.

Plaintiff's Opposition does not dispute the "proportionality" of the requested discovery.

The Special Master finds that Defendants have shown the requested discovery to satisfy the proportionality requirement.

C. **Plaintiff's Arguments**

Plaintiff argues that "there is nothing to compel" here. Opp'n at 3. Plaintiff argues that it has already produced the compiled "APK" files for Meishe app 1.0, 1.5, and 2.5.4 that were provided to public app stores in China, and that it has completed a diligent search but was unable to locate a compiled "APK" file for Meishe app v.1.3 rev 2631 provided to app stores or otherwise made publicly available. Opp'n at 3; Ex. A, Liang Jian Decl. "The court cannot order

production of documents that do not exist." *Optimize Tech. Solutions, LLC v. Staples, Inc.*, 2014 U.S. Dist. LEXIS 52214, at *1 (N.D. Cal. Apr. 14, 2014). Defendants have withdrawn "their request to compel discovery of the application code provided to public app stores" based on Plaintiff's representation that Plaintiff "does not possess or have access to an APK for Meishe app v.1.3rev2631." (Reply at 1 n.1.)

Plaintiff also argues that, with respect to the Meishe's comparison of decompiled Meishe code to decompiled TikTok code, Meishe accomplished this by paying to use third party software called IDA Pro (i.e., the software of Hex-Rays, a nonparty to this action). Opp'n at 3; Ex. A, Liang Jian Decl. According to Plaintiff, "[t]he IDA Pro software displayed the decompiled code directly in the software window and did not generate separate decompiled code files. Ex. A, Liang Jian Decl. Meishe used the IDA Pro search function to find relevant class and function names to perform a comparison between Meishe code and publicly available TikTok code. *Id*. The process of decompiling the code was carried out internally within the IDA Pro software, and no decompiled code files were generated. *Id*. As such, there is nothing to produce." Opp'n at 3.

Defendants continue to seek the results of Plaintiff's use of the IDA Pro software, even if Plaintiff did not generate or keep any decompiled code files. Defendants have offered evidence that IDA Pro software maintains a database of Plaintiff's prior use of the software, such that Plaintiff could obtain its prior results and produce them to Defendants. Mot. at 9; Ex. 9 (IDA "saves the results of your analysis in the IDA Database").

Plaintiff responds that, even if the IDA Pro software maintains a database of records of the decompiled code obtained by Plaintiff previously, Plaintiff is "not authorized" to provide IDA Pro's records to Defendants in response to discovery requests.[4] Opp'n at 3. "Meishe is not

---

[4] Based on Plaintiff's own interpretation of its agreement with Hex-Rays, Plaintiff takes the position that it is "not authorized" to produce the responsive materials. Plaintiff has not argued a lack of "control" over responsive materials at issue herein, i.e., materials that may be kept in IDA Pro's database to which Plaintiff has access. To the extent the argument that Plaintiff is "not authorized" also implies that Plaintiff lacks "control" over responsive materials, the position has not been adequately supported with citation to authorities and is not well-taken.

authorized to provide a copy of IDA Pro to Defendants. To the extent that Defendants remaining arguments seek a copy of internal proprietary IDA Pro files, such as IDA Pro database files, Meishe cannot give them to Defendants. *See* Ex. B, Terms and Conditions, at https://hex-rays.com/terms. IDA Pro's database files are considered the intellectual property of Hex-Rays SA. *Id*. ('Intellectual Property Rights' definition includes 'computer software programs, including source code and object code, databases and documentation thereof'). They are 'confidential information' for which Meishe is precluded from disclosing to third parties. *See id*. at § 4." Opp'n at 3.

The undersigned is not persuaded that Plaintiff can properly assert provisions of its agreement with Hex-Rays to avoid fully responding to the relevant and proportionate discovery at issue. First, contrary to Plaintiff's framing (Opp'n at 3), Defendants' discovery requests are not asking Meishe to "provide a copy of IDA Pro to Defendants." Instead, ***Defendants seek the specific results of <u>Plaintiff's</u> pre-lawsuit/investigatory running of Hex Ray's IDA Pro software to compare Plaintiff's code with TikTok code***, as described above and in the moving papers. Reply at 2-3. Based on the evidence filed with the moving papers, the results from Plaintiff's use of IDA Pro may have been recorded in an IDA Pro database over which Plaintiff may still have control. Plaintiff must produce those results (i.e., if still stored in an IDA Pro database) in order to satisfy its discovery obligations and to fully respond to Defendants' discovery requests quoted above herein. Reply at 2-3.

Second, Plaintiff has not offered any citations to authorities with analogous facts, i.e., where similar discovery by a propounding party was disallowed based on a third party's similar agreement with the responding party.

