WHITE & CASE LLP
Yar R. Chaikovsky (175421)
yar.chaikovsky@whitecase.com
Philip Ou (259896)
philip.ou@whitecase.com
David T. Okano (278485)
david.okano@whitecase.com
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA 94306-2109
Telephone: (650) 213-0300
Facsimile: (650) 213-8158

Additional Counsel listed on Signature page

*Attorneys for TikTok Inc., TikTok Pte. Ltd.,
ByteDance Ltd., and ByteDance Inc*

COVINGTON & BURLING LLP
John E. Hall (118877)
jhall@cov.com
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

Kathryn E. Cahoy (298777)
kcahoy@cov.com
Kurt G. Calia (214300)
kcalia@cov.com
3000 El Camino Real, 10th Floor
5 Palo Alto Square
Palo Alto, California 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

BEIJING MEISHE NETWORK TECHNOLOGY CO. LTD.,

Plaintiff,

v.

TIKTOK INC., TIKTOK PTE. LTD., BYTEDANCE LTD., AND BYTEDANCE INC,

Defendants.

Case No. 3:23-cv-06012-SI

**REDACTED VERSION**

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

Date: August 15, 2025
Time: 10:00 a.m.
Place: Courtroom 1, 17th Floor
Before: Hon. Judge Susan Illston
Trial Date: October 27, 2025

## TABLE OF CONTENTS

I.    INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED ....................... 1

II.   STATEMENT OF FACTS ................................................................................. 2

    A.    Non-Party XAT Develops the Meishe Code █████████████ ........... 2

    B.    XAT Spins Off Meishe as a Subsidiary. ................................................. 3

    C.    A Former XAT and Meishe Employee Quits and Joins ByteDance Years Later... 4

    D.    ████████████████████████████ . ... 4

    E.    TikTok Is Launched and Experiences Rapid Growth Due to Unique Features Like Its "For You" Feed and Recommendation Engine. ................................. 5

    F.    Without XAT, Meishe Sues ByteDance Entities in China and the United States. . 6

III.  LEGAL STANDARD ..................................................................................... 7

IV.   ARGUMENT ............................................................................................... 7

    A.    Meishe Lacks Article III Standing to Assert Trade Secret or Copyright Claims. .. 7

        1.    XAT Never Transferred the Asserted Trade Secrets to Meishe. ............... 8

        2.    Meishe Cannot Show That It, Rather Than XAT, Owns the Copyright in the Asserted Source Code. ................................................. 10

        3.    The █████████████ Is Inadmissible and Legally Inadequate..... 13

    B.    Meishe Cannot Assert a Claim Under the Copyright Act.................................... 18

        1.    XAT and Meishe Failed to Register the Asserted Copyrights for United States Works in the U.S. Before Filing Suit. ............................ 18

        2.    Meishe Cannot Recover Extraterritorial Damages. ................................. 22

        3.    ByteDance Ltd. Did Not Publish the TikTok App. ................................. 22

    C.    The Record Refutes Meishe's Trade Secrets Claim. ............................................. 23

        1.    Defendants Did Not Act with the Requisite Scienter. ............................. 23

        2.    ByteDance Ltd. Cannot Be Found Directly or Vicariously Liable.......... 25

V.    CONCLUSION............................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Addisu v. Fred Meyer, Inc.*,
   198 F.3d 1130 (9th Cir. 2000) ........................................................................................7

*Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.*,
   69 F.3d 381 (9th Cir. 1995) .........................................................................................22

*Barrio Fiesta, LLC v. Northridge Foods Int'l, Inc.*,
   2017 WL 1832008 (N.D. Cal. 2017) ...........................................................................15

*Bowoto v. Chevron Texaco Corp.*,
   312 F. Supp. 2d 1229 (N.D. Cal. 2004) .......................................................................23

*Brown Bag Software v. Symantec Corp.*,
   960 F.2d 1465 (9th Cir. 1992) .....................................................................................13

*CleanFish, LLC v. Sims*,
   2020 WL 1274991 (N.D. Cal. 2020) ...........................................................................24

*Comet Techs. USA Inc. v. XP Power LLC*,
   2022 WL 1131729 (N.D. Cal. 2022) .............................................................................8

*Computer Scis. Corp. v. Computer Assocs. Int'l, Inc.*,
   1999 WL 675446 (C.D. Cal. 1999).................................................................................8

*Corbello v. Valli*,
   974 F.3d 965 (9th Cir. 2020) ......................................................................................12

*Daniels v. Select Portfolio Servicing, Inc.*,
   201 Cal. Rptr. 3d 390 (Cal. Ct. App. 2016)................................................................17

*DC Comics v. Towle*,
   802 F.3d 1012 (9th Cir. 2015) ....................................................................................12

*De Sole v. Knoedler Gallery*,
   LLC, 137 F. Supp. 3d 387 (S.D.N.Y. 2015) ...............................................................25

*Dole Food Co. v. Patrickson*,
   538 U.S. 468 (2003).....................................................................................................23

*Enos v. Walt Disney Co.*,
   2025 WL 1753504 (C.D. Cal. 2025)............................................................................22

*Fischer v. CTMI, L.L.C.*,
   479 S.W.3d 231 (Tex. 2016)........................................................................................16

ii

*Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*,
    586 U.S. 296 (2019)................................................................................................18

*FTC v. Neovi, Inc.*,
    604 F.3d 1150 (9th Cir. 2010) ..............................................................................7

*Galderma Lab'ys, L.P. v. Revance Therapeutics, Inc.*,
    2024 WL 3008860 (C.D. Cal. 2024)......................................................................24

*GCA Corp. v. Chance*,
    1982 WL 1281 (N.D. Cal. 1982) ...........................................................................20

*Getaped.com, Inc. v. Cangemi*,
    188 F. Supp. 2d 398 (S.D.N.Y. 2002)....................................................................20

*GlobeRanger Corp. v. Software AG U.S.A., Inc.*,
    836 F.3d 477 (5th Cir. 2016) ................................................................................10

*Grant v. FMC Corp.*,
    1994 WL 564533 (N.D. Cal. 1994) .......................................................................25

*Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*,
    397 F.3d 1217 (9th Cir. 2005) ........................................................................10, 12

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
    153 F.3d 82 (2d Cir. 1998)..............................................................................11, 15

*JustMed, Inc. v. Byce*,
    600 F.3d 1118 (9th Cir. 2010) ..............................................................................16

*Keenan v. Allan*,
    91 F.3d 1275 (9th Cir. 1996) ................................................................................7

*Kernel Records Oy v. Mosley*,
    694 F.3d 1294 (11th Cir. 2012) ......................................................................18, 20

*Kinship Partners, Inc. v. Embark Veterinary, Inc.*,
    2022 WL 72123 (D. Or. 2022)..............................................................................23

*L.A. News Serv. v. Reuters Television Int'l, Ltd.*,
    149 F.3d 987 (9th Cir. 1998) ................................................................................22

*Laatz v. Zazzle, Inc.*,
    2025 WL 1359130 (N.D. Cal. 2025) .....................................................................21

*Lahiri v. Universal Music & Video Distrib., Inc.*,
    513 F. Supp. 2d 1172 (C.D. Cal. 2007) .................................................................15

*Lewis v. CCPOA Benefit Tr. Fund*,
    2010 WL 3398521 (N.D. Cal. 2010) .....................................................................10

iii

*Lindsay v. Lewandowski*,
  43 Cal. Rptr. 3d 846 (Cal. Ct. App. 2006) ...............................................................17

*LIVN Worldwide Ltd. v. Vubiquity Inc.*,
  2024 WL 3057363 (C.D. Cal. 2024)..........................................................................18

*Lizarraga-Davis v. Transworld Sys. Inc.*,
  2022 WL 4485813 (N.D. Cal. 2022) ..........................................................................15

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).....................................................................................................8

*Masterson v. Sine*,
  436 P.2d 561 (Cal. 1968) ............................................................................................17

*Minden Pictures, Inc. v. Pearson Educ., Inc.*,
  2013 WL 71774 (N.D. Cal. 2013) ..............................................................................22

*Morton v. Twitter, Inc.*,
  2023 WL 2626960 (C.D. Cal. 2023)...........................................................................13

*Nanometrics, Inc. v. Optical Sols., Inc.*,
  2020 WL 12863367 (N.D. Cal. 2020) .........................................................................17

