1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

8

9

10

11

12

BEIJING MEISHE NETWORK
TECHNOLOGY CO., LTD.,

Plaintiff,

v.

TIKTOK INC., et al.,

Defendants.

Case No. 23-cv-06012-SI

**ORDER RE: SUMMARY JUDGMENT,
SANCTIONS, AND
COPYRIGHTABILITY**

Re: Dkt. Nos. 591, 608, 609, 650

13

14

15

16

17

In this heavily litigated case, the parties have presented cross motions for summary judgment and presented further briefing on the issue of copyrightability. Defendants have also moved for sanctions. The Court held hearings on these issues on August 15 and 29, 2025. The Court considers these questions below. The parties also filed nine *Daubert* motions that are discussed in a separate order.

18

19

**BACKGROUND**

20

**I.     Procedural Background**

21

22

23

24

25

26

27

28

Plaintiff Meishe initiated this lawsuit in the Western District of Texas on May 18, 2021. Dkt. No. 1. The case was reassigned to this Court on November 28, 2023. Dkt. No. 380. The operative complaint is the Fourth Amended Complaint, filed by Meishe on May 14, 2024. Dkt. No. 433 ("FOAC"). The FOAC included four claims: copyright infringement (17 U.S.C. § 501), misappropriation of trade secrets in violation of federal law (18 U.S.C. § 1836(b)(1)), misappropriation of trade secrets in violation of state law (Tex. Civ. Prac. & Rem. Code Ann. § 134A), and false advertising (15 U.S.C. § 1125). This Court dismissed the false advertising count but allowed the others to proceed. Dkt. No. 465. On April 24, 2025, plaintiff's counsel informed

United States District Court
Northern District of California

defendants that Meishe was withdrawing its state law trade secrets claim, leaving at issue only the federal law claims for copyright infringement and misappropriation of trade secrets.[1]  Dkt. No. 644-10.[2]  Meishe has identified five versions of its software that constitute the scope of its copyrighted material:  the registered Chinese copyright 2015SR227927 and four unregistered copyrighted versions:  Meishe App v1.0, Meishe App v1.3 rev. 2631, Meishe App v1.5, and Meishe App v2.5.4.  Dkt. No. 644-9.  Meishe brings its claims against four related entities: TikTok Inc., TitTok Pte. Ltd., ByteDance Ltd., and ByteDance Inc.  FOAC ¶¶ 20-23.

The Court appointed a Special Master to manage discovery, Dkt. No. 423, and the parties engaged in protracted and at times acrimonious discovery proceedings.  The Special Master issued at least fifteen substantive orders and held numerous informal discovery conferences after his appointment on April 4, 2024.  On June 16, 2025, defendants filed a motion for terminating or evidentiary sanctions against Meishe for its actions during the discovery process.  Dkt. No. 591.  Plaintiff opposed, Dkt. No. 613, and defendants replied, Dkt. No. 654.

The parties filed cross-motions for summary judgment or partial summary judgment on July 11, 2025.  Dkt. Nos. 608, 609.  The parties filed oppositions, Dkt. Nos. 647, 648, and replies, Dkt. Nos. 657, 658.  The Court held a hearing on the motion for sanctions and the motions for summary judgment on August 15, 2025.

In addition, the parties have collectively filed nine *Daubert* motions seeking to exclude expert testimony.  Dkt. Nos. 625-642.  With leave from the Court, the parties filed separate briefs on the issue of the copyrightability of Meishe's source code on July 25, 2025.  Dkt. Nos. 650, 681, 715.  A hearing on these issues occurred on August 29, 2025.

---

[1] The letter also informed defendants that Meishe would seek monetary damages only in regard to copyright infringement and trade secret misappropriation for the TikTok and CapCut apps, but would continue to seek injunctive relief against all of defendants' accused apps: TikTok, CapCut, Faceu, Lemon8, Qinyang, and BytePlus Video Editor SDK.  Dkt. No. 644-10.

[2] Due to an error, defendants filed Docket Number 644 to replace Docket Number 607, the original sealed filing of its supporting exhibits for summary judgment.

United States District Court
Northern District of California

## II.      Relevant Factual Background

### A.      Meishe's Origin

Beijing Meishe Network Technology Co., Ltd. originated within the Chinese company Xin Ao Te (XAT).[3]  For many years, XAT focused on providing video technology solutions to the TV broadcasting industry.  Dkt. No. 608-4 at 108.  In 2010, XAT released a sophisticated "visual effects and video compositing system" called Dunhuang.  *Id.* at 146.  XAT then started developing code for a mobile video editing application in 2013.  Dkt. No. 610-5 (Zheng Dep. Day 1) at 63.  The business unit responsible for this work was the Video 360 department led by Pengcheng Zheng.  *Id.* at 61, 64, 69.  That department completed version 1.0 of the mobile application on September 26, 2014 and XAT obtained a Chinese copyright (Registration No. 2014SR205312) for the software program on December 22, 2014.  Dkt. No. 612-11.

In late 2014 and 2015, XAT spun off the Video 360 department into Beijing Meishe.  On September 30, 2014, XAT entered into an investment agreement with Mr. Zheng and one other entity to establish Beijing Meishe Network Technology Co., Ltd.  Dkt. No. 610-18 at 1.  Article 12.2 of the agreement noted that it "represents the complete consensus of the parties regarding the matters under this agreement and supersedes any prior written or oral agreements or other documents made by the parties regarding these matters."  *Id.* at 14.  The agreement stated that XAT would contribute ten million yuan in "intangible assets" and receive 40% of the shareholder equity, while Mr. Zheng would contribute five million yuan in cash and receive a 20% equity share.  *Id.* at 2.  On June 29, 2015, the three parties to the original investment agreement signed a supplemental agreement confirming that XAT had completed its investment in the company of its ten million yuan in intangible assets by transferring thirteen patents listed in the supplemental agreement's appendix. Dkt. No. 590-7.

Exactly when Meishe started operating independently is a little unclear from the record.  The investment agreement stated that Meishe's expenses shall be covered by Meishe starting October 1,

---

[3] In the record, XAT is sometimes referred to as China Digital Video or New Auto Beijing Video Technology, *see* Dkt. No. 610-5 (Zheng Dep. Day 1) at 60, and Beijing Meishe is sometimes referred to as Beijing Meicam.

United States District Court
Northern District of California

2014, but Mr. Zheng testified in deposition that Meishe commissioned XAT to handle financial matters for the company until "maybe 2018." Dkt. No. 610-18 at 2; Zheng Dep. Day 1 at 71. Meishe's Chinese business license lists an establishment date of October 23, 2014. Dkt. No. 610-17, ¶ 6, Ex. B. Meishe created employment agreements for its employees starting March 1, 2015, but Mr. Zheng testified that he started working for Meishe prior to that date. Zheng Dep. Day 1 at 67-69; Dkt. No. 644-7. At Meishe's inception, Mr. Zheng became Meishe's chief executive officer (CEO) and Liang Jian became the chief technology officer (CTO). Zheng Dep. Day 1 at 67; Dkt. No. 610-19 (Jian Dep.) at 54.

### B.      Source Code Development from Dunhuang to Meishe

The parties have disputed the extent to which Dunhuang source code, created by XAT, is present within Meishe's source code at issue in this litigation. The operative complaint refers to "Meishe's asserted highly confidential, independently-developed registered and unregistered source code." Dkt. No. 433 ¶ 1. In a hearing before this Court on defendants' motion to dismiss the operative fourth amended complaint, plaintiff's counsel repeated that the code at issue was Meishe's "independently developed source code," not "any third-party source code." Dkt. No. 590-13 at 9.

Defendants noticed, however, that a 2016 filing from XAT to the Hong Kong stock exchange boasted that XAT launched the Meishe mobile application "[u]tilizing [XAT's] visual effects and video compositing technologies in the *Dunhuang*-series, which are normally deployed in large-scale TV stations."[4] Dkt. No. 591-29 at 147. Defendants then asked the Special Master to compel Meishe to produce Dunhuang code. Dkt. No. 564 at 5. In opposition to this request, Meishe submitted a December 2024 declaration from CTO Jian stating that "[t]he Meishe software is independently developed from the ground up and no Dunhuang source code has been incorporated into the Meishe software." Dkt. No. 590-15.

Later in discovery, plaintiff discovered it had possession of old Dunhuang code on a

_____

[4] In an appendix, the same filing lists two registered Chinese copyrights for the Dunhuang Visual Effects Composing and Editing Systems, registered in 2011 and 2013. Dkt. No. 608-4 at IV-18, IV-23.