Further, Plaintiff has not shown that production of this specific responsive information from an IDA Pro database would violate the terms of its agreement with Hex-Rays. Plaintiff has not shown that responding to the subject discovery would reveal anything, let alone anything sensitive, about ***Hex-Rays'*** proprietary software programs, its source code or object code, or its databases. Reply at 2-3. Plaintiff has not shown that production of the requested information would reveal the internal workings of ***Hex-Rays'*** IDA Pro software programs, or ***Hex-Rays'***

9

source code, object code, or databases. Instead, the only information Defendants seek to discover are the *results of Plaintiff's specific previous use of IDA Pro*, and precisely when those results were obtained. There is no need to disclose anything about Hex-Ray's software, code, or database mechanisms; only the *specific results of Plaintiff's pre-lawsuit investigatory use of IDA Pro* is responsive to the discovery at issue.

In any event, even if producing this information would somehow also require production of Hex-Rays' sensitive or confidential information – which Plaintiff has not shown – such production could certainly be done within the scope of a protective order to ensure that any of Hex-Rays' "computer software programs, including source code and object code, databases and documentation thereof" be kept to outside attorneys' eyes only and used solely for purposes of this litigation. Reply at 2-3.

Plaintiff suggests that Defendants should open their own IDA Pro account and get their own resulting decompiled object code (Opp'n at 4), but the suggestion is not well-taken. A primary reason Defendants seek this discovery is to ascertain *precisely* what *Plaintiff* learned, and when, from the results of the IDA Pro comparison. Defendants purchasing their own access to IDA Pro and running their own comparison now, through their own account with IDA Pro software, would not reveal precisely what Plaintiff learned (and when) through *Plaintiff's own results* of its IDA Pro comparison.

The undersigned finds that Defendants' requested discovery satisfies the relevance and proportionality requirements of Rule 26(b)(1). Accordingly, Plaintiff shall provide the requested discovery to the extent it has responsive documents within its control, including through Plaintiff's ability to access an IDA Pro database with records of its comparison of code as part of its investigations prior to its initiation of this action. As to those responsive materials Plaintiff claims to have already produced (or claims that no further responsive documents exist), Plaintiff shall recheck those materials within its control – with "control" defined so as to include databases like the IDA Pro database discussed above – to ensure that there are truly no further responsive documents that must be produced. If Plaintiff encounters any such responsive materials that may not have been previously produced, they must be produced at this time.

### D. Defendants' Request For Fee Shifting

Defendants argue that Plaintiff's "positions in this motion are so unreasonable that the Special Master should recommend fee shifting as provided by Rules 37 and 45. *See* Okano Decl., Ex. 13 at 6.

Although the undersigned finds that Plaintiff's arguments were unpersuasive, it cannot be said that they lacked substantial justification. The undersigned does not find that fee shifting is warranted here.

### III.  ORDER APPOINTING SPECIAL MASTER

On April 4, 2024, the Court entered an Order Appointing Hon. Kendall J. Newman, Ret. As Special Master And Referring Discovery Disputes ("Order Appointing Special Master"). Dkt. No. 423.

The Order Appointing Special Master provides that, "Pursuant to Rule 53(b)(2)(A), the Special Master shall assist the Court with all discovery disputes and managing the conduct of discovery to promote efficiency and savings of time and cost, and dealing with any other matters which the Court may direct him to undertake. The Special Master shall have the authority to set the date, time and place for all hearings, to preside over hearings, to take evidence, to conduct telephonic conferences to resolve disputes arising during depositions, and to issue orders awarding non-contempt sanctions, including, without limitation, the award of attorneys' fees, as provided by Rules 37 and 45. . . ." Dkt. No. 423 at 2-3.

"Pursuant to Rule 53(e), the Special Master shall issue orders on motions presented to him which shall be final and not require the Court's signature, subject to the parties' right to file objections as described below. If the Special Master considers it advisable to make a Report to the Court, he shall do so in accordance with Rule 53(f)." Dkt. No. 423 at 3-4.

The Order Appointing Special Master also includes procedures for objections to the Special Master's orders, reports, and recommendations. "Pursuant to Rule 53(b)(2)(D) and 53(g), the procedures described in paragraphs 14 through 17 herein shall govern any action on the Special Master's orders, reports, and/or recommendations." Dkt. No. 423 at 4. "Any party wishing to file objections to or a motion to adopt or modify the Special Master's orders, reports,

and/or recommendations must file such objections or motion with the Court within 14 days from the day the Special Master filed the order, report, and/or recommendation via ECF. Any order issued by the Special Master shall remain in effect pending any such objection or motion." *Id.* at 4.