*Navigation Holdings, LLC v. Molavi*,
  445 F. Supp. 3d 69 (N.D. Cal. 2020) ..........................................................................24

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*,
  210 F.3d 1099 (9th Cir. 2000) ......................................................................................7

*Ochoa v. McDonald's Corp.*,
  133 F. Supp. 3d 1228 (N.D. Cal. 2015) ........................................................................7

*Orr v. Bank of Am., NT & SA*,
  285 F.3d 764 (9th Cir. 2002) ........................................................................................9

*Rahman v. Mott's LLP*,
  2014 WL 5282106 (N.D. Cal. 2014) .............................................................................9

*Righthaven LLC v. Hoehn*,
  716 F.3d 1166 (9th Cir. 2013) ......................................................................................8

*Roblox Corp. v. WowWee Grp. Ltd.*,
  660 F. Supp. 3d 880 (N.D. Cal. 2023) ........................................................................13

*Silvers v. Sony Pictures Ent., Inc.*,
  402 F.3d 881 (9th Cir. 2005) (en banc) ......................................................................10

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
  952 F.3d 1051 (9th Cir. 2020) (en banc) ....................................................................20

*Spice Jazz LLC v. Youngevity Int'l, Inc.,*
  2019 WL 4573705 (S.D. Cal. 2019) ...................................................................23

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ..............................................................................................8

*Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.,*
  24 F.3d 1088 (9th Cir. 1994) (en banc) ..............................................................22

*Syntek Semiconductor Co. v. Microchip Tech. Inc.,*
  307 F.3d 775 (9th Cir. 2002) ...............................................................................20

*Town & Country Linen Corp. v. Ingenious Designs LLC,*
  556 F. Supp. 3d 222 (S.D.N.Y. 2021) ..................................................................24

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC,*
  692 F.3d 1009 (9th Cir. 2012) .......................................................................10, 12

*U.S. v. Bestfoods,*
  524 U.S. 51 (1998) ...............................................................................................23

*UAB "Planner 5D" v. Facebook, Inc.,*
  2019 WL 6219223 (N.D. Cal. 2019) ....................................................................22

*Unicolors, Inc. v. H&M Hennes & Maurit, L.P.,*
  52 F.4th 1054 (9th Cir. 2022) ..............................................................................15

*Vox Network Sols., Inc. v. Gage Techs., Inc.,*
  2024 WL 1260573 (N.D. Cal. 2024) ......................................................................8

*West v. Quintanilla,*
  573 S.W.3d 237 (Tex. 2019) ................................................................................16

*Yellowcake, Inc. v. Morena Music, Inc.,*
  522 F. Supp. 3d 747 (E.D. Cal. 2021) ..................................................................15

**Statutes**

17 U.S.C. § 101 .............................................................................................18, 20, 21

17 U.S.C. § 102(a) ...................................................................................................10

17 U.S.C. § 103 .................................................................................................10, 11

17 U.S.C. § 204(a) ...................................................................................................15

17 U.S.C. § 411 .........................................................................................18, 19, 22

18 U.S.C. § 1836(b)(1) ...............................................................................................8

v

18 U.S.C. § 1839(5)(A)...................................................................................................................24

China's Copyright Law, Art. 12 (2010 version) ...........................................................................11

China's Copyright Law, Art. 25 (2010 version) ...........................................................................16

China's Implementing Regulations of the Copyright Law, Art. 2 (2013 version) ...........................11

**Rules**

Fed. R. Civ. P. 37(c)(1)................................................................................................................14

Fed. R. Civ. P. 44.1.....................................................................................................................15

Fed. R. Civ. P. 56.....................................................................................................................1, 7

**Other Authorities**

Restatement (Third) of Unfair Competition § 45. .......................................................................25

**NOTICE OF MOTION AND MOTION**: PLEASE TAKE NOTICE that on August 15, 2025, at 10:00 a.m., Defendants will and hereby do move pursuant to Federal Rule of Civil Procedure 56 for summary judgment on all claims. This motion is based on the memorandum in support, attached exhibits, other papers on file in this action, and such other evidence and argument as the Court permits.

## MEMORANDUM IN SUPPORT

## I.    INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED

After more than four years of litigation, the truth has finally emerged: Meishe does not own the intellectual property it asserts as the basis of its claims. The real owner is China Digital Video (Beijing) Limited (hereafter, "XAT"), the publicly traded Chinese company that developed the IP more than a decade ago, and then spun off Meishe while keeping most of the IP for itself. Meishe has stonewalled discovery related to XAT for over three years, submitted false sworn declarations and statements to this Court, █████████████████████████████████████ and changed its ownership story after the close of discovery to a never-previously-mentioned ██████████████████████ █████████████████████████ all as documented in Defendants' pending motion for sanctions. *See* Dkt. 591. Even if Meishe is not sanctioned, the Court should grant summary judgment because there is no admissible evidence to support foundational elements of its claims.

Most fundamentally, Meishe lacks evidence that it owns either the trade secrets or the copyrights remaining in the case, meaning it lacks Article III standing. For the asserted trade secrets, Meishe has identified no admissible evidence that Meishe—rather than XAT—developed them, or that XAT ever transferred them to Meishe. And for the copyright claims, Meishe fails to offer evidence of its own novel enhancements to the code from which the Meishe app was indisputably derived—XAT's ██████████████ Because XAT continues to be the copyright owner of Dunhuang, and because any copyright claim by Meishe could only be based, as a matter of law, on ████████████████████ ███████████, Meishe's failure of proof dooms its copyright claims as well.

Although the Court need not reach the merits given Meishe's lack of standing, the copyright claims fail for independent legal reasons. Subject to narrow exceptions, copyrights asserted in the U.S. must be registered in the U.S. Meishe never registered in the U.S., and it cannot avail itself of the foreign work exception to U.S. registration because the record shows the asserted works are United States

works. Moreover, Meishe's claims for copyright infringement outside the U.S. should be rejected because it identifies no underlying domestic act of infringement enabling those extraterritorial claims. Finally, Meishe cannot maintain a copyright claim against ByteDance Ltd., which undisputedly did not publish the app and thus did not infringe any copyright.

The trade secrets claims likewise fail on the merits because there is no evidence that Defendants acted with the requisite scienter. To prevail on a trade secret claim, a plaintiff must show acquisition, use, or disclosure when the defendant knew or had reason to know a trade secret was obtained through improper means. Meishe cannot do so. It waited years to file and serve this complaint on Defendants and has no evidence Defendants were aware previously, warranting summary judgment against Meishe for lack of scienter. Nor can Meishe recover from ByteDance Ltd., an equity holding company that did not do anything.

## II.   STATEMENT OF FACTS

### A.   Non-Party XAT Develops the Meishe Code ████████████████████

Founded in 1990, XAT is a digital media technology company based in Beijing, China, that offers a range of products for the traditional broadcasting industry. *See* Ex. C at 1, 108.[1] In 2008, XAT employee Pengcheng Zheng ████████████████████████. *See* Ex. B at MEISHE-TT_00310837. ███████████████ included a suite of video editing software for sophisticated, high-end customers, such as large-scale TV stations. *Id.* XAT launched Dunhuang in 2010. Ex. C at 146. It then registered Chinese copyrights for at least two versions of the Dunhuang code: 2011SR006288 (registered February 2011) and 2013SR099288 (registered September 2013). *Id.* at IV-18, IV-23.

XAT's Video 360 team later ████████████████████ to develop a mobile application called "Meicam" or "Meishe." *Id.* at 147; Ex. B at 116:18–117:17 (Zheng Tr.). The Meishe app let users create and edit videos and share them to social media platforms. Ex. C at 146. An XAT employee, Liang Jian, ████████████████████████████████████████

---

[1] XAT also goes by the names Xin Ao Te and New Auto Beijing Video Technology. *See* Ex. B at 60:10–17 (Zheng Tr.). Unless otherwise specified, all Exhibits cited herein are attached to the accompanying Declaration of Kathryn E. Cahoy.