United States District Court
Northern District of California

computer in storage and produced this code to defendants, allowing for a comparison between Dunhuang and Meishe code. Dkt. No. 612-12 at 7. A Meishe employee's deposition then revealed that, while "the Dunhuang app and the Meishe app are two completely different products or programs," the Video 360 group in XAT (that later spun off as Meishe) "evolved" the Meishe software from the Dunhuang software. Dkt. No. 590-18 (Li Dep.) at 68. When defendants took CTO Jian's deposition on April 16, 2025, he acknowledged that he was a primary developer of the source code for the Meishe app and then admitted that the Meishe app used "very little" of Dunhuang source code, but he also said that Meishe used a different "video editing architecture" compared to Dunhuang. Jian Dep. at 96-97. Mr. Jian then submitted a letter to the Special Master two days later in an attempt to clarify the discrepancy between his sworn declaration and sworn deposition testimony:

> Regarding the Dunhuang declaration, the statements I made were truthful based on my understanding at the time. I was familiar with both the Meishe app and the Dunhuang app, and based on my memory I believed there was no overlap of the code between the two. At the time I did not have any Dunhuang code to review, so I could only testify from my memory. However, later we located an old copy of Dunhuang code and produced it to Defendants, and it appears that some Dunhuang code and some Meishe code in some files is similar. I testified to that fact in my recent deposition.

Dkt. No. 590-17.

### C.    Publication of the First Version of the Meishe App

Meishe asserts that its app version 1.0—the application associated with Chinese copyright registration 2014SR205312 (re-registered with Meishe as 2015SR227927)—was first made available to the Chinese app stores AppChina, Huawei, Baidu, and 360/Qihoo on or around September 27, 2014. Dkt. No. 644-5 at 50. On September 29, 2014, XAT human resources emailed company employees announcing the launch of the Meishe app and inviting them to download it from the following app stores: "Baidu Mobile Assistant, 360 Mobile Assistant, Wandoujia, Application Treasure, Anzhi Market, Meizu App Store, Huawei App Store, Oppo App Store." Dkt. No. 646-6.

Defendants argue that the Meishe app was first sent to the Apple store, pointing to a

United States District Court
Northern District of California

September 1, 2014 email to Jian Liang from the iTunes store showing he submitted an app for review. Dkt. No. 644-15. Plaintiff contends that this app was not the Meishe app, highlighting that the Chinese name of the app in this email translates to "Little Video Expert" and that "the 'App SKU' identifies it as a 'test' file." *See id.*; Dkt. No. 647 at 5. Plaintiff points instead to an October 15, 2014 email from the iTunes store to Jian Liang acknowledging the submission of an app named Meishe with an SKU of "com.cdv.video360.1.0." Dkt. No. 646-7.

According to XAT's submission to the Hong Kong Stock Exchange, the Meishe app launched on the Android and iOS operating systems in October and November 2014. Dkt. No. 608-4 at 147.

### D.    Transfer of Ownership of Copyright and Trade Secrets

In October 2015, XAT and Meishe signed a written "Computer Software Transfer Agreement" in which XAT transferred "the various copyrights"[5] over the Meishe Mobile-phone Video Shooting and Editing Software, version 1.0, registration number 2014SR205312. Dkt. No. 610-6. The agreement gives Meishe the copyright or copyrights to the Software from the date of execution, October 10, 2015. *Id.* Meishe registered the copyright to the software in its name on November 20, 2015, receiving a new registration number (2015SR227927) from the Chinese copyright administration. Dkt. No. 610-6.

On August 18, 2021, Meishe submitted a declaration from XAT to the Chinese court for the purpose of advancing similar litigation against ByteDance in that country. Zheng Dep. Day 1 at 148; Dkt. No. 610-6. XAT's declaration stated the following:

> It is hereby declared that: China Digital Video (Beijing) Limited (hereinafter referred to simply as "the Company") began research and development of "MEISHE Mobile-phone Video Shooting and Editing Software" ("the Software") in October 2013 and completed its development of version V1.0 on September 26th, 2014.

---

[5] The parties offer different English translations of the agreement. Plaintiff's version translates Article 2 as follows: "Party A [XAT] hereby transfers to Party B [Meishe] gratuitously and without geographical restrictions *the various copyrights over the Software*." Dkt. No. 610-6 (emphasis added). Defendants' version translates the same article as follows: "Party A transfers *all rights to the copyright of the software* to Party B free of charge and without geographical restrictions." Dkt. No. 590-4 (emphasis added).

United States District Court
Northern District of California

> Subsequently, the Company applied for registration of its copyrights to the Software with the National Copyright Administration, which approved the copyright registration for the "MEISHE Mobile-phone Video Shooting and Editing Software [referred to simply as: MEISHE] V1.0" on December 22nd, 2014. **In February 2015, the Company transferred the "MEISHE Mobile-phone Video Shooting and Editing Software" to Beijing Meishe Network Technology Co., Ltd. Beijing Meishe Network Technology Co., Ltd. has since become copyright owner and trade secret owner of the "MEISHE Mobile-phone Video Shooting and Editing Software", and there exists no ownership dispute between the Company and Beijing Meishe Network Technology Co., Ltd. with respect to the Software.**

Dkt. No. 610-6 (emphasis added). The statement is signed with a corporate seal. *Id.*

After reviewing this declaration, defendants proceeded to seek evidence of the purported February 2015 transfer through discovery in this litigation. *See* Dkt. No. 591 at 3. On July 29, 2022, defendants served the following interrogatory: "Identify all current, former, and claimed ownership interests in each of the Asserted Copyrights, Alleged Nonpublic Source Code, or Related Products, and all agreements and negotiations related to those actual or claimed ownership interests and/or changes in ownership interest." Dkt. No. 591-5, Interrogatory No. 14. In response, plaintiff directed defendants to the October 2015 transfer agreement, the 2021 XAT declaration, the September 30, 2014 investment agreement, and the subsequent supplemental investment agreement. Dkt. No. 590-6. Through Hague Convention letters rogatory to XAT, defendants also received XAT's Intellectual Property Management Policy, revised in 2012, which states that "[w]hen the company's intellectual property rights are transferred externally, a written contract must be signed in accordance with legal provisions . . . ." Dkt. No. 590-25.

As the question of ownership over the relevant copyrights and trade secrets persisted, on December 16, 2014 the Special Master ordered Meishe to produce a declaration addressing

> a. The relationship between Meishe and XAT from inception to present,
>
> b. Whether any documents or agreements exist that bear on the terms of Meishe's separation from XAT, including any cooperation agreements, and including any documents addressing intellectual property as between Meishe and XAT
>
> c. If such documents exist, Meishe's declaration shall clearly state this and shall also clearly state whether any copies of such documents will be provided with the declaration.
>
> d. How that relationship has evolved from inception to present; . . .

Dkt. No. 519 at 32.  In a subsequent sworn declaration dated January 27, 2025, Mr. Zheng stated, "when Meishe was formed as its own company, XAT transferred ownership of all the IP the Meishe product team had been working on to the new Meishe company (including all copyrights and trade secrets) and provided some early assistance, as described below, to help Meishe establish itself as a company."  Dkt. No. 610-17 ¶ 4.  Mr. Zheng then asserted that "Meishe previously produced the one document we had where XAT assigned IP rights to the Meishe IP to Meishe," referring to the October 2015 transfer agreement.  *Id.* ¶ 5.  The declaration also referenced the 2021 statement from XAT to the Chinese courts.  *Id.*

Defendants pressed Mr. Zheng further about any agreements transferring intellectual property from XAT to Meishe during Mr. Zheng's deposition on April 14, 2025.  Mr. Zheng testified that there was only one IP transfer agreement and confirmed it was the October 2015 agreement. Zheng Dep. Day 1 at 124, 145.  When asked about the discrepancy between the October date in the written agreement and the February date in XAT's 2021 declaration to the Chinese court, Mr. Zheng first asserted that XAT submitted the declaration to the Chinese court but then conceded that Meishe was the party in that litigation that submitted the declaration to the court.  *Id.* at 145-48.  Meishe did not try to change the February date listed in the XAT declaration.  *Id.* at 148.

Ten days after Mr. Zheng's deposition, Yanfang Wang, a Chinese law professor and former judge, submitted an expert report affirming the validity of an "oral agreement" between XAT and Mr. Zheng to transfer intellectual property.  Dkt. No. 610-2 (Wang Report).  The fact section of the Wang report contained the following statements:

> 9. On April 21, 2025, I communicated with the CEO, CTO, and Vice President of R&D of Meishe Company, who confirmed the following facts:
>
> 10. Before October 2014, Mr. Zheng Pengcheng (currently the CEO of Meishe Company), who was an employee of China Digital Video (Beijing) Limited (hereinafter referred to as "Xin Ao Te Company"), began discussions with Xin Ao Te Company regarding the independent commercialization of the Meishe APP software. Based on mutual consensus, it was proposed to advance the project through the establishment of a new company for market operations. Before formally signing a written agreement, both parties had formed an oral agreement that they believed to have legal binding effect, with core terms stipulating that upon the establishment of Meishe Company, Xin Ao Te Company would need to transfer all rights (including copyrights and trade secrets) related to the Meishe APP software to

United States District Court
Northern District of California

Meishe Company as an investment in the newly established company. After Meishe Company acquired these rights, Meishe Company would then transfer a portion of its shares to Xin Ao Te Company as consideration.