"Pursuant to Rule 53(g)(3)-(5), the Court shall review findings of fact made or recommended by the Special Master for clear error. The Court shall review de novo any conclusions of law made or recommended by the Special Master. The Court will set aside the Special Master's ruling on a procedural matter only for an abuse of discretion." *Id.* at 4. "Pursuant to Rule 53(g)(1), in acting on an order, report, or recommendation of the Special Master, the Court shall afford the parties an opportunity to present their positions and, in its discretion, may receive evidence, and may adopt or affirm; modify; wholly or partly reject or reverse; resubmit to the Special Master with instructions; or make any further orders it deems appropriate." *Id.* at 4.

## IV.    SPECIAL MASTER'S FEE ALLOCATION

The Order Appointing Special Master specifies how the Special Master's compensation is to be allocated in this matter. "Pursuant to Rule 53(b)(2)(E) and 53(h), the Special Master shall be compensated at an hourly rate to be set by Judge Newman, Ret. after consultation with the parties, plus the Administrative Fee charged by Judicate West, and shall be reimbursed for any out-of-pocket expenses (e.g., expenses for telephone conference calls). The Special Master shall not charge for travel time. Judge Newman, Ret. shall prepare a monthly invoice for his services, which he shall provide to counsel. Plaintiff and defendants shall each pay half of the monthly invoice, unless the Special Master or the Court directs otherwise. Counsel shall each be responsible for promptly forwarding payment of the Special Master's invoice." Dkt. No. 423 at 3 (Order Appointing Special Master).

Here, the Special Master has complied with this provision and has provided his monthly invoicing to counsel, reflecting the time necessary for the Special Master to address the issues herein, with the assistance of his research attorney.

Rule 53(g) provides further that "The court must allocate payment among the parties after

12

considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master."

Here, the Special Master finds that Plaintiff and Defendants shall each pay half of the Special Master's monthly invoice in connection with the instant Order.

The Special Master will file a copy of this Order with the Court, whereupon the Order will also be served electronically on all parties.[5]

## V. CONCLUSION

For these and all the foregoing reasons, the Special Master hereby **ORDERS** that:

1. Defendants' Motion to Compel Discovery of Decompiled Object Code and Software Applications [Issue F] is GRANTED, such that:

    a. Defendants have satisfied the relevance and proportionality requirements of Rule 26(b)(1) with respect to Defendants' requested discovery regarding RFP Nos. 5 and 44. Plaintiff's arguments against providing such discovery are not well-taken.

    b. Plaintiff shall produce decompiled object code and compiled application code for the Meishe apps and SDK in response to RFP Nos. 5 and 44, i.e., Plaintiff shall produce decompiled object code for "Meishe app v.1.5, v.2.5.4, and Meishe Software Development Kit ("SDK") v.1.0.1; and "computer-compiled software applications" for Meishe app v.1.0, v.1.3rev.2631, v.1.5, and v.2.5.4." Mot. at 1.

        i. Plaintiff shall produce materials responsive to the requested discovery to the extent it has responsive materials within its control, including through Plaintiff's ability to access any IDA Pro database containing records of Plaintiff's comparison of code

---

[5] Fed. R. Civ. Proc. § 53(d)-(e) ("A master who issues an order must file it and promptly serve a copy on each party. The clerk must enter the order on the docket.") and ("A master must report to the court as required by the appointing order. The master must file the report and promptly serve a copy on each party, unless the court orders otherwise.").

13

as part of its investigations prior to its initiation of this action. As to those responsive materials Plaintiff claims to have already produced (or claims that no further responsive documents exist), Plaintiff shall recheck those materials within its control – with "control" defined so as to *include* databases such as an IDA Pro database discussed above – to ensure that there are truly no further responsive documents that must be produced. If Plaintiff encounters any such responsive materials that may not have been previously produced, they must be produced at this time.

  c. Unless the parties stipulate in writing to a different date, Plaintiff's responses to this discovery and the production of responsive documents shall be served within 14 calendar days from the date the Special Master files this Order with the Court, whereupon the Order will also be served electronically on all parties.

2. The undersigned is mindful of the equities and concerns presented if Plaintiff later attempts to introduce or rely on a third party's documents, i.e., after having claimed an inability to access such documents due to a lack of "control" over such documents. Whether Plaintiff does or does not ultimately have access to or control over such documents, the undersigned strongly encourages the trial judge to look with disfavor upon documents introduced by any party during summary judgment proceedings and/or trial proceedings where that party previously claimed to lack control over such documents during discovery.

3. Plaintiff and Defendants shall each pay half of the Special Master's monthly invoice in connection with the instant Order.

  IT IS SO ORDERED.

Dated:   January 27, 2025          _____
                  Honorable Kendall J. Newman (Ret.)
                  Special Master