1  ███████ Ex. P. Approximately one week later, ██████████████████████████████,
2  █████████████████████████████████████████. Ex. E at 50. The app was released on the
3  Android and iOS operating systems in October and November 2014, respectively. Ex. C at 147.██
4  ████████████████████████████████████████████████████████████████████████████████
5  ██████████████████████████ Dkt. 591-4 (Ex. C) at MEISHE-TT_00002502. There is no evidence that
6  a copyright for the Meishe app was ever registered in the United States.
7  ███████████████████████████████████████████████████████████
8  ██████████████████████████████████████. See, e.g., Ex. F at 107:8–120:25 (Jian Tr.);
9  Dkt. 591-20 (Ex. T) at 79:18–87:20, 116:18–117:23. XAT represented that the Meishe app "utiliz[es]
10 [XAT's] visual effects and video compositing technologies in the Dunhuang-series" along with "a
11 variety of templates, which are from [XAT's] Dunhuang-series." Ex. C at 147–48. Similarly, a
12 contemporaneous presentation noted ███████████████████████████████████████████████
13 ████████████████████████████████████████████████████████████████████████████████
14 ███████████ Ex. A at MEISHE-TT_00307639. Meishe employees ████████████████████████
15 ████████████████████████, see Dkt. 591-20 (Ex. T) at 68:22–69:2, █████████████████████
16 ████████████████████████████████████████████████. Dkt. 591-21 (Ex.
17 U) at 138:21–141:25.

18 **B.    XAT Spins Off Meishe as a Subsidiary.**

19 In October 2014, ████████████████████████████████████████████████
20 ████████████████████████████████████████. Ex. B at 64:12–15, 69:23–25 (Zheng Tr.).
21 ████████████████████████████. Id. at MEISHE-TT_00076752.████████████████████ Dkt.
22 591-18 (Ex. R) at 96:12-15. ████████████████████████████████, see, e.g., Dkts. 591-8 (Ex.
23 G), -20 (Ex. T), -21 (Ex. U), and ████████████████████████████████████, see Ex. B at
24 112:17–20 (Zheng Tr.). XAT and Meishe ████████████████████████████████████████████
25 ████████████████████████████████████████████████████████. See Ex. H at 8; Dkt. 591-21 (Ex. U) at 43:5–13. ████████████████████████
26 ███████████. See Ex. H at 8; Dkt. 591-21 (Ex. U) at 43:5–13. ████████████████████████
27 ████████████████████████████████████████████. See Ex. B at 74:3–75:5 (Zheng Tr.); Ex. G
28 (Meishe employment contract).

3

1   XAT formed Meishe through 

2   

3   *See* Dkt. 591-7 (Ex. F) at MEISHE-TT_00061977.

4   

5   . *Id.* at MEISHE-TT_00061965.

6   

7   

8   

9   

10  **C.    A Former XAT and Meishe Employee Quits and Joins ByteDance Years Later.**

11  Xie Jing worked as a software engineer for XAT for eight years. Dkt. 433 ¶ 85. He then joined

12  Meishe after the spin off. *Id.* Mr. Xie allegedly helped develop the Meishe code during his

13  employment with both companies. *Id.* He resigned three months after formally joining Meishe, on June

14  8, 2015. *Id.* ¶ 87. More than two years later, after stints at other companies, Mr. Xie joined a Chinese

15  subsidiary of ByteDance Ltd. *See id.* ¶ 90. Meishe bases this case on allegations that Mr. Xie took

16  Meishe code in June 2015 and later integrated some of that code in Defendants' affiliate's source code,

17  which was then allegedly distributed to other affiliates. *Id.* ¶¶ 90, 140.

18  **D.** 

19  

20  

21  . Dkt. 591-4 (Ex. C) at MEISHE-

22  TT_00002500

23  

24  

25  

26  . *See id.* at MEISHE-TT_00002500–01.

27  

28

█████████████████████████████████████████████████████████

███████████████████ *See* Ex. H at 8 ████████████████████

███████████████████

### E.    TikTok Is Launched and Experiences Rapid Growth Due to Unique Features Like Its "For You" Feed and Recommendation Engine.

In 2012, two engineers founded the technology company ByteDance as a start-up. *History of ByteDance*, ByteDance, https://www.bytedance.com/en/.[2] Its first flagship app was launched that same year using a proprietary recommendation engine to create a personalized content feed for each user. *Id.* Building on this experience, ByteDance launched in China a short entertainment video app called Douyin in 2016. *Id.* Following the success of the Douyin app in China, another app, TikTok, was developed and launched globally in 2017. *Id.*

TikTok, designed to serve a user base outside of China, is operated separately from Douyin. *See id.*; *Myths vs. Facts*, TikTok U.S. Data Security, https://usds.tiktok.com/usds-myths-vs-facts/. TikTok uses an innovative recommendation engine that customizes each user's content feed based on how the user interacts with the content they watch. *See How TikTok recommends content*, TikTok, https://support.tiktok.com/en/using-tiktok/exploring-videos/how-tiktok-recommends-content. Users view content on TikTok primarily through its "For You" feed, which presents each user with content curated specifically for them. *Id.* Since its launch, TikTok has grown to be one of the most widely used online platforms in the world. *See* Dkt. 433 ¶ 66.

The TikTok platform is provided in the U.S. by Defendant TikTok Inc. *Id.* ¶ 42. Defendant ByteDance Inc. provides support for the platform and other ByteDance products available in the U.S. *Id.* Their ultimate parent company is Defendant ByteDance Ltd., a Cayman Islands-incorporated equity holding company that owns operating subsidiaries around the world and has no U.S. employees. *See* Dkt. 64-2 ¶¶ 6, 8.[3]

---

[2] In this motion, "ByteDance Ltd." refers to the Cayman holding company. "ByteDance" refers to the ByteDance group, including ByteDance Ltd.'s subsidiaries and affiliates. "TikTok Inc." refers to the U.S. corporation providing the U.S. TikTok platform. "TikTok" refers to the online platform.

[3] Although not expressly discussed herein, the smaller apps mentioned in Meishe's complaint allegedly give rise to the same claims and so are equally subject to this motion. *See* Dkt. 433 ¶ 15 (listing apps).

5

**F.      Without XAT, Meishe Sues ByteDance Entities in China and the United States.**

In 2021, six years after Mr. Xie left Meishe and more than three years after the launch of TikTok, Meishe allegedly discovered its app's source code in TikTok and its Chinese counterpart, Douyin, and filed multiple suits in China against indirect subsidiaries of ByteDance Ltd. *See* Dkt. 433 ¶¶ 127, 170. In that litigation, Meishe submitted a ███████████████████████████████ █████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████ ██████████████████████████. Notably, the "Declaration" is unsigned, unsworn, and does not even identify the person who supposedly made the declaration. *Id*.

Meishe sued Defendants in the Western District of Texas in May 2021, Dkt. 1, but did not serve Defendants until November 12, 2021. Dkts. 16–19. Meishe filed its operative Fourth Amended Complaint on May 14, 2024, asserting claims under the Copyright Act and the Defend Trade Secrets Act. Dkt. 433 ¶¶ 93–187.[4] Meishe's claims are based on five asserted works: ███████████████ █████████████████████████████████████████████████████. *See* Ex. I. Meishe alleged in its Complaint that "at all material times hereto" it has owned the copyrights and trade secrets at issue. Dkt. 433 ¶¶ 1, 3, 94, 149.

Given the close relationship between XAT and Meishe, Defendants have sought discovery into Meishe's relationship with XAT since July 2022, but Meishe consistently resisted, relying on declarations and representations that turned out to be false. *See, e.g.,* Dkt. 564 at 3. On May 7, 2025, Special Master Newman granted Defendants' renewed motion to compel and ordered Meishe to produce "[a]ll Dunhuang code that existed before development of the Meishe app began." *Id.* at 18. Despite its protestations that it had no ability to obtain XAT documents, ████████████████████████ █████████████████████████████████████████████████████████████████████████ ████████████████████████████████ Ex. S.█████████████████████████████ ██████████████████████████████████ *see* Dkt. 591-15 (Ex. O) at 1; Dkt. 591-17

---

[4] Meishe is pursuing only these two remaining claims. *See* Ex. J (April 24, 2025 letter from Meishe).