11. Meishe Company was officially established on October 23, 2014, and received its business license. In February 2015, based on the oral agreement, Xin Ao Te Company transferred the Meishe APP software and all its intellectual property rights to Meishe Company.

*Id.* at 6-7.[6] Judge Wang summarized her legal conclusions as follows:

17. Based on relevant Chinese laws, the facts, evidence, and materials of this case, combined with my judicial practice and academic research experience, I have formed the following opinions: First, the "oral agreement" reached between Xin Ao Te Company and Meishe Company is legal and valid; second, as early as February 2015, when Xin Ao Te Company transferred the Meishe APP software and all its intellectual property rights to Meishe Company, Meishe Company obtained all copyrights and trade secrets of the Meishe APP software as stipulated in the "oral agreement," including the copyright and trade secrets of the "Dunhuang Software" source code within the Meishe APP; third, the fact that Xin Ao Te Company has never asserted any ongoing rights to the Meishe APP software against Meishe Company indicates that the rights transfer stipulated in the "oral agreement" has been completed, and the status of rights is stable; fourth, the "Statement" issued by Xin Ao Te Company further supports and confirms Xin Ao Te Company's acknowledgment of the prior rights transfer (that all copyrights and trade secrets of the Meishe APP software have been transferred to Meishe Company).

*Id.* at 10.

Judge Wang's report also details how in 2023 and 2024 the Supreme People's Court in China recognized Meishe's ownership of intellectual property, including copyrights and trade secrets, in a couple of versions of Meishe's software. *Id.* at 23-24; *see also* Dkt. Nos. 647-9, 647-10, 647-11 (full text of Chinese court opinions). The report notes that not all the versions at issue in the U.S. litigation were at issue in the Chinese litigation, but that the "Meishe SDK software mentioned in the Chinese litigation is essentially the same software involved in the U.S. litigation concerning the Meishe APP software."[7] Dkt. No. 610-2 at 8.

---

[6] In later deposition testimony, Judge Wang stated that she learned the facts of the case from phone calls with plaintiff's counsel, wrote a draft report, and then confirmed the facts in her draft report with Meishe executives. Dkt. No. 655-3 at 74-76, 164-171. The confirmation came in the form of a group WeChat thread, where plaintiff's counsel shared specific language and the Meishe executives approved it. *Id.* at 170; Dkt. No. 655-4.

[7] In her deposition, Judge Wang clarified that she is not a software expert and that this statement relied on a characterization of similarity provided by plaintiff's counsel. Dkt. No. 655-3 at 159. Defendants note that, in a separate *Daubert* motion, plaintiff seeks to exclude expert

9

Defendants' expert Judge Xiangjun Kong offers a contrary opinion as to the validity of any transfer of intellectual property from XAT to Meishe. Dkt. No. 610-3 (Kong Report). Judge Kong offered the following summary of his opinions:

> Meishe did not obtain any copyrights or trade secrets pursuant to any oral agreement in 2014 or in February 2015. Put simply, Meishe has not been able to articulate any specific terms of the alleged oral agreement, nor has Meishe provided evidence of a purported oral agreement between XAT and Mr. Zheng. In fact, Prof. Wang's description of the core terms of the alleged oral agreement reveals that it merely states that XAT "would need to transfer" certain IP rights to Meishe in the future [footnote omitted]; the purported oral agreement **did not** state that XAT was obligated to transfer any rights when the oral agreement was allegedly made. Therefore, in my opinion, any oral discussions between XAT and Mr. Zheng in 2014 were, at most, negotiations or a mere statement of intent to transfer certain IP rights in the future.

*Id.* ¶ 10. Judge Kong also opined that any oral agreement would not be valid under Chinese laws, the 2021 declaration from XAT is not evidence of an oral agreement, the capital contribution agreements did not transfer copyrights or trade secrets, and the October 2015 transfer agreement did not transfer trade secrets or rights to Dunhuang code. *Id.* ¶¶ 11-14. While Judge Kong acknowledged the decisions of the Chinese courts in favor of Meishe, he suggested that the information considered by those courts was more limited than what is available here. *Id.* ¶ 83.

After the release of Judge Wang's report, Mr. Zheng submitted an errata sheet attempting to make substantive changes to his testimony on the issue of transfer agreements. Dkt. No. 590-12. In response to the question, "Are you aware that there's only one IP transfer agreement between Xin Ao Te and Meishe, yes or no?", Mr. Zheng sought to change his answer from yes to no. *Id.* He also sought to add the following unspoken statements into the transcript: (1) "The Meishe app source code and all associated intellectual properties belong to Meishe after they were transferred to Meishe

---

testimony regarding SDK code as "irrelevant" since that code is not being asserted in this case. Dkt. No. 659-1 at 8 (citing Dkt. No. 632 at 16-17). The Court remarks that earlier in this litigation, the parties argued the opposite of what they are arguing now in regard to the similarity between the Chinese litigation and the claims here. In seeking a stay of this litigation, defendants argued previously that the issues and parties in the Chinese litigation were like those here. Dkt. No. 36-2 at 10 (seeking a stay of the U.S. litigation to avoid "duplicative litigation" and the "risk of inconsistent findings"). In opposing that motion, plaintiff wrote "there is little similarity between the issues and products of the Chinese litigation and the current action." Dkt. No. 46-1 at 9. Now, plaintiff asserts that the favorable judgment of the Chinese litigation applies here, while defendants argue the opposite.

United States District Court
Northern District of California

during February 2015" and (2) "The February 2015 agreement was an oral agreement." *Id.*  At the point where he was asked to confirm again that there was only one transfer agreement, Mr. Zheng requested to change his answer from "Yes" to "Yes there is only one written agreement." *Id.*  He also sought to insert testimony affirming that Meishe did not attempt to correct the February date in the 2021 XAT declaration "because it is accurate." *Id.*

More recently, after the parties filed their opening briefs for summary judgment, XAT and Meishe signed on July 24, 2025 a written agreement concerning intellectual property rights in the source code used for the Meishe application.  Dkt. No. 646-5.  The agreement states that the parties have always agreed that Meishe owns all rights to the source code used in its app, even if that source code had been used first in Dunhuang products. *Id.*  The agreement confirms the understanding set forth in Judge Wang's expert report that an oral agreement led to the transfer of rights in February 2015 and that the October 2015 written agreement confirmed the prior oral agreement and included the transfer of trade secret rights. *Id.*  The agreement further states,

> To the extent there remains any question about or challenge to the validity of the transfer of rights in the Meishe App, the parties hereby agree that all rights in the Meishe App are hereby and were in February 2015 transferred from Xin Ao Te to Meishe, including any source code in the Meishe App that was also used in other Xin Ao Te projects. That includes all copyrights, trade secrets, patents, and all other rights to the Meishe App, effective retroactively to February 2015. This agreement assigns to Meishe the right to enforce any and all rights to the Meishe App including against third parties based on these rights, including litigation or settlement, at any time since February 2015. This agreement is effective immediately upon execution by the parties and retroactively to February 1, 2015.

*Id.*

### E.    Meishe Employee Leaves Meishe and Joins Affiliate of Defendants

Central to this lawsuit is an individual named Xie Jing, who worked for XAT from 2007 to 2015 and then moved to Meishe, signing a labor contract with Meishe on March 1, 2015.  Dkt. No. 610-16 at MEISHE-TT_00342486.  Mr. Xie's labor contract with Meishe prohibited him from disclosing Meishe's confidential information, including trade secrets, to any third parties. *Id.* at MEISHE-TT_00342573-74.  Mr. Xie and Meishe mutually agreed to part ways in June 2015. *Id.* at

MEISHE-TT_00342581.   When Mr. Xie left the company's employment, he took all the code of the Meishe app with him.  Dkt. No. 611-10 (Xie Dep.) at 52.

Mr. Xie started working for a ByteDance company in China in 2017.  Xie Dep. at 87.  After Meishe initiated the Chinese litigation, Mr. Xie told his supervisor at that ByteDance company, Jianchao Yang,[8] that Mr. Xie had used code while working for ByteDance that he had written before he joined Bytedance.  Dkt. No. 611-9 (Yang Dep.) at 139-42.[9]  Mr. Xie and his ByteDance-affiliated employer entered into several iterations of a Termination Agreement in August through November 2023, resulting in his ultimate termination on November 22, 2023.  Dkt. No. 611-8.  The termination agreement reserved a right for the company to bring a legal claim against Mr. Xie in relation to the Meishe litigation, but the company also agreed to pay Mr. Xie's legal fees related to his deposition in the Meishe lawsuit.  *Id.* at 3.