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                                    CASE NO. 3:23-cv-06012-SI

1    (Ex. Q) ¶ 3, ███████████████████████████████████████████

2    ███. *See, e.g.*, Ex. F at 107:8–113:5 (Jian Tr.).[5]

3    **III.    LEGAL STANDARD**

4            "The court shall grant summary judgment if the movant shows that there is no genuine dispute as

5    to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

6    Summary judgment may dispose of an entire case or "even just portions of a claim or defense." *Ochoa v.*

7    *McDonald's Corp.*, 133 F. Supp. 3d 1228, 1232 (N.D. Cal. 2015). To show summary judgment is

8    warranted, the moving party may "produce evidence negating an essential element of the nonmoving

9    party's claim," or "show that the nonmoving party does not have enough evidence of an essential

10   element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz*

11   *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The nonmoving party then must "identify with

12   reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275,

13   1279 (9th Cir. 1996). "A scintilla of evidence or evidence that is merely colorable or not significantly

14   probative does not present a genuine issue of material fact," *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130,

15   1134 (9th Cir. 2000), nor do "bald, uncorroborated, [or] conclusory assertions rather than evidence,"

16   *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th Cir. 2010).

17   **IV.    ARGUMENT**

18        **A.    Meishe Lacks Article III Standing to Assert Trade Secret or Copyright Claims.**

19           Meishe's lack of Article III standing is a threshold, case-dispositive issue that deprives the Court

20   of subject matter jurisdiction over both remaining claims. At this stage, Meishe "can no longer rest on

21   . . . 'mere allegations,' but must 'set forth' . . . evidence [of] 'specific facts'" to show standing for each

22   claim for relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The "[f]irst and foremost"

23   requirement is that Meishe show that it suffered an injury in fact, *i.e.*, "an invasion of a legally protected

24   interest." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). To have such an interest, Meishe must

25   demonstrate that it owns the intellectual property underlying its claims. *See, e.g., Computer Scis. Corp.*

26

27   ─────────────────────────
     [5] Defendants filed a motion for sanctions on June 16, 2025, covering this and many other of Meishe's
28   material misrepresentations infecting core allegations in this case. *See* Dkt. 591.

7

*v. Computer Assocs. Int'l, Inc.*, 1999 WL 675446, at *6 (C.D. Cal. 1999) ("[O]wnership of the alleged trade secrets is synonymous with standing."); *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1172 (9th Cir. 2013) (no "standing to sue for infringement" where plaintiff "was not the owner" of copyright). For independent reasons, Meishe cannot carry this burden for either its trade secrets or copyright claim.

### 1.    XAT Never Transferred the Asserted Trade Secrets to Meishe.

"A plaintiff cannot recover for an alleged misappropriation of something—here a trade secret— that the plaintiff never owned." *Comet Techs. USA Inc. v. XP Power LLC*, 2022 WL 1131729, at *4 (N.D. Cal. 2022). Meishe therefore must provide evidence that it "owned the trade secret" at issue. *Vox Network Sols., Inc. v. Gage Techs., Inc.*, 2024 WL 1260573, at *3 (N.D. Cal. 2024); *see also* 18 U.S.C. § 1836(b)(1) (limiting cause of action to "owner of a trade secret").

Meishe has no such evidence. The evidence instead shows that XAT developed and owned version 1.0 of the Meishe app, including any related trade secrets. Using ███████████, XAT created the Meishe app's version 1.0 and submitted it to app stores before spinning off Meishe. *See, e.g.*, Ex. A; Ex. C at 147–48; Ex. F at 107:8–120:25 (Jian Tr.); Ex. P; Dkt. 591-4 (Ex. C) at MEISHE-TT_00002502. XAT employees continued working on the app until shortly before Mr. Xie left, with no Meishe employment agreements in effect to grant the company any later-developed trade secrets. *See* Ex. B at 69:1–20, 74:3–75:5 (Zheng Tr.); Ex. G (███████████████████████████).

XAT never transferred those trade secrets to Meishe. In creating Meishe, XAT ████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████. Dkt. 591-7 (Ex. F). Under the terms of that agreement, ████████████████████████████████████████ ████████████. *See id.* at MEISHE-TT_00061965. ████████████████████ ██████████████████████████████████████ ██████████████████████████████████████████ *Id.* at MEISHE-TT_00061977. ████████████ ██████████████████████████████████████ ████████████████████████████ Dkt. 591-8 (Ex. G) at 2. ████████████

████████████████████████████████████████████████████████████████████

████ . *Id.* at 6–7. ██████████████████████████████ .

Because XAT's intellectual property would remain with XAT in the absence of a transfer, Defendants' interrogatories asked Meishe to "[i]dentify all current, former, and claimed ownership interests" it asserts in this case. Dkt. 591-5 at 81. Meishe's sole response was to ████████████████ ████████████████████████████████████████ , Dkts. 591-7, -8; (2) ████████████████████████████████████████████████████ Dkt. 591-4 (Ex. C) at MEISHE-TT_00002500–03; and (3) ████████ ████████████████████████████████████ , Dkt. 591-2 (Ex. A). *See* Dkt. 591-6 (Ex. E) at 81–82.

None of these documents provides any evidence that Meishe owned the asserted trade secrets. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ , Dkt. 591-2 (Ex. A), that assertion is made in an anonymous, unsigned, and unsworn Chinese court "declaration" that is classic "hearsay and legal conclusion[]," inadequate to defeat summary judgment. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002). Meishe cannot offer XAT's untested out-of-court statement for the truth of the matter asserted, and Meishe has no way of rectifying this issue ████████████ ████████████████████████ . *See* Ex. L. Meishe has no admissible evidence of a transfer of trade secret rights from XAT to Meishe, so summary judgment for lack of standing is warranted. *See, e.g.*, *Rahman v. Mott's LLP*, 2014 WL 5282106, at *10 (N.D. Cal. 2014) (granting summary judgment despite "assertion" by nonmoving party's witness "unsupported by any independent facts").

Moreover, Meishe's co-founder and ████████████████████████████████ ████████████████████████████████████████████████ Dkt. 591-3 (Ex. B) at 147:16–148:20. Instead, ████████████████████████ ████████████████████████████████████████████████ . *See id.*; *see also, e.g.*, *GlobeRanger Corp. v. Software AG U.S.A., Inc.*, 836 F.3d 477, 483, 488 (5th Cir. 2016) ("[t]he different spheres of intellectual property protection can sometimes overlap," but trade secrets offer "substantially different protection than copyright law").

9

1    Though Mr. Zheng ████████████████████████████████████████████████

2    ██████████████████████████████████████████, *see* Mot. for Sanctions, Dkt. 591 at 15,

3    that "'sham' correction is akin to a 'sham' affidavit." *Hambleton Bros. Lumber Co. v. Balkin Enters.,*

4    *Inc.*, 397 F.3d 1217, 1225 (9th Cir. 2005). It thus falls under the rule that "a party cannot create an issue

5    of fact by an affidavit contradicting his prior deposition testimony." *Id.* Meishe's attempt to change its

6    CEO's testimony in fundamental ways, including changing his answers from ███████████ while

7    omitting "any stated reasons for the changes," supports the conclusion "that the "corrections" were not

8    corrections at all, but rather "changes offered solely to create a material factual dispute in a tactical

9    attempt to evade an unfavorable summary judgment." *Id.*; *see also Lewis v. CCPOA Benefit Tr. Fund*,

10    2010 WL 3398521, at *2 (N.D. Cal. 2010) (circumstances indicating sham declaration errata include

11    "the number of corrections," "whether the corrections fundamentally change the prior testimony," and

12    "the impact of the corrections on the case (including the extent to which they pertain to dispositive

13    issues)").

14    Thus, there is no genuine dispute of material fact that ████████████████████████

15    ████████████████████████████████████████████████████████.

16        2.    <u>Meishe Cannot Show That It, Rather Than XAT, Owns the Copyright in the Asserted Source Code.</u>

17

18    The same lack of ownership dooms Meishe's copyright claim, but for different reasons. Under

19    the Copyright Act, "only a legal or beneficial owner of an *exclusive* right is entitled to sue." *Silvers v.*

20    *Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc) (emphasis added). Copyright law

21    recognizes exclusive rights only in "original works." 17 U.S.C. § 102(a). For computer programs, "non-

22    trivial enhancements" through which software "evolves" "can be separately copyrightable as derivative

23    works." *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1013, 1015, 1017 (9th Cir.