### F.    Meishe's Pre-Suit Investigation and Related Documents

In the operative FOAC, plaintiff detailed the following allegations:

> 79. In March 2021, Meishe discovered that a series of apps belonging to ByteDance, Ltd. had infringed Meishe's Copyrighted Works since at least 2018. These apps included, but were not limited to, TikTok, Douyin, Jianying, and CapCut. Meishe personnel conducted an analysis between code of Meishe app and that of TikTok app shows that the code used to implement video and audio editing functions in the two apps is strikingly similar, proving that Defendants copied Meishe's copyrighted work.

> 80. At that time, though Meishe could not obtain the source code of TikTok app, Meishe was able to conduct a comparison between decompiled "TikTok v8.5.0" object code and decompiled "Meishe v2.5.4" object code. On the Android platform, object code of an app is in the form of Android application package ("APK") file. The release version refers to the APK file. "TikTok v8.5.0" APK file can be obtained from public channels. In March 2021, Meishe downloaded "TikTok v8.5.0" APK file from a third-party android app store. Meishe's analysis showed that numerous source code methods contained identical names to Meishe's copyrighted source code, including typographical errors.

FOAC ¶¶ 79-80.  Defendants sought the documentary evidence of this object code comparison in

---

[8] Mr. Yang worked for a different ByteDance entity, defendant ByteDance, Inc.  Dkt. No. 614-19 ¶ 2.

[9] At his deposition, Mr. Xie testified that he did not recall this interaction.  Xie Dep. at 91.

discovery, but plaintiff told defendants on November 27, 2024 that "Meishe did not generate files of decompiled object code." Dkt. No. 591-16. Plaintiff asserted that it used a software that "can display the decompiled code directly in the software window, so no decompiled code files were generated." *Id.*

After defendants further moved to compel decompiled object code files, Meishe submitted a declaration from CTO Jian reiterating that "the process of decompiling the code was carried out internally with the IDA Pro software, and no decompiled code files were generated." Dkt. No. 590-24. The Special Master granted defendants' motion, ordering that Meishe produce responsive materials to the extent it had any, "including through Plaintiff's ability to access any IDA Pro database containing records of Plaintiff's comparison of code as part of its investigations prior to its initiation of this action." Dkt. No. 531 at 13-14. On February 14, 2025, Meishe then produced IDA Pro files but no comparison documents. Dkt. No. 591-27.

At Meishe CTO Jian's deposition on April 16, 2025, he testified that Meishe had created an Excel spreadsheet file comparing plaintiff's and defendants' decompiled object code at the time of its pre-suit investigation. Jian Dep. at 142. Several days later, the Special Master convened an informal discovery conference to discuss production of this spreadsheet. Dkt. No. 560 at 2. Plaintiff's counsel argued the spreadsheet was created in 2022 at the direction of Meishe's Chinese counsel and was privileged. *Id.* The Special Master ultimately ordered production of the spreadsheet with redactions of notations by counsel and Meishe produced the redacted file. *Id.*

### G.     Comparison of Plaintiff Meishe's and Defendants' Source Codes

Plaintiff's expert Michael Shamos compared Meishe's code with defendants' codes and found, in his opinion, that 89 of the 98 produced versions of defendants' code infringed Meishe's intellectual property. Dkt. No. 610-9 (Shamos Report) ¶ 62. Dr. Shamos alleges finding evidence of similar comments and misspellings in plaintiff's and defendants' code across various versions of defendants' code. *Id.* ¶¶ 71-81. Dr. Shamos submitted detailed comparisons of three exemplary versions of defendants' code. *Id.* ¶¶ 82-102. In a rebuttal report, defendants' expert Nigel Jones contends that about 90% of Meishe's asserted code consists of unprotectable material. Dkt. No.

United States District Court
Northern District of California

649-12 (Jones Report) ¶¶ 1245-47.

# DISCUSSION

## I.    Summary Judgment and Copyrightability

### A.    Legal Standard

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c).

When considering cross-motions for summary judgment, the Court must review each motion "on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotation marks and citation omitted). The Court must consider the evidence presented in support of each motion "to determine whether it present[s] a disputed issue of material fact precluding summary judgment" on the other motion. *Id.* at 1135. In other words, the Court collectively considers all of the evidence presented, then decides each motion for summary judgment separately based on the sum of the evidence.

**B.    Ownership**

As a threshold matter, the Court must first determine whether summary judgment is appropriate on the question of plaintiff's ownership of the underlying intellectual property. Defendants assert that there is no evidence to show that XAT transferred to plaintiff ownership of the intellectual property at issue in this case when plaintiff became its own company. Consequently, defendants maintain plaintiff lacks standing. Plaintiff argues that its ownership of the rights to the Meishe app is undisputed between XAT and plaintiff.

**1.    Relevant Evidence and Admissibility Considerations**

The Court first examines the evidence presented on this issue and evaluates its admissibility.

**a.    September 2014 and June 2015 Investment Agreements**

The investment agreements between XAT, Zheng, and a third party memorialize the establishment of Meishe and XAT's investment in the company in the form of thirteen patents, ostensibly worth ten million yuan. *See* Dkt. Nos. 610-18, 590-7. These documented agreements were produced in discovery and are admissible.

**b.    October 2015 Copyright Transfer Agreement**

The October 2015 agreement transferring copyright of the Meishe software version 1.0 from XAT to Meishe was produced in discovery and is similarly admissible.

### c.    XAT's 2021 Declaration to the Chinese Court

In the Chinese litigation, plaintiff submitted a declaration from XAT dated August 18, 2021 stating that XAT transferred the rights to the copyrights and trade secrets of the Meishe software to plaintiff in February 2015 and that there was no ownership dispute between the two companies regarding the software.  Dkt. No. 610-6.  Defendants argue this declaration is inadmissible as anonymous, unsworn hearsay that Meishe cannot offer in Court because it disclosed no XAT witnesses on its witness list in discovery.  Dkt. No. 608 at 9.  Plaintiff counters that the use of a corporate seal in place of a personal signature is a common Chinese custom and that the statement is exempt from hearsay as a legal or verbal act.  Dkt. No. 647 at 10-11; Dkt. No. 657 at 6.  The Court finds the document admissible.

### d.    Evidence of Prior Oral Agreement

Meishe asserts that XAT and Mr. Zheng entered into an oral agreement prior to October 2014 that effected a transfer of intellectual property in the Meishe software to plaintiff in February 2015.  Defendants object to the evidence that supports the existence of an oral agreement.

### i.    Zheng Testimony

Meishe CEO Zheng submitted a declaration on January 27, 2025 stating that XAT transferred the ownership of all intellectual property the Meishe team had been working while still at XAT.  Dkt. No. 610-17 ¶ 4.  When defendants took Mr. Zheng's deposition in April, he stated that there was only one transfer agreement, the October 2015 agreement.  Zheng Dep. Day 1 at 124, 145.  Mr. Zheng then submitted an errata sheet to the deposition transcript seeking to make numerous substantive edits to his testimony, including inserting references to a previously unmentioned oral agreement.  Dkt. No. 590-12.  The submission of deposition errata "is to be used for corrective, and not contradictory, changes."  *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1226 (9th Cir. 2005).  The Court will not consider Mr. Zheng's inappropriate errata as facts to be considered at summary judgment.

16

### ii.    Wang Report

Judge Wang's expert report states that, on April 21, 2025, Meishe executives confirmed that Mr. Zheng had discussions with XAT before October 2014 about creating the new company, that the parties formed a binding oral agreement, and the transfer of intellectual property rights occurred in February 2015 based on this oral agreement. Wang Report at 6-7. Judge Wamg explained in a later deposition that she first learned these facts from plaintiff's counsel, wrote her draft report, then received approval of the specific language from the Meishe executives in a group WeChat threat. Dkt. No. 655-3 at 74-76, 164-171; Dkt. No. 655-4. Based in part on these facts, Judge Wang concluded that Meishe owns the intellectual property rights at issue in this case. Wang Report at 10.

Without commenting on Judge Wang's legal analysis, the Court finds it inappropriate at the summary judgment stage to consider facts relied upon in an expert report that have not been independently produced in discovery. Meishe produced no evidence of an oral agreement during fact discovery prior to Judge Wang's report.