24    2012). But derivative works are eligible for copyright protection at most for their original contributions

25    beyond "the preexisting material employed in the work." 17 U.S.C. § 103(b) (derivative work copyright

26

27

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT    CASE NO. 3:23-cv-06012-SI

"does not imply any exclusive right in the preexisting material").[6] Regardless of whether the use of preexisting material was authorized or unlawful, that preexisting material must be removed from the analysis of the alleged infringement. *See* 17 U.S.C. § 103. ████████████████████████████████████, and Meishe cannot show that Defendants' allegedly infringing source code was part of a non-trivial Meishe enhancement.

████████████████████████████████████████████. *See* Dkt. 591-20 (Ex. T) at 68:22–69:2. ████████████████████████████████████████████. Dkt. 591-21 (Ex. U) at 38:20–23, 43:5–13. ████████████████████████. *Id.* at 138:21–141:25. Public documents show the Meishe app "[u]tiliz[ed] [the] visual effects and video compositing technologies" and "[a] variety of templates" from XAT's Dunhuang app. Ex. C at 147–48. And a contemporaneous presentation states that ██████████ ████████████████████ Ex. A at MEISHE-TT_00307639.

The record thus shows indisputably that Meishe's version 1.0 source code ████████ ████████████████████████████████. *See, e.g.*, Ex. F at 107:8–113:5 (Jian Tr.) ████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ██████████████ *See* Ex. N. And Meishe's CTO, Mr. Jian, confirmed ████████████

---

[6] U.S. law applies here because the asserted copyrights are U.S. works. *See infra*, IV.B.1. In any event, there is no material difference between these aspects of the U.S. and Chinese copyright frameworks, and thus no reason to conduct a Berne Convention "choice of law" analysis. *See Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 88 (2d Cir. 1998); *see also* Ex. M at 8 (China's Implementing Regulations of the Copyright Law (2013 version), Art. 2 (protecting only "originality")); *id.* at 7 (China's Copyright Law (2010 version), Art. 12 (protecting derivative works to the extent they do not infringe the original work's copyright)).

11

1    ████████████████████████████████████████████. Dkt.

2    591-18 (Ex. R) at 97:12–15, 101:10–103:8, 127:5–11.[7]

3    ███████████████████████████████████████

4    ████████████████████████  ████████████████████████████

5    ███████████████████████████████. *See* Ex. H at 8. Instead, in

6    December 2014—more than two months after Meishe's formation, *see* Dkt. 591-7 (Ex. F) at MEISHE-

7    TT_00061964—████████████████████████████████████████

8    ████████████████████." Dkt. 591-4 (Ex. C) at MEISHE-TT_00002500. In October 2015, ████

9    ████████████████████████████████████████████████████

10   ████████████████. *See id.* at MEISHE-TT_00002500–01.

11   Meishe's version 1.0 ████████ thus covers only the Meishe code's non-trivial "evol[ution]"

12   ████████████████. *U.S. Auto Parts Network*, 692 F.3d at 1013, 1015. The copyright for that

13   remainder of the Meishe code that was "dr[awn] from the underlying work and employed in the

14   derivative work" is "retain[ed]" by "the owner of the underlying work"—XAT. *DC Comics v. Towle*,

15   802 F.3d 1012, 1023 (9th Cir. 2015).

16   To differentiate between XAT's and Meishe's exclusive rights, Meishe would have to separate

17   ████████████████, including any trivial modifications to that code. That is because proving

18   Defendants "copied protected aspects of the work" in which Meishe claims a copyright requires Meishe

19   to "identif[y] similarities between the copyrighted work"—*i.e.*, **Meishe's** copyrighted work after

20   "disregard[ing]" ████████████—"and the accused work." *Corbello v. Valli*, 974 F.3d 965, 974

21   (9th Cir. 2020). Stated another way, Meishe would have to filter out ████████████ and any trivial

22   modifications and then prove that Defendants copied a protected aspect of what remains. Meishe has not

23   even attempted it.

24   Indeed, Meishe's only source code expert, Michael Shamos, testified that "████████████████

25   ████████████████." Ex. O at 318:21–24 (Shamos Tr.). He ████████████████████████

26   ────────────────────

27   [7] Even if Meishe is not sanctioned for ████████████████████████████████

28   ████, *see* Mot. for Sanctions, Dkt. 591 at 8-10, Meishe is bound by this testimony and cannot rely on the
     sham affidavit to oppose summary judgment. *See Hambleton Bros.*, 397 F.3d at 1225.

                                                12

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████ as opposed to

3 XAT's. *See id.* at 317:22–24. Dr. Shamos ████████████████████████

4 ████████████████████████████████████. *See id.* at 316:24–318:20. When asked

5 whether he should have considered how much ██████████ was in the Meishe code if Meishe did *not*

6 own ██████, Dr. Shamos candidly replied: "Probably." *Id.* at 320:5–13.

7 ████████████████████████████████████████████████████████

8 ████████████████████████████. *See id.* at 316:24–317:16. This assertion is irrelevant to

9 the legal issue. For Meishe to have a claim, it cannot merely rely on the fact that some TikTok code

10 allegedly copies Meishe code; instead, it must prove with admissible evidence that the copied code **was**

11 **not** ██████████. In other words, the question is not how much TikTok code came from Meishe

12 code, but how much of the Meishe code allegedly in TikTok **did not** come ██████████.

13     As Dr. Shamos concedes, Meishe has no evidence of whether the allegedly infringing code in

14 version 1.0 corresponds with its copyrighted slice of the Meishe code ████████████████

15 ████████████. Similarly, the other asserted versions of the Meishe app ████████████

16 ██████████ and thus require the same analysis of infringement. Without that evidence, Meishe

17 cannot carry its burden of showing that it owns an exclusive right in the asserted lines of source code.

18 Summary judgment is therefore appropriate. *See Brown Bag Software v. Symantec Corp.*, 960 F.2d

19 1465, 1472 (9th Cir. 1992) (affirming summary judgment where "plaintiff fail[ed] to show . . . that the

20 allegedly infringing work is substantially similar to the work *protected by plaintiff's copyright*"

21 (emphasis added)); *see also Roblox Corp. v. WowWee Grp. Ltd.*, 660 F. Supp. 3d 880, 897 (N.D. Cal.

22 2023) (dismissing copyright claim for lack of "ownership of any relevant copyright"); *Morton v. Twitter,*

23 *Inc.*, 2023 WL 2626960, at *1 (C.D. Cal. 2023) (granting summary judgment dismissing claims where

24 plaintiff failed to establish ownership of the copyrights in the material at issue).

25     3.    The <u>██████████" Is Inadmissible and Legally Inadequate.</u>

26     Recognizing that its written agreements are inadequate, and that ownership is fundamental to its

27 claims, Meishe belatedly tried to rewrite history and rely on ████████████████████

28 ████████████████████████. *See* Dkt. 591 at 14, 17. This

1   facially implausible theory was either concocted or intentionally concealed until after the close of fact

2   discovery. Either way, the misconduct warrants case-terminating or evidentiary sanctions. *See* Mot. for

3   Sanctions, Dkt. 591. Even apart from any sanction, however, there is no admissible evidence of the

4   ██████████████████ sufficient to defeat summary judgment.

5           a)      The ███████████" Is Inadmissible.

6           Fact discovery closed on April 11, 2025. *See* Dkt. 553. Meishe had produced no evidence of ██

7   ██████████ transferring IP. But two weeks later, on April 25, Meishe served an expert report

8   asserting that Meishe obtained ownership rights via an ████████. Dkt. 591-11 (Ex. K) ¶¶ 10–11,

9   16–17. The next month, on May 15, Meishe served its CEO's sham "errata" ████████

10  ███████████████████████████—when no such thing had been said during

11  his actual deposition. *See* Dkt. 591-13; *see also* Dkt. 591 at 6 (describing changes).

12          According to Meishe's expert report, ████████████████████

13  ███████████████████████████████████

14  ███████████████████████████████. Dkt.

15  591-11 (Ex. K) ¶¶ 10, 17. ███████████████████████

16  ███████████████████ *Id.* ¶ 9. Mr. Zheng's "errata"

17  attempted ██████████. *See* Dkt. 591-13 (Ex. M).

18          ███████████████████████████████

19  ███████████████████████████

20  ██████[8]—Meishe's failure to disclose this agreement until after the close of fact discovery is fatal.