### iii.    July 2025 Agreement

XAT and Meishe signed another written agreement on July 24, 2025, after the cross motions for summary judgment had been filed in this case. Dkt. No. 646-5. This new agreement confirms Judge Wang's understanding that an oral agreement transferred the rights to the copyrights and trade secrets at issue in this case. *Id.* While written in English—a language Mr. Zheng said he cannot read—it is signed by an XAT director and Mr. Zheng. *Id.*; Zheng Dep. Day 1 at 9. The Court gives minimal consideration to the agreement, produced in the heat of litigation, only noting that it maintains the consistent position of XAT and Meishe that all rights to the Meishe app were previously transferred from XAT to Meishe.

### e.    Chinese Court Judgments

As detailed in Judge Wang's report, the Supreme People's Court in China recognized

United States District Court
Northern District of California

1    Meishe's ownership of copyrights and trade secrets in related versions of Meishe software. Wang

2    Report at 23-24; Dkt. Nos. 647-9, 647-10, 647-11 (full text of Chinese court opinions). The Court

3    will take notice of these opinions as a material fact bearing on the question of ownership in this case.

4

5                        **f.       Additional Licensing Agreements**

6        Meishe has submitted evidence of licensing agreements from 2018 and 2024 wherein Meishe

7    allowed XAT to use its software for a fee. Dkt. Nos. 646-13, 646-14. These agreements are

8    admissible.

9

10                   **2.       Evaluating Plaintiff's Ownership of Asserted Copyrights**

11       Five versions of Meishe's software are at issue in its copyright infringement claim: the

12   registered Chinese copyright 2015SR227927 and four unregistered copyrighted versions: Meishe

13   App v1.0, Meishe App v1.3 rev. 2631, Meishe App v1.5, and Meishe App v2.5.4. *See* Dkt. No.

14   644-9.

15       It is undisputed that XAT transferred the copyright of Meishe App v1.0 to Meishe via the

16   October 2015 transfer agreement. *See* Dkt. No. 610-6. Meishe then updated the registration of the

17   copyright in China to reflect its ownership, receiving registration number 2015SR227927. *Id.* It is

18   likewise undisputed that the Meishe app source code "evolved" from the Dunhuang code. Li Dep.

19   at 68.

20       Defendants argue that XAT did not transfer rights to any underlying Dunhuang code in the

21   application so Meishe's copyright only includes "Meishe code's non-trivial 'evol[ution]' from the

22   Dunhuang code." Dkt. No. 608 at 12. Ninth Circuit authority recognizes that copyright protection

23   for derivative works "extends only to the material contributed by the author of such work, as

24   distinguished from the preexisting material employed in the work, and does not imply any exclusive

25   right in the preexisting material." 17 U.S.C. § 103(b); *U.S. Auto Parts Network, Inc. v. Parts Geek,*

26   *LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012); *DC Comics v. Towle*, 802 F.3d 1012, 1023 (9th Cir.

27   2015). Defendants argue that Meishe "must prove with admissible evidence that the copied code

28   ***was not*** from Dunhuang" and that Meishe has not done so. Dkt. No. 608 at 13.

United States District Court
Northern District of California

1    The Court first considers whether Meishe owns the rights to the underlying Dunhuang code

2    in its application.  The Court notes that Meishe app v1.0 was created by employees of XAT, before

3    the creation of Meishe as an independent entity.  The app was published to Chinese app stores on

4    September 27, 2014, a few days before the investment agreement creating Meishe was signed and

5    a month before Meishe received its business license.  Dkt. No. 644-5 at 50; Dkt. No. 610-18 at 1;

6    Dkt. No. 610-17, ¶ 6, Ex. B.  Depending on the English translation, the October 2015 transfer

7    agreement gave Meishe "the various copyrights over the Software" or "all rights to the copyright of

8    the software."  Dkt. No. 610-6; Dkt. No. 590-4.  Meishe's expert opined that this agreement

9    confirmed that a prior oral agreement included a transfer of the copyright for the Dunhuang source

10    code embedded in the Meishe software.  Wang Report ¶ 42.  Defendants' expert concludes the

11    agreement does not transfer the rights of any Dunhuang code.  Kong Report ¶ 50.

12    While the mechanism of transfer is unclear, the Court finds that the record establishes that

13    Meishe owns all the rights to the source code in the Meishe app, including any Dunhuang code

14    carried over into the Meishe app.  Notwithstanding Judge Kong's opinion to the contrary, the Court

15    finds no evidence to overrule the shared conclusions of the parties to the transfer and the Chinese

16    courts that have since ruled on the effect of the transfer.  Further, the subsequent licensing

17    agreements in the record confirm that XAT believes plaintiff owns the Meishe application—indeed,

18    XAT has paid plaintiff to use the software.

19    If plaintiff owns full rights to the original version of the software, it follows that plaintiff

20    owns full rights to the subsequent versions for which plaintiff claims an unregistered copyright.  No

21    record evidence suggests any intervening acts have disrupted or severed plaintiff's ownership of the

22    copyright of the software it has continued to develop and refine.

23

24    **3.    Evaluating Plaintiff's Ownership of Trade Secrets**

25    Defendants likewise dispute plaintiff's ownership of the trade secrets in the Meishe software,

26    contending that, to the extent any trade secrets exist, they still reside in XAT's ownership.  The

27    October 2015 transfer agreement does not mention trade secrets.  Nonetheless, XAT asserted in its

28    2021 declaration that it transferred the trade secrets in the Meishe software to plaintiff.  Dkt. No.

United States District Court
Northern District of California

610-6.  And in a 2024 ruling, the Chinese court determined that Meishe owned the trade secrets in version 1.5 of the Meishe software.  Dkt. No. 647-11 at 30-31.  The Court does not see how a jury could find otherwise.  Thus, the Court finds that plaintiff Meishe owns the trade secrets at issue in this litigation and defendants' motion for summary judgment on the grounds of lack of ownership is DENIED.

### 4.    Ownership Conclusion

The Court determines that there is not a triable issue of fact regarding the ownership of the copyrights and trade secrets asserted in this case.  The record shows that plaintiff owns the intellectual property at issue.

## C.    Applicability of Copyright Registration Requirement

Defendants next contend that plaintiff's copyright infringement claim must fail because plaintiff has not registered its copyrights with the U.S. Copyright Office.  Plaintiff responds that it is exempt from the registration requirement.

Foreign works are exempt from registering with the U.S. Copyright Office under 17 U.S.C. § 411(a), but for United States works, registration is generally a prerequisite for pursuing copyright infringement in federal court.  *See Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 301 (2019).  The Copyright Act defines a "United States work" differently depending on whether the alleged work is a published work or an unpublished work.  *See* 17 U.S.C. § 101.  A published "United States work" is defined as a work that is first published –

> (A) in the United States;
>
> (B) simultaneously in the United States and another treaty party . . .
>
> (C) simultaneously in the United States and a foreign nation that is not a treaty party; or
>
> (D) in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of audiovisual work legal entities with headquarters in, the United States[.]

*Id.*  An unpublished "United States work" is defined as a work in which "all the authors of the work are nationals, domiciliaries, or habitual residents of the United States . . . ."  *Id.*

United States District Court
Northern District of California

The parties dispute whether the copyrighted works in question were published and, if so, whether they were published in a manner that renders them "United States works" under the statute.

### 1. Published or Unpublished Works

Meishe admits that it made at least four of the five versions included in its copyright claim available on online app stores.[10]  Meishe argues, however, that the sale of a software application does not constitute publication of the copyright-protected source code, since an end-user can only derive the object code from the publicly available application, not the source code.  The Ninth Circuit has explained the relationship between source code and object code as follows:

> Computer programs are works of authorship entitled to protection under the Copyright Act. 17 U.S.C. § 101, 102. The Copyright Act defines a computer program as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. Computer programs can be expressed in either source code or object code. "Source code is the computer program code as the programmer writes it, using a particular programming language." Compendium of Copyright Office Practices, § 321.01. Source code is a high level language that people can readily understand. "Object code is the representation of the program in machine language [binary] ... which the computer executes." *Id.* at § 321.02. Source code usually must be compiled, or interpreted, into object code before it can be executed by a computer. Object code can also be decompiled into source code. Source code and object code are "two representations of the same computer program. For registration purposes, the claim is in the computer program rather than in any particular representation of the program." *Id.* at § 321.03. However, source code created by decompiling object code will not necessarily be identical to the source code that was compiled to create the object code.

*Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 779 (9th Cir. 2002).

The parties have not presented case law that directly answers whether publication of object code in the form of a computer program constitutes publication of copyright-protected source code in the context of determining whether a work is a United States work.  Defendants rely on the above passage from *Syntek* to argue that distribution of the software application meets the statutory definition of publication for the underlying source code, since the Ninth Circuit wrote that "[s]ource

---

[10] As discussed below, the parties dispute whether the asserted copyright attached to app1.3 rev. 2631 was published.