21  Under Rule 37(c)(1), Meishe "is not allowed to use that information . . . to supply evidence on a motion,

22  at a hearing, or at a trial, unless the failure [to timely disclose] was substantially justified or is harmless."

23  There is no justification here. Meishe failed to disclose its *entire theory* of how it has standing to sue

24  despite Defendants' repeated requests throughout discovery and its many supplemental responses, until

25

---

26  [8] *See* Dkt. 591-7 (Ex. F) at MEISHE-TT_00061977 (████████████████████

27  ████████████████); Dkt. 591-28 (Ex. BB) at TTI-BDI_00932468

28  (██████████████████████████████").

after fact discovery closed. Nor was this late disclosure harmless—it prejudiced Defendants' ability to test the veracity of this theory in depositions and develop their defenses. *See* Mot. for Sanctions, Dkt. 591 at 13–15. Because Meishe "may not use [this] information . . . on a motion or at trial, it could not be considered on summary judgment." *Lizarraga-Davis v. Transworld Sys. Inc.*, 2022 WL 4485813, at *2 (N.D. Cal. 2022).

This case is much like *Barrio Fiesta, LLC v. Northridge Foods Int'l, Inc.*, 2017 WL 1832008 (N.D. Cal. 2017). There, the defendant moved for summary judgment on standing grounds, and the plaintiff made a last-minute attempt to assert that a third party "did in fact orally grant Plaintiff the exclusive right" to intellectual property before the suit's filing. *Id.* at *2. The court granted summary judgment because the plaintiff "ma[de] no effort to justify its failure to disclose any alleged earlier oral agreement to attain an exclusive license, although repeatedly asked during discovery to provide information regarding all agreements." *Id.* at *3. The same result is compelled here.

          *b)*      *The ██████████████" Is Precluded by Law.*

Even if Meishe had admissible evidence to support the ██████████" theory, it would still fail as a matter of law.

For a copyright transfer, the Copyright Act requires "an instrument of conveyance, or a note or memorandum of the transfer, [that] is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). An "oral agreement" in "[t]he absence of a written transfer agreement defeats both [a plaintiff's] standing to pursue, and substantive claim of, copyright infringement based on a transfer of ownership" from a third-party. *Yellowcake, Inc. v. Morena Music, Inc.*, 522 F. Supp. 3d 747, 762 (E.D. Cal. 2021).

The outcome would be the same under Chinese law. When a foreign work originates in a country that is a signatory to the Berne Convention, federal common law determines the "choice of law concerning ownership," and courts look to the law of the country with "the most significant relationship" to the case. *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 90–91 (2d Cir. 1998). In the event of a conflict, this often means that "foreign law governs issues of ownership" for foreign works. *Unicolors, Inc. v. H&M Hennes & Maurit, L.P.*, 52 F.4th 1054, 1079 (9th Cir. 2022). This Court, not the jury, would then determine the Chinese law governing this dispute. *See*

15

Fed. R. Civ. P. 44.1; *see also, e.g.*, *Itar-Tass Russian News Agency,* 153 F.3d at 92; *Lahiri v. Universal Music & Video Distrib., Inc.*, 513 F. Supp. 2d 1172, 1176 n.4 (C.D. Cal. 2007) (applying India's copyright laws). As relevant here, Chinese law has the same prohibition on oral transfers of copyrights. *See* Decl. of Dr. Xiangjun Kong, Rebuttal Rep. ¶¶ 68–69. Article 25 of China's Copyright Law (2010 version), which was in effect during the relevant time period, provides that "[a]nyone who transfers" a copyright "shall conclude a written contract with the transferee." *Id.* ¶ 69. Article 20 of China's Regulations on Protection of Computer Software (2013 version), which was in effect during the relevant time period, likewise states: "In the case of a transfer of software copyright, the parties shall conclude a written contract." *Id.*; *see also* Ex. M at 9.

For a trade secrets transfer, the Court looks to the governing contracts law to determine ownership. *See JustMed, Inc. v. Byce*, 600 F.3d 1118 (9th Cir. 2010). The Court previously determined that, because this case was transferred from the Western District of Texas, Texas choice of law analysis applies to this dispute. *See* Dkt. 465 at 22. The Court then applied a domestic choice of law analysis under Texas's choice-of-law rules to determine whether the contracts law of the transferor state, Texas, or transferee state, California, apply. *See id.* at 23. Here, too, there is no material difference between the potentially applicable laws—both state's laws provide that oral agreements are legally inadequate.

Under Texas law, an alleged oral agreement transferring both copyright and trade secrets would at most constitute a non-binding "agreement to agree," which therefore was superseded by the ███ ███████████████████████████████████████████████████████████. When an agreement "leaves material matters open for future adjustment and agreement"—none of which are ████████████████████████ ████████████████████████—"it is not binding upon the parties and merely constitutes an agreement to agree." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). The ████████████████████ ██████ was "neither supported by separate consideration, nor the kind of agreement that 'might naturally' be made separately under the circumstances." *West v. Quintanilla*, 573 S.W.3d 237, 248 (Tex. 2019). XAT supposedly entered the agreement ████████████████████████████████████████ ██████████████, since Meishe had not yet been created, so there is no evidence of consideration. *Compare* Dkt. 591-7 (Ex. F) at MEISHE-TT_00061965 (████████████████████████████████ ███, *with* Dkt. 591-8 (Ex. G) at 2 (███████████████████████████████████). And it was

1   not at all "natural" for a company ███████████████████████████████████████

2   ████████████████████████████████. That is especially true since ███████████

3   █████████████████████, Dkt. 591-28 (Ex. BB) at TTI-BDI_00932468, █████████████████████

4   █████████████████████████████████████████████████████████████████

5   █████████" Dkt. 591-7 (Ex. F) at MEISHE-TT_00061977.

California law is not materially different. Just as in Texas, an agreement "is unenforceable if the parties fail to agree on a material term or if a material term is not reasonably certain," as here. *Lindsay v. Lewandowski*, 43 Cal. Rptr. 3d 846, 849 (Cal. Ct. App. 2006). Likewise, "[p]reliminary negotiations or agreements for future negotiations—so-called agreements to agree—are not enforceable contracts." *Daniels v. Select Portfolio Servicing, Inc.*, 201 Cal. Rptr. 3d 390, 413 (Cal. Ct. App. 2016). Further still, in California a collateral oral agreement must also be "such an agreement as might naturally be made as to a separate agreement by parties situated as were the parties to the written contract." *Nanometrics, Inc. v. Optical Sols., Inc.*, 2020 WL 12863367, at *5 (N.D. Cal. 2020) (quoting *Masterson v. Sine*, 436 P.2d 561, 565 (Cal. 1968)). If, however, "the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact." *Id.* (quoting *Masterson*, 436 P.2d at 565). Meishe's conclusory evidence of ██████████████████ thus likewise fails under California law.

Nor would a Berne Convention choice-of-law analysis save Meishe. Just like copyright transfers, in China "[a]ssignments of ownership in . . . trade secrets are treated by law as special type of transaction—a . . . technology transfer contract for trade secrets, . . . which require[s] a written contract for execution . . . [and] a written form to transfer such ownership rights." Decl. of Dr. Xiangjun Kong, Rebuttal Rep. ¶ 80. Further, under Chinese law, ███████████████████████████████████
███████████████████████████████████████████████████████████████. *Id.* ¶ 19. The alleged ████████████████████████████████████████████
█████████ *Id.* ¶¶ 28–29, 37–39, 75. Accordingly, ███████████████████████████████████
██████████████████████████████████████████████████████████." *Id.* ¶ 82. As a matter of Chinese law, ███████████████████████████████████████
█████████████. *See id.* ¶ 79.

**B.**    **Meishe Cannot Assert a Claim Under the Copyright Act.**

1.    <u>XAT and Meishe Failed to Register the Asserted Copyrights for United States Works in the U.S. Before Filing Suit.</u>

Meishe bases its claims on five asserted works, *see* Ex. I, but none was registered with the U.S. Copyright Office. Rather, Meishe argues that the asserted works are "foreign works" not subject to the registration requirement. Dkt. 443 at 15–18. Not so. The evidence establishes that all of the asserted works were first published in the United States or else were published simultaneously abroad and in the United States. Thus, all of the asserted works are "United States works." Summary judgment is appropriate because Meishe cannot demonstrate that its failure to register the asserted works is excused by the Copyright Act's limited statutory exception.