United States District Court
Northern District of California

code and object code are 'two representations of the same computer program.'"[11]  *See id.*  Plaintiff directs the Court to *GCA Corp. v. Chance*, where a prior court likewise determined that source code and associated object code are to be treated as one work.  No. C-82-1063-MHP, 1982 WL 1281, at *1-2 (N.D. Cal. Aug. 31, 1982).  As such, that court determined that a copyright of a source code protects the object code as well.  *Id.* at *1. However, the court concluded that prior publication of the object code did not invalidate the copyright of the source code because the source code itself had never been published.  *Id.*

While this question of law may be a close one,[12] the Court chooses not to extend the determination in *GCA Corp.* to the circumstances and disputed issue here—what constitutes publication for the purposes of determining whether copyrighted material is a "United States work." The Court finds the analysis in *Syntek* that lumps source code and object code together persuasive and relevant.  The court in *GCA Corp.*, on the other hand, considered the two codes as one program for purposes of protection but not publication.  This Court is not persuaded that this bifurcation is proper in this instance.  Accordingly, the Court holds that, as a matter of law, the publication of the software's object code constitutes publication of a copyrighted source code.

### 2.    Foreign, Domestic, or Simultaneous Publication

Plaintiff made version 1.0 of the Meishe app available in Chinese app stores on or around September 27, 2014.  Dkt. No. 644-5 at 50.  Defendants contend that plaintiff's works "were at least simultaneously published worldwide, including in the U.S., by submitting the app's object code to 'Chinese app stores.'"  Dkt. No. 608 at 21.  Defendants highlight an email exchange suggesting that

---

[11] 17 U.S.C. § 101 defines publication as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending.  The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication.  A public performance or display of a work does not of itself constitute publication."

[12] On considering this issue in the motion to dismiss the fourth amended complaint, the Court wrote that it "cannot conclude as a matter of law based on *GCA Corp.* and the other out-of-circuit authorities defendants cite in their reply that Meishe's Copyrighted Works were published, but does not resolve this dispute because . . . it finds that Meishe's allegations are sufficient to allege the works are not United States works regardless of whether they are deemed published or unpublished." Dkt. No. 465 at 11 n.5.  At that stage, the parties had not pointed the Court to the language in *Syntek*.

United States District Court
Northern District of California

CTO Jian's brother downloaded and used the app in the United States from a Chinese app store as early as October 2, 2014. Dkt. No. 644-16. Plaintiff counters that the publication of a mobile application comes in two steps: (1) sending to an app store for approval, then (2) distribution to the public via the app store. Dkt. No. 657 at 8-9. Since the statute defines publication as including "offering to distribute copies . . . to a group of persons for purposes of further distribution . . . constitutes publication," plaintiff argues that the first step was the initial "publication." *See id.*; 17 U.S.C. § 101. And if correct on this point, plaintiff has put forward evidence suggesting that this first step occurred only in China, which would disqualify the works from being considered "United States works." *See*, *e.g.*, Dkt. No. 647-15.

The Court finds that plaintiff's description of app publication has persuasive value—the works should not be considered simultaneously published in the United States if they were only sent to Chinese app stores initially, even if users can subsequently access those online stores worldwide. The question then becomes one of fact: were the versions at issue here first sent to Chinese app stores? The evidence presents a genuine dispute of material fact on this point as to at least some of the asserted copyrights.

For example, defendants argue that the Meishe app v1.0 was first sent to the Apple store, pointing to a September 21, 2014 email to Jian Liang from the iTunes store showing he submitted an app for review. Dkt. No. 644-15. Plaintiff contends that this transmission was a test file, not the Meishe app. *See id.*; Dkt. No. 647 at 5. Plaintiff points instead to an October 15, 2014 email from the iTunes store acknowledging the submission of an app named Meishe with an SKU of "com.cdv.video360.1.0." Dkt. No. 646-7. This presents a dispute of fact for version 1.0. There is some question as to whether these same facts also cover the registered copyright and the unregistered copyright for app1.3 rev. 2631. *See* Dkt. No. 644-19 at 19 (highlighting evidence showing that app1.0, registered copyright 2015SR227927, and app1.3 rev. 2631 are related to the same program); Dkt. No. 646-1 at 5 (citing a declaration suggesting app1.3 rev. 2631 was not sent to app stores). Considering these disputed facts, summary judgment regarding whether the registration requirement

applies is inappropriate for these three asserted copyrights.[13]

The parties likewise present conflicting evidence about whether version 2.5.4 was released first to Chinese app stores or U.S.-based app stores, but plaintiff's evidence regarding this version is inadmissible. Defendants present an email showing that the version was sent to the U.S.-based Apple Store on October 26, 2016. Dkt. No. 644-5. A separate document produced by plaintiff shows this version was released to Wandoujia, a Chinese app store, two weeks later on November 10, 2016. Dkt. No. 647-7. In its opposition brief, Meishe attached a previously undisclosed email from an employee showing submission of an app to a different Chinese app store on October 24, 2016. Dkt. No. 646-15. While the email does not specify the version number, Meishe submitted a new declaration from the employee in the email thread stating that the email concerned version 2.5.4, and that Meishe's practice in general was "to submit the app to a number of app stores in China before submitting it to any app stores outside China." Dkt. No. 647-15. However, defendants rightfully object that this email was not disclosed during discovery, and the employee was never identified as a potential witness. The Court therefore considers the email and declaration inadmissible. Without other evidence that helps plaintiff meet its burden, defendants are therefore entitled to summary judgment as to version 2.5.4. This version is a "United States work" and the absence of registration bars plaintiff's claim for infringement as to this version.

Defendants' motion for summary judgment on the basis of a lack of registration is therefore DENIED in part and GRANTED in part.

### D.    Liability for Copyright Infringement

Plaintiff seeks summary judgment on its claim that defendants infringed upon its copyrights.

To establish copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The copying prong "contains two separate

---

[13] The parties do not discuss publication dates for version 1.5 and the Court cannot say on summary judgment whether this version was published first or simultaneously in the United States.

components: 'copying' and 'unlawful appropriation.'" *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020). Copying may be proven through direct evidence or "circumstantially by showing that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying." *Id.* "Access is proven when the plaintiff shows that the defendant had an opportunity to view or to copy plaintiff's work." *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977). "[A]n opportunity to view or to copy plaintiff's work . . . is often described as providing a 'reasonable opportunity' or 'reasonable possibility' of viewing the plaintiff's work." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000) (citations omitted). Copying may also be established by showing "that the two works in question are strikingly similar." *Malibu Textiles, Inc. v. Label Lane International, Inc.*, 922 F.3d 946, 952 (9th Cir. 2019). "Where two works are strikingly similar, access may be inferred." *Id.* (citing *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 987-88 (9th Cir. 2017)).

As to unlawful appropriation, courts in the Ninth Circuit have held that "the hallmark of 'unlawful appropriation' is that the works share *substantial* similarities. *Skidmore*, 952 F.3d at 1064 (citing *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004). *Skidmore* explains that this inquiry involves a two-part test. *Id.*

> The first part, the extrinsic test, compares the objective similarities of specific expressive elements in the two works. Crucially, because only substantial similarity in protectable expression may constitute actionable copying that results in infringement liability, it is essential to distinguish between the protected and unprotected material in a plaintiff's work. The second part, the intrinsic test, tests for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance. Both tests must be satisfied for the works to be deemed substantially similar.

*Id.* (internal quotation marks, alterations, and citations omitted). The extrinsic test contains several steps, including an "analytic dissection" that separates "unprotectable ideas" from "potentially protectable expression" and a determination as to whether the copyrighted work is entitled to "broad" or "thin" protection. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994). If a work is in an area where there is a wide range of expression, broad protection applies and the factfinder considers whether the allegedly infringing work is "substantially similar" to the

1    copyrighted work. *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 913-14 (9th Cir. 2010), *as amended*

2    *on denial of reh'g* (Oct. 21, 2010).  If a work is in an area where only a narrow range of expression

3    is possible, thin protection applies and the factfinder uses a more stringent "virtually identical"

4    standard.  *Id.*  When a factfinder determines that the extrinsic test is met, it need not proceed to the

5    intrinsic test.  *See Skidmore*, 952 F.3d at 1065 ("Because the extrinsic test was not satisfied, the jury

6    did not reach the intrinsic test.").

7          Plaintiff has requested summary judgment on the issue of copyright infringement, but the

8    Court's analysis in this regard is preempted by its holding on registration.  Since a genuine dispute

9    of material fact exists as to whether the remaining copyrights needed to be registered—a threshold

10   issue—the Court need not proceed further on the copyright infringement claim at summary

11   judgment.[14]

12

13         **E.      Copyrightability Analysis**

14         In separate briefing, defendants ask the Court to make a series of rulings about the

15   copyrightability of the material contained within plaintiff's copyright before the case proceeds to

16   trial. Dkt. No. 651-3.  First, relying on the expert report of Mr. Jones, defendants argue that the vast

17   majority of source code in plaintiff's asserted copyrights is not protectable, and thus must be

18   dissected out of plaintiff's copyright and not considered in the comparative analysis.  As part of

19   their proposed analytic dissection, defendants apply the doctrines of merger and scènes à faire.