Subject to narrow exceptions, a copyrighted "United States work" must be registered with the U.S. Copyright Office before the copyright owner may sue for infringement in the United States. *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 299 (2019); 17 U.S.C. § 411(a). The definition of "United States work" includes those works that were first published in the U.S. or simultaneously published in the U.S. and another country. *See* 17 U.S.C. § 101.

To be exempt from the registration requirement, Meishe must prove that the works are not "United States works" within the meaning of 17 U.S.C. § 101. To meet this burden, Meishe must prove by "substantial probative evidence" either (1) that its works are unpublished, or (2) where publication occurred. *See LIVN Worldwide Ltd. v. Vubiquity Inc.*, 2024 WL 3057363, at *4 (C.D. Cal. 2024). In other words, Meishe bears the burden of proving that each asserted work was "unpublished" or first "published" in a foreign country, and "the publication was, in fact, the first publication, and that the geographic extent of this first publication diverges from the statutory definition of a 'United States work.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1304–05 (11th Cir. 2012).

The Court has endorsed this legal framework. In its order dismissing the copyright claims in Meishe's Third Amended Complaint, the Court held that Meishe "ha[d] not adequately alleged that its copyrighted works are not 'United States works' subject to the § 411 publication requirement." Dkt. 429 at 16. After Meishe amended its complaint, Defendants renewed their motion to dismiss, which the Court denied on the ground that Meishe "plausibly alleged that its Copyrighted Works were first

18

published solely in China if published and authored solely by Chinese nationals if unpublished." Dkt. 465 at 12. Meishe ███████████████████████████████████████████████████, Dkt. 443 at 18, and the Court declined to presume at that stage "that by distributing software applications derived from its source code to app stores in China for further distribution in China the software was simultaneously available in the United States." Dkt. 465 at 12.

The undisputed facts now disprove Meishe's argument, and Meishe has not, and cannot, meet its burden to show that it is exempt from section 411(a)'s registration requirement for any of the asserted works. Meishe's works were either published first in the U.S. or simultaneously worldwide, including the U.S. In either event, the undisputed facts establish that the asserted works are "United States works" subject to the registration requirement of 17 U.S.C. § 411. Because Meishe cannot meet its burden to show exemption from U.S. registration requirements, summary judgment is appropriate with respect to all of the asserted works.

a)    *The Asserted Works Were First Published Through Apple in the U.S.*

Four of the accused works—███████████████████████████████—were first published in the U.S. The undisputed evidence shows that version "1.0" of Meishe's computer program ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████ According to Meishe's CTO, Mr. Jian, ██████████████████ ████████████████████████. Ex. F at 44:4–14 (Jian Tr.); Dkt. 591-4 (Ex. C) at MEISHE-TT-002502 ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████927. Ex. I. Thus, according to Meishe's witnesses and discovery responses, ██████████████████ ████████████████████████████████████████████████████ ███████████████████████████. Meishe's interrogatory responses confirm it did not submit the object code corresponding to ████████████████████████████ ████████████████████████████████████████████████████████████

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                                    CASE NO. 3:23-cv-06012-SI

*See* Ex. E at 50. ███████████████████████████████████████████

███████████████████████████████████████████. Ex. D.

There can be no dispute that these submissions to ██████ constitute a publication because they were a distribution of the work to the public, or at least an offering to distribute copies of the work to the public. 17 U.S.C. § 101 (definition of "publication"). Meishe has admitted as much. Meishe previously argued to the Court that sending "its software applications to app stores in China for further distribution in China" is a "first offer to distribute copies to the Chinese app stores [that] constitutes a first publication" under 17 U.S.C. § 101. Dkt. 443 at 18. Applying that same rationale to versions ████████

████████████████████████████████████████████████████████████████

██████████████████████ Thus, these versions are United States works because they are "a work that is first published [] in the United States." 17 U.S.C. § 101; *see also Kernel*, 694 F.3d at 1306 (publication occurs when an offer is made); *Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398, 402 (S.D.N.Y. 2002) (finding that works first published on the Internet are "United States works").

It makes no difference that the app's object ████████████████████████████████

████████████████████. The Ninth Circuit has explained that the Copyright Act protects computer programs, which can be expressed in either source code or object code. *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 779 (9th Cir. 2002). But the source code and object code are not separate works. Rather, the "source code and object code are two representations of the same computer program." *Id.* (internal quotations omitted). *See also GCA Corp. v. Chance*, 1982 WL 1281, at *2 (N.D. Cal. 1982) ("Because the object code is the encryption of the copyrighted source code, the two are to be treated as one work . . . ."). This is consistent with the Copyright Office's treatment of computer programs. Compendium § 721.5 states that "[t]he U.S. Copyright Office views source code and object code as two representations of the same work." For that reason, the Copyright Office generally "will not issue separate registrations for the source code and object code versions of the same program."

---

[9] Meishe contends "the last source code version in development during Mr. Jing Xie's employment was Meishe's app1.5, which was completed on or around June 4, 2015." Dkt. 433 ¶ 114. This is yet another reason Meishe's claim fails. *See Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (en banc) (plaintiff must show "defendant had access to[] plaintiff's work").

Compendium § 721.5; *Laatz v. Zazzle, Inc.*, 2025 WL 1359130, at *23 (N.D. Cal. 2025). Publishing the compiled object code thus is treated as legally equivalent to a publication of the source code from which that object code was created—both constitute publication of the protected computer program.

> b)    *The Asserted Works Were Simultaneously Published in the U.S. by Chinese App Stores.*

Setting aside publication through Apple in the United States, Meishe's documents and interrogatory responses ███████████████████████████████████████████████████ ████████████████████████████████████████████ Dkt. 531 at 4; *see also* Ex. E at 50; Ex. T at MEISHE-TT_00351904–05 (██████████████████████); *id.* at MEISHE-TT_00351903 (██████████████████████████).

Publication to "████████████" does not exempt Meishe from U.S. registration requirements if it wants to sue for copyright infringement in the U.S. Rather, providing the Meishe computer program to these app stores constitutes a simultaneous publication of Meishe's source code, in object code form, throughout the world. While the Court's motion to dismiss order ruled on Meishe's allegations, the undisputed evidence now demonstrates that Chinese app stores are not limited to distribution in China. ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████. This email exchange demonstrates ██████████████████████████████████████████████ ████████████████████████████████. At minimum, these versions thus are "United States works" because they are "a work that is first published . . . simultaneously in the United States and another treaty party." 17 U.S.C. § 101.

*    *    *

Because the undisputed facts establish the asserted code meets the definition of a "United States work," Meishe was required to register the works with the U.S. Copyright office prior to filing suit. *See* 17 U.S.C. § 411. Meishe's failure to register is fatal to its copyright claim. *See, e.g., UAB "Planner 5D"*

21

*v. Facebook, Inc.*, 2019 WL 6219223, at *6 (N.D. Cal. 2019) (dismissing copyright claim for failure to register United States works before filing complaint)

### 2.    Meishe Cannot Recover Extraterritorial Damages.

If any part of Meishe's copyright claim proceeds to trial, Meishe cannot as a matter of law recover the bulk of the damages sought, and summary judgment should be granted against its claims for "worldwide" damages. *See, e.g.*, Dkt. 433 ¶¶ 89, 123–24, 142, 180, 214, 217.

The Ninth Circuit has been clear that "wholly extraterritorial acts of infringement are not cognizable under the Copyright Act." *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1090 (9th Cir. 1994) (en banc). Instead, a plaintiff may recover, at most, the profits from foreign copyright violations "made possible" by the "predicate act of infringement occurring within the United States." *L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 992 (9th Cir. 1998). For example, a plaintiff may recover if a foreign entity "published local reprints of the domestically-infringing works." *Minden Pictures, Inc. v. Pearson Educ., Inc.*, 2013 WL 71774, at *2 (N.D. Cal. 2013). But for extraterritorial damages to be available, the "alleged infringement must be completed entirely within the United States." *Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.*, 69 F.3d 381, 387 (9th Cir. 1995).