20   Second, considering that only a small portion of plaintiff's source code remains protectable,

21   defendants argue that the Court should determine that the virtually identical standard applies.

22         In response, plaintiff argues that the "extrinsic" test should not be applied to copyrighted

23   source code because it is a "literal" element.  Dkt. No. 680-15.  Further, plaintiff argues that the

24   doctrines of merger and scènes à faire are considered affirmative defenses to infringement in the

25   Ninth Circuit, not relevant to the threshold copyrightability analysis.  Plaintiff takes issue with Mr.

26

27         _____

           [14] To the extent the parties present no genuine dispute about where version 1.5 was first
28   published, the Court still finds summary judgment inappropriate as to that version for the reasons
     explained in the Court's discussion of copyrightability.

Jones' granular analysis, as discussed by this Court separately in regard to plaintiff's *Daubert* motion seeking to exclude Mr. Jones' testimony. And unsurprisingly, plaintiff argues that its works are entitled to broad protection and that the substantial similarity test should apply.

As an initial matter, the Court is not convinced by defendants' contention that these are necessarily decisions for the judge to make before a case is presented to the jury. Certainly a judge must decide issues of copyrightability before issuing summary judgment on the question infringement. But when there are disputed issues of material fact, courts have tasked juries with applying the extrinsic test. *See Skidmore*, 952 F.3d at 1065 (jury deciding the extrinsic test); *Moonbug Ent. Ltd. v. BabyBus (Fujian) Network Tech. Co.*, No. 21-CV-06536-EMC, 2023 WL 11922845, at *11-13 (N.D. Cal. Mar. 7, 2023) (leaving to jury questions related to protectability and the standard for the scope of protection to be applied). Since the parties' experts disagree about the extent of originality within plaintiff's copyrighted source code, the Court finds this question better suited for the ultimate factfinder in this case.

Similarly, the Court finds genuine disputes of material fact exist as to the range of possible expression that was available to plaintiff in its development of its audio-visual editing source code. Accordingly, the Court will allow the jury to determine this range and the resulting scope of protection.

Next, the parties dispute whether merger and scènes à faire figure into the question of what material is copyrightable or the subsequent question of whether defendants have unlawfully appropriated copyrightable material. The Ninth Circuit has made clear that these doctrines are affirmative defenses to be applied in the context of infringement, not copyrightability. *See Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000); *see also Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1358 (Fed. Cir. 2014) (summarizing Ninth Circuit law). But ultimately, as this Court has previously found, this is a distinction without a difference in the final result, at least when both stages of analysis will be determined by the same factfinder. *See* Dkt. No. 650-21 (*Ets-Hokin v. Skyy Spirits, Inc., et al.*, No. C 96-3690 SI (N.D. Cal. Nov. 5, 2001), Dkt. No. 187 at 6 ("In the instant case, the Court finds that both approaches to the limiting doctrines yield the same result.").

Finally, plaintiff contends that the Ninth Circuit's extrinsic test should not be applied to a

case where the alleged copying is purely literal.  As the extrinsic/intrinsic test feels less than intuitive, plaintiff's position has some appeal.[15]  But it is unclear what plaintiff's replacement test would be.  If plaintiff is suggesting that there need be no separation of unprotectable elements before making an ultimate determination, the suggestion is not well-taken.

In conclusion, the parties have not convinced the Court that it is in the position to make judgments on copyrightability as a matter of law at this stage of the case.  These issues can and should be decided at trial through the presentation of evidence to the jury and the crafting of appropriate jury instructions.

### F.    Liability for Misappropriation of Trade Secrets

A "trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret."  *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (citing 18 U.S.C. §§ 1839(3), (5)).  To prove misappropriation of a trade secret, the plaintiff must show that "(1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff."  *Id.* at 657-58.  Misappropriation can include the improper acquisition, disclosure, or use of a trade secret under certain circumstances.  18 U.S.C. § 1839.[16]

---

[15] The two-part extrinsic/intrinsic test was developed in the context of a case involving non-literal copying. See *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977).  One leading treatise distinguishes "nonliteral similarly"—"when the fundamental essence or structure of one work is duplicated in another"— from "fragmented literal similarity"—"when there is some literal similarity (virtually, though not necessarily, completely word for word)."  Melville B. Nimmer and David Nimmer, 4 *Nimmer on Copyright* § 13D.11 (Matthew Bender, Rev. Ed. 2025).  According to Nimmer, the essential inquiry in cases of fragmented literal similarity is whether the copied work constitutes a substantial portion of plaintiff's work, an inquiry that includes quantitative and qualitative aspects. *Id.* § 13D.12.

[16] The relevant definitions in the statute are as follows:

(5) the term "misappropriation" means-

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without

United States District Court
Northern District of California

Defendants challenge whether Meishe has established that defendants acted with actual or constructive knowledge of misappropriation, as required by 18 U.S.C. § 1839(5). Defendants further contend that Meishe did not take reasonable steps to protect its trade secrets, as required by 18 U.S.C. § 1839(3)(A). Defendants assert the source code at issue can be reverse engineered and that Meishe had weak internal controls to protect the trade secrets.

Based on the current record, the Court determines there is a genuine dispute of material fact as to defendants' liability for misappropriation of trade secrets. Plaintiff's request for summary judgment on this claim is DENIED.

---

express or implied consent by a person who-

> (i) used improper means to acquire knowledge of the trade secret;

> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was-

>> (I) derived from or through a person who had used improper means to acquire the trade secret;

>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

> (iii) before a material change of the position of the person, knew or had reason to know that-

>> (I) the trade secret was a trade secret; and

>> (II) knowledge of the trade secret had been acquired by accident or mistake;

(6) the term "improper means"-

> (A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and

> (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition; . . . .

18 U.S.C. § 1839.

United States District Court
Northern District of California

### G.    Applicability of Extraterritorial Damages

Plaintiff seeks summary judgment establishing its entitlement to damages for defendants' actions outside of the United States.  Federal trade secret law "applies to conduct occurring outside the United States if . . . an act in furtherance of the offense was committed in the United States."  18 U.S.C. § 1837.  Under the federal Copyright Act, a plaintiff "is entitled to recover damages flowing from exploitation abroad of the domestic acts of infringement committed by defendants," so long as the domestic infringement occurred entirely within the United States.  *Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 990-92 (9th Cir. 1998), *as amended on denial of reh'g and reh'g en banc* (Aug. 25, 1998).  The extraterritorial reach of the Defend Trade Secrets Act is broader than that of the Copyright Act, because the Defend Trade Secrets Act "does not require a completed act of domestic misappropriation, nor does it impose a specific causation requirement." *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 486 (7th Cir. 2024).[17]

It is undisputed that Mr. Xie—the alleged source of improper acquisition—lived and worked in China, so plaintiff relies on unlawful further distribution and use.  Plaintiff points to declarations from defendants' employees stating that U.S.-based employees work with Google and Apple for distribution of the TikTok application in those companies' respective app stores.  Dkt. No. 611-16 ¶¶ 17, 19.  Plaintiff also highlights how defendants develop the "video editing functionality" of TikTok and other allegedly infringing apps in China and in ByteDance, Inc.'s Mountain View, California office.  Dkt. No. 614-19 ¶¶ 7-11.  Defendants argue that plaintiff "gets things backward," contending that domestic acts of misappropriation that occur as a result of or in parallel with foreign acts are not "act[s] in furtherance of the offense."  Dkt. No. 649-1 at 14.  Defendants' argument carries more weight in the copyright context but reads too much into the law in the trade secret context—at least according to the Seventh Circuit.[18]

Regardless, the Court cannot declare that plaintiff is entitled to extraterritorial damages at

---

[17] Defendants cite to *Motorola* but seem to misread its reasoning.  *See* Dkt. No. 649-1 at 13-14.  In *Motorola*, the Seventh Circuit explicitly rejected a requirement that extraterritorial damages under the Defend Trade Secrets Act be directly caused by acts inside the United States.  108 F.4th at 486-88.

[18] The parties have not identified any relevant Ninth Circuit law on this issue.

the summary judgment stage.  Whether defendants misappropriated or infringed plaintiff's intellectual property at all remains in dispute, so the Court cannot determine whether any infringing domestic acts occurred.  Plaintiff's request for summary judgment on the issue of extraterritorial damages is DENIED.