Here, it is undisputed that no "predicate act" of infringing publication in the U.S. enabled further acts of copyright infringement abroad. The U.S. TikTok app is not the master version from which the app in other countries is copied. *See, e.g.*, Dkt. 58-3 ¶ 22 ("███████████████████████████████████ ██████████████████████████████████."). Meishe therefore cannot show that Defendants' alleged act of infringement in the U.S.—distributing the U.S. TikTok app via the app stores—caused additional infringement in other countries. *See, e.g.*, *Enos v. Walt Disney Co.*, 2025 WL 1753504, at *2 (C.D. Cal. 2025) (no predicate U.S. act where no evidence that defendants "shipped . . . products abroad" or that the "products marketed in Hawaii are the same as the . . . products sold abroad").

### 3.    ByteDance Ltd. Did Not Publish the TikTok App.

Meishe contends Defendants violated its exclusive rights as a purported copyright owner "by reproducing, displaying, and profiting from inducing users to download and use the TikTok app." Dkt.

433 ¶ 122. There is no dispute, however, ByteDance Ltd. did none of these things, since it is not alleged to have published the app. *See id.* ¶¶ 43–45.

There are no facts to support ByteDance Ltd.'s liability for the acts of its subsidiaries or their employees. It is a "deeply ingrained" principle of corporate law that "a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998). Meishe alleged that ByteDance Ltd. publishes and distributes the TikTok app "through its agents, including TikTok Inc., TikTok Ltd., and TikTok Pte. Ltd." Dkt. 433 ¶ 51. As this Court has explained, a showing of agency requires three elements: "(1) there must be a manifestation by the principal that the agent shall act for him; (2) the agent must accept the undertaking; and (3) there must be an understanding between the parties that the principal is to be in control of the undertaking." *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1239 (N.D. Cal. 2004). The "agency theory is necessarily a very fact-intensive inquiry into the structure of the corporations," *id.* at 1243, which Meishe has chosen not to pursue in this case. Meishe has adduced no facts through discovery on any one of these elements. Nor could it because it is undisputed that ByteDance Ltd. is merely a Cayman Islands-based equity holding company. For this record to sustain indirect liability would invert the "basic tenet of American corporate law [] that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003).

Meishe's copyright claim against ByteDance Ltd. thus should be dismissed.

**C.    The Record Refutes Meishe's Trade Secrets Claim.**

**1.    Defendants Did Not Act with the Requisite Scienter.**

"[M]isappropriation of trade secrets is an intentional tort." *Spice Jazz LLC v. Youngevity Int'l, Inc.*, 2019 WL 4573705, at *6 (S.D. Cal. 2019). "[A]t minimum," a plaintiff "must show the defendant acted with some degree of bad faith." *Kinship Partners, Inc. v. Embark Veterinary, Inc.*, 2022 WL 72123, at *5 (D. Or. 2022). That bad faith requirement is reflected in the Defend Trade Secrets Act's element of knowledge. Specifically, a defendant may be held liable for its "acquisition of a [plaintiff's] trade secret" only if, at that time, it "knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A). A defendant's "disclosure or use of a [plaintiff's] trade secret" likewise may be actionable only if, "at the time of disclosure or use," a defendant "knew or had

reason to know" that its access to the plaintiff's trade secret was "derived from or through a person who

had used improper means to acquire the trade secret." *Id.* § 1839(5)(B).

There can be no dispute that Defendants lacked actual or constructive knowledge of the asserted

misappropriation when Meishe filed this suit. *See Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d

69, 79 (N.D. Cal. 2020) (dismissing trade secret claim where complaint was "devoid of any factual

substantiation of Defendants' knowledge"). Nothing in the record shows that Defendants knew or had

reason to know that Mr. Xie allegedly used Meishe source code after joining a Chinese affiliate of

Defendants in 2017—years before Meishe claims to have discovered Mr. Xie's actions. *See* Dkt. 433

¶ 79. Mr. Xie spent two years working for other companies after leaving Meishe. *See id.* ¶ 90. And Mr.

Xie's employment contract with Defendants' affiliate forbade him from disclosing third parties'

confidential information to the company. Ex. R at 103:6–104:12. The record likewise is "devoid of any

facts to establish [Defendants] participated in or encouraged [Mr. Xie's] alleged malfeasance,"

*Galderma Lab'ys, L.P. v. Revance Therapeutics, Inc.*, 2024 WL 3008860, at *3–4 (C.D. Cal. 2024), or

that "Defendants knew that the information [Mr. Xie] provided . . . was actually Plaintiff's, knew that it

was protectable, or knew that [Mr. Xie] acquired it through improper means," *CleanFish, LLC v. Sims*,

2020 WL 1274991, at *10 (N.D. Cal. 2020).

Meishe did not even serve Defendants with its complaint until November 12, 2021—more than

six years after Mr. Xie purportedly acquired its trade secrets. *See* Dkts. 16–19. And that complaint

contained only vague references to Meishe's purported trade secrets as "proprietary software codes that

allow for video and audio editing, video and audio processing, video and audio release, personalized

audio and video recommendations, webcasting, and other services." Dkt. 9 ¶ 88. Defendants thus had

"no way to know—short of guessing—exactly what information [was] claimed as a trade secret." *Town

& Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 270 (S.D.N.Y. 2021).

Rather than promptly acting to protect its trade secrets, Meishe has delayed and concealed what

it claims to be the subject of ongoing misappropriation, preventing any ability by Defendants to mitigate

damages, if necessary. Defendants have understandably "made a substantial good faith investment in the

[alleged] trade secret prior to receiving notice of the plaintiff's claim," making it "inequitable to require

the relinquishment of all profits." *See* Restatement (Third) of Unfair Competition § 45, cmt. *g* (1995). Summary judgment is thus warranted for lack of scienter.

### 2.    ByteDance Ltd. Cannot Be Found Directly or Vicariously Liable.

As noted above, ByteDance Ltd. took none of the actions at issue in this case because it is simply an equity holding company. It did not acquire, use, or disclose Meishe's asserted trade secrets. And to the extent that Meishe seeks to impute Mr. Xie's actions to his Chinese employer's parent company, its theory of liability is foreclosed because "[c]orporate separateness prevents the application of respondeat superior." *Grant v. FMC Corp.*, 1994 WL 564533, at *2 (N.D. Cal. 1994); *see also De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 417 (S.D.N.Y. 2015) ("the doctrine of respondeat superior does not render a parent company liable for the conduct of a subsidiary").

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter summary judgment for Defendants on all remaining claims in this action.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                                    CASE NO. 3:23-cv-06012-SI

1

2    Dated: July 11, 2025                    Respectfully submitted,

3

4                                            */s/ Kurt G. Calia*

5

6                                            WHITE & CASE LLP
                                             Yar R. Chaikovsky (175421)
7                                            yar.chaikovsky@whitecase.com
                                             Philip Ou (259896)
8                                            philip.ou@whitecase.com
                                             David T. Okano (278485)
9                                            david.okano@whitecase.com
                                             3000 El Camino Real
10                                           2 Palo Alto Square, Suite 900
                                             Palo Alto, CA 94306-2109
11                                           Telephone: (650) 213-0300
                                             Facsimile: (650) 213-8158
12

13                                           Michael Songer
                                             michael.songer@whitecase.com
14                                           701 Thirteenth Street, NW
                                             Washington, DC 2005-3807
15                                           Telephone: (202) 626-3600
                                             Facsimile: (202) 639-9355
16

17                                           Andrew Zeve
                                             andrew.zeve@whitecase.com
18                                           Jeremy Dunbar
                                             jeremy.dunbar@whitecase.com
19                                           609 Main Street, Suite 2900
                                             Houston, Texas 77002
20                                           Telephone: (713) 496-9700
                                             Facsimile: (713) 496-9701
21

22                                           COVINGTON & BURLING LLP
                                             John E. Hall (118877)
23                                           jhall@cov.com
                                             415 Mission Street, Suite 5400
24                                           San Francisco, CA 94105
                                             Telephone: (415) 591-6000
25                                           Facsimile: (415) 591-6091

26

27                                           Kathryn E. Cahoy (298777)
                                             kcahoy@cov.com
28                                           Kurt G. Calia (214300)

                                             26

kcalia@cov.com
3000 El Camino Real, 10th Floor
5 Palo Alto Square
Palo Alto, California 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800

*Attorneys for TikTok Inc., TikTok Pte. Ltd.,
ByteDance Ltd. and ByteDance Inc.*

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT    CASE NO. 3:23-cv-06012-SI