### H.    Liability of ByteDance, Ltd. as a Holding Company

Defendants seek summary judgment relieving defendant ByteDance Ltd., a Cayman Islands-based holding company, of liability under either claim.  Dkt. No. 608 at 22-23, 25.  Plaintiff argues that ByteDance Ltd. is vicariously liable for infringing actions under both claims.  Dkt. No. 646-1 at 20-21, 24.  Defendants have the better argument.

"[V]icarious infringement's roots lie in the agency principles of *respondeat superior*." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007) (citation omitted).  "To state a claim for vicarious copyright infringement, a plaintiff must allege that the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity."  *Id.* (footnote and citation omitted).

The Court may limit its discussion to the first element.  Plaintiff alleges that the infringement occurred through the actions of Mr. Xie.  Mr. Xie worked for Meishe then later for ByteDance entities, Beijing ByteDance Network Technology Co., Ltd and Beijing Zitiao Network Technology Co., Ltd.  Dkt. Nos. 611-6, 611-7, Dkt. No. 614-19 ¶ 10.  The leader of Mr. Xie's work group was employed by defendant ByteDance, Inc.  Yang Dep. at 61-62, 213; Dkt. No. 614-19 ¶ 8.  These facts do not raise a genuine dispute as to whether defendant ByteDance, Ltd. has the "right and ability to supervise the infringing conduct" because they do not involve ByteDance, Ltd.  *See Perfect 10, Inc.*, 494 F.3d at 802.

Subject to exceptions, "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks and citation omitted).  Plaintiff only argues in a conclusory manner that ByteDance, Ltd. "developed and controls the accused software

and wholly owns, directs, and controls the other defendants." Dkt. No. 646-1 at 21. Plaintiff has not presented any facts to suggest that ByteDance, Ltd. exercises direct control over the activities of its many subsidiaries. Absent evidence that the Court should collapse corporate distinctions, "the demand to respect corporate formalities remains." *Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*, 145 S. Ct. 681, 687 (2025). Both of plaintiff's claims against ByteDance, Ltd. fail as a matter of law.[19]

The Court GRANTS defendants' motion to dismiss the remaining two claims against defendant ByteDance, Ltd.

## II.    Defendants' Request for Sanctions

Defendants have also filed a motion for terminating or alternatively evidentiary sanctions based on plaintiff's conduct during discovery in relation to three separate issues. Dkt. No. 592-1.

### A.    Legal Standard

District courts have inherent power to impose sanctions for "conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). "Dismissal is an available sanction when 'a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings' because 'courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.'" *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (quoting *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)).

Terminating sanctions should be imposed only in extreme circumstances, "where the violation is 'due to willfulness, bad faith, or fault of the party.'" *In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996) (quotation omitted). In deciding whether to impose terminating sanctions, courts consider the following factors: "(1) the public's interest in expeditious resolution of litigation;

---

[19] While the above analysis focuses on copyright infringement, plaintiff argues that the standard for vicarious liability is similar for misappropriation of trade secrets. Dkt. No. 646-1 at 24. Plaintiff's arguments thus fall together.

United States District Court
Northern District of California

(2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Leon*, 464 F.3d at 958 (quoting *Anheuser-Busch*, 69 F.3d at 348).  While the district court need not make explicit findings regarding each of the five factors, a finding of "willfulness, fault, or bad faith" is required for dismissal or default judgment to be proper. *See Leon*, 464 F.3d at 958.  "In deciding whether to impose case-dispositive sanctions, the most critical factor is not merely delay or docket management concerns, but truth." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007).  The Court has "broad fact-finding powers" with respect to sanctions, and its findings warrant "great deference." *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1366 (9th Cir. 1990).

### B.     Evidence of Oral Agreement

Defendants seek terminating sanctions based on plaintiff's late introduction of evidence of an oral agreement transferring intellectual property from XAT to Meishe after the close of fact discovery, via Judge Wang's report.  As discussed above, the Court finds some of Meishe's conduct in this regard to be questionable—in particular the attempt to substantively change or add new deposition testimony through errata.  However, the Court has concluded that Meishe owns the intellectual property in question based on evidence outside of the oral agreement.  The Court therefore finds no prejudice to defendants and denies their request for terminating or evidentiary sanctions on this point.

### C.     Evidence of Meishe Code's Evolution from Dunhuang Code

Defendants also seek terminating sanctions based on plaintiff's incorrect assertions to the Court and the Special Master that the source code at issue was independently developed.  Plaintiff made these statements in its complaints, at hearing, and in a sworn declaration from CTO Jian.  Dkt. No. 592-1 at 7-8.  Plaintiff's position on this question undisputedly changed at the end of discovery, when it admitted that its code had evolved from XAT's Dunhuang code.  Defendants then sought XAT's Dunhuang code and the Special Master ordered plaintiff to provide it.  Dkt. No. 564.  Plaintiff

33

United States District Court
Northern District of California

objected to the Special Master's order, arguing that it did not have a legal right to XAT's code, and the Court agreed.  *See* Dkt. No. 619.  However, plaintiff received from XAT "the Dunhuang source code version that existed just prior to the development of Meishe app v1.0 in 2014" and provided this code to defendants.  Dkt. No. 587-2.

The shifting statements from CTO Jian are of particular concern to the Court.  In December 2024, he submitted a declaration under penalty of perjury that "[t]he Meishe software is independently developed from the ground up and no Dunhuang source code has been incorporated into the Meishe software."  Dkt. No. 590-15.  But then at his deposition, he admitted that the Meishe code incorporated a small amount of Dunhuang code.  Jian Dep. at 96-97.  He explained the discrepancy by saying that the declaration was "truthful based on my understanding at the time" but that a later review of Dunhuang code showed some similarities between Dunhuang and Meishe code.  Dkt. No. 590-17.  CTO Jian helped write some Dunhuang code and agreed that he was a "primary developer" of the Meishe app code.  Jian Dep. at 91-92, 96.  The Court shares defendants' skepticism about the credibility of Mr. Jian's explanation for his changing answers.

Nonetheless, the Court does not believe that terminating sanctions are warranted for this conduct.  To be sure, defendants are correct to raise concerns about the truthfulness of Mr. Jian's testimony.  But the Court has concluded that Meishe owns the rights to any underlying Dunhuang code in the Meishe application, so defendants suffer no prejudice here.

The Court also will not grant defendants' requested evidentiary sanction—finding that all of the Meishe code was copied unlawfully from Dunhuang code.  *See* Dkt. No. 592-1 at 24.  Considering the evidence presented, the Court does not find such a sanction to be warranted.

### D.    Production of Object Code Comparison Document

Defendants' third basis for seeking sanctions is plaintiff's belated production of decompiled object code and a document from its pre-suit investigation that compared decompiled object code from one version of the TikTok and Meishe apps.  Defendants claim an earlier production of this document could have helped them mitigate damages from any future infringement, if necessary.  Plaintiff responds that it was initially not aware of decompiled object code files and that the

34

comparison document was attorney work product.

Plaintiff's explanation is not convincing, but defendants have not suffered substantial prejudice from the late disclosure. The document at issue is a comparison of decompiled object code, which is different from the original source code. *See Syntek*, 307 F.3d at 779 ("However, source code created by decompiling object code will not necessarily be identical to the source code that was compiled to create the object code."). As the Court has previously noted, earlier in the litigation defendants refused an opportunity to use software to compare the original source code at issue. *See* Dkt. No. 620 at 7-8.

The belated disclosure here does not merit terminating sanctions. Nor will the Court grant defendants' requested alternative sanction that "the Court deem admitted that Meishe's pre-suit comparison demonstrated no copyright infringement or trade secret misappropriation." Dkt. No. 592-1 at 25. Such a finding would not impact this case, as the comparison involved decompiled object and plaintiff's claims are based on subsequent comparisons of the actual source code. Should the case proceed to a stage where the mitigation of damages are at issue, defendants may raise this issue again to argue that it was prevented from promptly mitigating its unlawful activity, if any is found.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court grants summary judgment for plaintiff on the question of its ownership of the copyrights and trade secrets at issue. The Court holds that, as a matter of law, the publication of the software's object code constitutes publication of a copyrighted source code, but there is a disputed issue of material fact regarding where this publication first occurred for all versions except version 2.5.4, which is an unregistered United States work. The Court grants summary judgment in favor of defendants on the issue of defendant ByteDance, Ltd.'s non-liability. The Court denies the parties' requests for summary judgment in all other respects.

The Court likewise declines to issue judgment on questions of copyrightability, finding enough disputed facts for these issues to be presented to the jury.

United States District Court
Northern District of California

Finally, the Court denies defendants' request for sanctions.

**IT IS SO ORDERED**.

Dated: September 2, 2025

_____
SUSAN ILLSTON
United States District Judge